# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SIRI DIAZ, CAROLYN SIEGEL, TALIA BUMB, BLERTA VIKKI, DANIELLE OWIMRIN, on behalf of themselves and all others similarly situated,<br><br>                      Plaintiffs,<br><br>       -against-<br><br>SCORES HOLDING COMPANY, INC.; GO WEST ENTERTAINMENT, INC. a/k/a SCORES WEST SIDE; and SCORES ENTERTAINMENT, INC., a/k/a SCORES EAST SIDE.<br><br>                    Defendants. | No. 07-8718 (RMB)<br><br>**DECLARATION OF SUSAN LEVIN** |

      I, SUSAN LEVIN, declare, upon personal knowledge and under penalty of perjury, pursuant to 28 U.S.C. Section 1746, that the following is true and correct:

      1.     I worked at Scores' East Side location and, occasionally at its West Side location, from approximately November 2006 through approximately April 2007.

      2.     During my employment with Scores, I worked as a dancer.

      3.     Throughout my employment as a dancer for Scores, I was not paid any hourly or overtime wages. My compensation was entirely comprised of customer tips.

      4.     Scores required me to pay a "house fee" for every shift that I worked. The amount of this fee ranged from $40-$180. Scores required me to pay this fee to the manager or the "house mother" near the start of my shift. If I did not pay this fee to Scores, I would not be permitted to work.

      5.     Nobody at Scores ever informed me about a federal law regarding a tip credit at any time during my employment at Scores. Nobody at Scores ever told me that I

would be paid less than the minimum wage because I would receive tips. Nobody at Scores ever told me that my tips would be used as a credit against the minimum wage that Scores was required to pay me. When I started working at Scores and during the entire course of my employment, nobody ever gave me or showed me a copy of any laws, rules, or regulations regarding the tip credit and minimum wages. While working at Scores, I never saw any posters, signs, or notices regarding any law, rule, or regulation regarding the tip credit or an employer's deductions from wages and tips.

6.      Throughout my employment at Scores, I was not allowed to retain all of the tips that I received.

7.      Scores required me to give a portion of my tips to other employees, including the DJ, the "house mother," and the makeup artist. No one from Scores told me that I could choose to not pay these individuals some of my tips. Neither the DJ, the house mother, nor the makeup artist had customer service duties and none of them had any contact with customers while they were working.

8.      During my employment at Scores, I estimate that I received approximately 65% of my tips in Diamond Dollars. Diamond Dollars are imitation currency in denominations of $20.00 that customers can buy from Scores using their credit cards. Many customers used Diamond Dollars to tip workers, including other dancers and me.

9.      When workers, like other dancers and me, presented Scores with the Diamond Dollars we received as tips and asked Scores to exchange them for cash, Scores deducted and retained a portion of that our tips. Scores paid workers only 90 cents on the dollar – it took $2.00 for itself out of each $20 Diamond Dollar we earned.

2

10.    Scores made it difficult for me and other workers to exchange Diamond Dollars for cash. It only permitted us to cash-in our Diamond Dollars during designated times (usually 10:00 pm on Mondays), and only through designated personnel. When I tried to exchange my Diamond Dollars for cash at other times, Scores rebuffed me. At least one time, Scores refused to exchange my Diamond Dollars for cash at all, telling me that my Diamond Dollars had "expired."

11.    Scores' policies and practices with respect to Diamond Dollars apply to all workers who receive Diamond Dollars as tips, including all dancers, servers, cocktail servers, and bartenders.

12.    Scores enforced a strict uniform policy, requiring all dancers, including me, to wear either a long gown or short dress; a garter belt and stockings; a specific type of underwear; and high heeled shoes.

13.    Occasionally, Scores held theme nights and required dancers, including me, to wear uniforms consistent with the theme. For example, on school girl night, some employees wore plaid skirts and ties; on Superbowl Night football themed shirt, cheerleading skirts, or referee uniforms; on Lingerie Night lingerie; and on Valentine's Day red lingerie.

14.    Scores never reimbursed me (or any other worker, to my knowledge) for the cost of purchasing, laundering, or maintaining uniforms.

15.    Scores sold dresses that the dancers could use to fulfill the uniform requirement. The cost of these dresses ranged from $40 to $200, or more.

3

16.    Over the course of my employment with Scores, I purchased approximately 7 dresses 15 pairs of stockings, 7 garters from Scores to meet their uniform requirement.

17.    I estimate that I spent at least $750 to purchase clothing and accessories to satisfy the uniform requirement.

18.    Scores controlled many aspects of my employment and the employment of other dancers.

19.    For example, Scores told dancers, including and me, what to wear to work.

20.    Scores also dictated dancers' schedules, including mine. Scores scheduled dancers, including me, for certain shifts, and required us to obtain permission to work shifts other than our scheduled shifts. If I did not show up for my scheduled shift, I was subject to discipline, including termination.

21.    Scores had the power to terminate my employment at will. I had no contractual protection against termination at will. Scores terminated my employment in approximately April 2007.

22.    Scores unilaterally determined my method of compensation – they required me to work exclusively for tips.

23.    I performed all of my work for Scores as a dancer on Scores' premises.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Del Rio, Texas
       January 16, 2008

Susan Levin

4