# Exhibit J

10QSB/A 1 v076473_10qsba.htm

## U.S. SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

### FORM 10-QSB/A

(Mark One)

☒ QUARTERLY REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended: March 31, 2007

☐ TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE EXCHANGE ACT

For the transition period from _____ to _____

Commission file number 000-16665

Scores Holding Company Inc.
(Exact name of small business issuer as specified in its charter)

| Utah | 87-0426358 |
|------|------------|
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |

50 Main Street - White Plains, NY 10705
(Address of principal executive offices)

(914) 682-6859
(Issuer's telephone number)

(Former Name, Former Address and Former Fiscal Year,
if Changed Since Last Report)

Check whether the issuer (1) filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No☐

State the number of shares outstanding of each of the issuer's classes of common equity, as of the latest practical date: 165,186,124 as of May 7, 2007 Transitional Small Business Disclosure Format (check one). Yes ☐ No ☒

Scores Holding Company Inc.
March 31, 2007
Quarterly Report on Form 10-QSB/A

Table of Contents

| | Page |
|---|---|
| Special Note Regarding Forward Looking Statements | 2 |
| **PART I - FINANCIAL INFORMATION** | |
| Item 1. Financial Statements | 3 |
| Item 2. Management's Discussion and Analysis or Plan of Operation | 10 |
| Item 3. Controls and Procedures | 11 |
| **PART II - OTHER INFORMATION** | |
| Item 1. Legal Proceedings | 11 |
| Item 5. Other Information | 12 |
| Item 6. Exhibits | 12 |

1

SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

To the extent that the information presented in this Quarterly Report on Form 10-QSB/A for the quarter ended March 31, 2007 discusses financial projections, information or expectations about our products or markets, or otherwise makes statements about future events, such statements are forward-looking. We are making these forward-looking statements in reliance on the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Although we believe that the expectations reflected in these forward-looking statements are based on reasonable assumptions, there are a number of risks and uncertainties that could cause actual results to differ materially from such forward-looking statements. These risks and uncertainties are described, among other places in this Quarterly Report, in "Management's Discussion and Analysis or Plan of Operation".

In addition, we disclaim any obligations to update any forward-looking statements to reflect events or circumstances after the date of this Quarterly Report. When considering such forward-looking statements, you should keep in mind the risks referenced above and the other cautionary statements in this Quarterly Report.

2

PART I - FINANCIAL INFORMATION

ITEM 1.   FINANCIAL STATEMENTS

|  | Page |
|---|---|
| Consolidated Balance Sheets as of March 31, 2007 (Unaudited) and December 31, 2006 | 4 |
| Consolidated Statements of Operations for the three months ended March 31, 2007 and March 31, 2006 (Unaudited) | 5 |
| Consolidated Statements of Cash Flows for the three months ended March 31, 2007 and March 31, 2006 (Unaudited) | 6 |
| Notes to Consolidated Financial Statements (Unaudited) | 7 |

3

SCORES HOLDING COMPANY, INC. AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

|  | March 31, 2007 (Unaudited) | December 31, 2006 (Audited) |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash | $ 63,898 | $ 231,332 |
| Licensee receivable - including affiliates - net | 62,952 | 30,789 |
| Prepaid expenses | 35,463 | 68,790 |
| Inventory | 63,166 | 63,627 |
| Total Current Assets | 225,479 | 394,538 |
| INTANGIBLE ASSETS, NET | 265,740 | 280,670 |
| Security deposits | 7,000 | — |
|  | $ 498,219 | $ 675,208 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES:** | | |
| Accounts payable and accrued expenses | $ 39,922 | $ 111,260 |
| Related party payable | 15,232 | 9,600 |
| Notes payable - Current | 109,375 | 117,500 |
| Total Current Liabilities | 164,529 | 238,360 |
| Notes Payable - Long Term | — | 20,000 |
| COMMITMENTS & CONTINGENCIES | — | — |
| **STOCKHOLDERS' EQUITY** | | |
| Preferred stock, $.0001 par value, 10,000,000 shares authorized, -0- issued and outstanding | — | — |
| Common stock, $.001 par value; 500,000,000 shares authorized, 165,186,124 and 165,186,124 issued and outstanding, respectively | 165,186 | 165,186 |
| Additional paid-in capital | 5,998,117 | 5,998,117 |
| Accumulated deficit | (5,829,613) | (5,746,455) |
| Total stockholder's equity | 333,690 | 416,848 |
|  | $ 498,219 | $ 675,208 |

4

SCORES HOLDING COMPANY, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS

|  | Three months ended March 31, | |
|  | 2007 | 2006 |
|  | (Unaudited) | (Unaudited) |
| REVENUES |  |  |
| Royalty | $ 154,204 | $ 440,126 |
| Merchandise | 9,959 | 16,447 |
| Public relations | 3,000 | 3,000 |
| Total | 167,163 | 459,573 |
| COST OF MERCHANDISE SOLD | 8,192 | 13,158 |
| GROSS PROFIT | 158,971 | 446,415 |
| GENERAL AND ADMINISTRATIVE EXPENSES | 242,129 | 260,988 |
| NET INCOME (LOSS) FROM OPERATIONS | (83,158) | 185,427 |
| INTEREST INCOME | — | 27,304 |
| NET INCOME (LOSS) BEFORE INCOME TAXES | (83,158) | 212,731 |
| PROVISION FOR INCOME TAXES | — | — |
| NET INCOME (LOSS) | $ (83,158) | $ 212,731 |
| NET INCOME (LOSS) PER SHARE - Basic and Diluted | $ 0.00 | $ 0.00 |
| WEIGHTED AVERAGE OF COMMON SHARES OUTSTANDING - Basic and diluted | 165,186,124 | 85,462,370 |

5

SCORES HOLDING COMPANY, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Three months ended March 31, | |
| | 2007 | 2006 |
| | (Unaudited) | (Unaudited) |
|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| Net income (loss) | $ (83,158) | $ 212,731 |
| | | |
| Adjustments to reconcile net loss to net | | |
| cash provided by (used) in operating activities: | | |
| Depreciation & Amortization | 14,930 | 8,750 |
| Royalty receivable | (32,163) | (101,280) |
| Prepaid expenses | 33,327 | (3,336) |
| Inventory | 461 | (8,979) |
| Interest receivable | — | (27,585) |
| Security deposits | (7,000) | — |
| Accounts payable and accrued expenses | (71,338) | (80,969) |
| | | |
| NET CASH (USED IN) OPERATING ACTIVITIES | (144,941) | (668) |
| | | |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Cash collected on notes receivable | — | 23,200 |
| | | |
| NET CASH PROVIDED BY INVESTING ACTIVITIES | — | 23,200 |
| | | |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Related party payable | 5,632 | (500) |
| Repayment of notes payable | (28,125) | (28,965) |
| | | |
| NET CASH (USED IN) FINANCING ACTIVITIES | (22,493) | (29,465) |
| | | |
| NET (DECREASE) IN CASH | (167,434) | (6,933) |
| | | |
| CASH, beginning of the period | 231,332 | 31,185 |
| | | |
| CASH, end of the period | $ 63,898 | $ 24,252 |
| | | |
| Supplemental disclosures of cash flow information: | | |
| Cash paid during the year for interest | $ — | $ 280 |
| Cash paid during the year for income taxes | — | — |
| Non-cash financing activities: | | |
| Common stock issued in connection with debenture conversion | $ — | $ 12,850 |

6

Scores Holding Company Inc. and Subsidiaries

Notes To Consolidated Financial Statements
(Unaudited)

Note 1: Basis of Presentation

1. The accompanying unaudited consolidated financial statements of Scores Holding Company Inc., formerly Internet Advisory Corporation, (the "Company") have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-QSB and Regulation S-B. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements. In the opinion of management, all adjustments considered necessary for a fair presentation (consisting of normal recurring accruals) have been included. The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. Operating results expected for the three months ended March 31, 2007 are not necessarily indicative of the results that may be expected for the year ending December 31, 2007. For further information, refer to the financial statements and footnotes thereto included in the Company's Annual Report on Form 10-KSB for the year ended December 31, 2006.

Note 2: Summary of Significant Accounting Principles

Stock based compensation plans -

Effective January 1, 2006, the Company adopted SFAS 123(R), under SFAS 123(R), the Company is required to record compensation expense for all awards granted after the date of adoption and for the unvested protion of previously granted awards that remain outstanding at the date of adoption. Per the provision of SFAS 123(R), the Company has adopted the policy to recognize compensation expense on a straight-line attribution method.

SFAS 123(R) eliminates the alternative to use the intrinsic value methods of accounting that was provided in SFAS 123, which generally resulted in no compensation expense recorded in the financial statements related to the issuance of stock options. SFAS 123(R) requires that the cost resulting from all share-based payment transactions be recognized in the financial statements. SFAS 123(R) establishes fair value as the measurement objective in accounting for share-based payment transcactions with employees.

Fair Value of Financial Instruments

The carrying amounts reported on the balance sheets for cash, accounts payable, accrued expenses, licensee receivable and notes payable approximate fair value based on the short-term maturity of these instruments.

Concentration of Credit Risk

Currently, the Company earns royalties and merchandise revenues from gentleman's clubs which license the Company's intellectual property. There are seven such clubs currently operating, two in New York city, and one in each of Baltimore, Chicago, Las Vegas, New Orleans and Lake Geneva, Wisconsin which operates seasonally.  A club in New Orleans, Lousiana commenced operations on April 27, 2007. The two New York city clubs ("Scores East" and "Scores West") are under common control as the Company. Another club under common control with the Company was located in North Miami, Florida and declared bankruptcy on December 11, 2006.

For the three months ended March 31, 2007, royalties earned from unrelated clubs amounted to $154,204 of which $62,952 was due and outstanding as of March 31, 2007. Royalties earned during the three months ended March 31, 2007 from Scores East were $109,394, and $103,541 from Scores West. At March 31, 2007, Score East owed us $1,230,263 in unpaid royalties and Scores West owed $293,552. Scores West also borrowed $1,636,264 from the company, issuing a 7% promissory note which is in default. At March 31, 2007, $1,867,310 (including $355,189 of accrued interest) remained due under the loan.

During the current period 2007, the Company, for reporting purposes did not report revenues from affiliates due to provisions made on these royalties in the prior year 2006; however, for book purposes, the Company continues to record royalties from affiliates and reasonably estimate the outcomes of collectiblity.

Any future cash received from these affiliates will result in a reversal of bad debt expense in the period collected. Also, unless financial stability and collection of these receivables can be reasonably assured and by management, the Company intends to suspend, for book purposes, all future recognition of royalties and interest income due by these affiliates.

7

As discussed in Item 6 Management Discussion and Analysis,a reserve for the entire $1,540,870 and $1,867,310 was provided for based on both the unstable financial conditions, bankruptcy, and government matters mentioned in Item 3 Legal Proceedings for both Scores East and Scores West. In addition, any future cash received from these affiliates will result to a reversal of bad debt expense in the period collected. Also, unless financial stability and collection of these receivables can be reasonably assured and by management, the Company intends to suspend, for book purposes, all future recognition of royalties and interest income due by these affiliates.

Note 3: Equity Transactions

None.

Note 4: New Accounting Pronouncements

FASB 155 - Accounting for Certain Hybrid Financial Instruments

In February 2006, the FASB issued FASB Statement No. 155, which is an amendment of FASB Statements No. 133 and 140. This Statement; (a) permits fair value re-measurement for any hybrid financial instrument that contains an embedded derivative that otherwise would require bifurcation, (b) clarifies which interest-only strip and principal-only strip are not subject to the requirements of Statement 133, (c) establishes a requirement to evaluate interests in securitized financial assets to identify interests that are freestanding derivatives or that are hybrid financial instruments that contain an embedded derivative requiring bifurcation, (d) clarifies that concentrations of credit risk in the form of subordination are not embedded derivatives, and (e) amends Statement 140 to eliminate the prohibition on a qualifying special-purpose entity from holding a derivative financial instrument that pertains to a beneficial interest other than another derivative financial instrument. This Statement is effective for financial statements for fiscal years beginning after September 15, 2006. Earlier adoption of this Statement is permitted as of the beginning of an entity's fiscal year, provided the entity has not yet issued any financial statements for that fiscal year. Management believes this Statement will have no impact on the financial statements of the Company once adopted.

FASB 156 - Accounting for Servicing of Financial Assets

In March 2006, the FASB issued FASB Statement No. 156, which amends FASB Statement No. 140. This Statement establishes, among other things, the accounting for all separately recognized servicing assets and servicing liabilities. This Statement amends Statement 140 to require that all separately recognized servicing assets and servicing liabilities be initially measured at fair value, if practicable. This Statement permits, but does not require, the subsequent measurement of separately recognized servicing assets and servicing liabilities at fair value. An entity that uses derivative instruments to mitigate the risks inherent in servicing assets and servicing liabilities is required to account for those derivative instruments at fair value. Under this Statement, an entity can elect subsequent fair value measurement to account for its separately recognized servicing assets and servicing liabilities. By electing that option, an entity may simplify its accounting because this Statement permits income statement recognition of the potential offsetting changes in fair value of those servicing assets and servicing liabilities and derivative instruments in the same accounting period. This Statement is effective for financial statements for fiscal years beginning after September 15, 2006. Earlier adoption of this Statement is permitted as of the beginning of an entity's fiscal year, provided the entity has not yet issued any financial statements for that fiscal year. Management believes this Statement will have no impact on the financial statements of the Company once adopted.

In July 2006, the FASB issued Interpretation No. 48, "Accounting for Uncertainty in Income Taxes—an Interpretation of FASB Statement No. 109" ("FIN 48"). FIN 48 contains a two step approach to recognizing and measuring uncertain tax positions accounted for in accordance with SFAS No. 109. The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates it is more likely than not that the position will be sustained on audit, including resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount which is more than 50% likely of being realized upon ultimate settlement. This provision is effective for fiscal

years beginning after December 15, 2006, which will be our fiscal year 2007. We are evaluating the impact, if any, the adoption of this statement will have on our results of operations, financial position or cash flows. Given our substantial loss carry-forward, we do not, in the near term, expect to have any impact of our tax position with the adoption of FIN 48.

In September 2006, the FASB issued SFAS No. 157 "Fair Value Measurements." SFAS No. 157 defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles, and expands disclosures about fair value measurements. SFAS No. 157 does not require any new fair value measurements, rather it applies under existing accounting pronouncements that require or permit fair value measurements. SFAS No. 157 is effective for fiscal years beginning after November 15, 2007, which will be our fiscal year 2008. We are currently evaluating the impact of SFAS No. 157 on our financial statements.

In February 2007, the FASB issued FAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities" (SFAS 159), including an amendment to FASB No. 115. FAS 159 gives entities the irrevocable option to measure eligible financial assets, financial liabilities and firm commitments at fair value, on an instrument-by-instrument basis, that are otherwise not permitted to be accounted for at fair value under other accounting standards. The election, called the fair value option, will enable entities to achieve an offset accounting effect for changes in fair value of certain related assets and liabilities without having to apply complex hedge accounting provisions. SFAS 159 is effective as of the beginning of a company's first fiscal year that begins after November 15, 2007. We are currently evaluating the impact of SFAS 159 on our consolidated financial statements.

8

In September 2006, the Securities and Exchange Commission ("SEC") issued Staff Accounting Bulletin No. 108 (SAB 108) "Considering the Effects of Prior Year Misstatements in Current Year Financial Statements." SAB 108 provides guidance on quantifying financial statement misstatements, including the effects of prior year errors on current year financial statements. SAB 108 is effective for fiscal years beginning after November 15, 2006, which will be our fiscal year 2007.

Note 5 - Related party Receivable

The notes receivable amount current and long term portion, including accrued interest amounts to $1,867,310. Such amount relates to a secured receivable from Scores West which is partially owned and operated by a former President and Chief Executive Officer. Payments in the amount of $20,000 have been made on this outstanding balance through March 31, 2007; this amount was reserved against bad debt expense during the quarter ended March 31, 2007.

The Company received no payments for royalties from Scores West during the 2007 period (See Item 2 Management Discussion (Bad debt expense).

Included in the royalty receivable is $1,230,263 due from Scores East, which is partially owned and operated by a former President and Chief Executive Officer of the Company. Such receivables from Scores West and Scores East have been fully reserved. Any future cash received from these affiliates will result to a reversal of bad debt in the period collected. Also, unless financial stability and collection of these receivables can be reasonably assured by management, the Company intends to suspend, for book purposes, all future recognition of royalties and interest income due by these affiliates.

Note 6 - Sub-licensees

On April 27, 2007, Scores New Orleans "D/B/A Silver Bourbon, Inc." commenced its operations pursuant to an agreement made with Entertainment Management Services, Inc. on April 2, 2007. There were no royalties due during the quarter ended March 31, 2007.

Note 7 - Commitments and Contingencies

As a result of the settlement agreement entered into in September 2006 between the Company and affiliated parties and Scores Entertainment Inc. ("SEI") and Irving Bilzinsky ("Bilzinsky") the Company is obligated to pay Bilzinsky, as sole shareholder of SEI, $175,000 in 18 monthly installments, which commenced on September 24, 2006, of $9,375 for each of the first 8 months and $10,000 for each of the remaining 10 months.

The Company leases offices in White Plains, New York, and New York, New York pursuant to a one year lease agreement with HQ Global Services, Inc. The lease is for approximately 500 square feet of office space at $4,500 per month. The Company has an option to renew the lease which has an escalation clause of three percent(3)% of the base rent on an annual basis.

9

ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATION

We recognize revenues as they are earned, not necessarily as they are collected. Direct costs such as hosting expense, design cost, server expense and Diamond Dollar expense are classified as cost of goods sold. General and administrative expenses include accounting, advertising, contract labor, bank charges, depreciation, entertainment, equipment rental, insurance, legal, supplies, payroll taxes, postage, professional fees, rent, telephone and travel.

For the year ended March 31, 2007 (the "2007 period") compared to the year ended March 31, 2006 (the "2006 period").

REVENUES:

Revenues decreased to $167,163 for the 2007 period from $459,573 for the 2006 period. Royalties received from unaffiliated clubs was significantly reduced after February 2007 when Richard Goldring, our former President and Chief Executive Officer resigned. His failure to be an officer or director of ours triggered a provision of the Amended and Restated Master License Agreement that we have with Entertainment Management Services, Inc. whereby we now receive 50% of the royalties that we earned when Goldring was an officer or director. See Item 5. Other Information. During the 2007 period, the Company recorded no royalty revenue from affiliates (see - Bad Debt Expense below). The club in New Orleans commenced operations on April 27, 2007. We anticipate that operations in Los Angeles will commence by third quarter 2007. Royalties for our Chicago, Las Vegas and Baltimore clubs accounted for 18, 62 and 15 percent of total revenues, respectively, for the 2007 period.

In January 2007, our website offering, Scoreslive.com debuted. Still a pilot program, without any promotional efforts, the site is generating 30,000 page views per week and over $5,000 in monthly gross revenues. We expect our partner to begin promotional campaigns shortly, which we believe will double the number of page views and revenue. Through 2007 we intend to launch several additional internet modules which collaboratively will make up our adult web community. Modules will include online merchandise ecommerce platform and poker gaming platforms. We believe that out internet initiatives will generate minimal gross revenues through 2007 as we are and will continue to be in development mode through 2007.

BAD DEBT EXPENSE:

During the fourth quarter 2006, the Company made provisions for bad debts in the amount of $3,391,126 related activities at our affiliated nightclubs. Both companies have informed us that their ability to make payments on the amounts owed is impaired due to increased legal costs incurred during investigations together with revenue shortfalls. Based on this information, the Company concluded that future collections of royalties amounting to $293,552 owed by Scores West and its ability to make payments under a certain promissory note amounting to $1,867,310 would be impaired. The Company also concluded that future collections of royalties amounting to $1,230,263 owed by Scores East would be impaired.

OPERATING EXPENSES:

Operating expenses decreased 7 percent during the 2007 period to $242,129 from $260,988 during the 2006 period. This decrease was primarily due to payroll, rents and other expenses related to changes with executive management. During 2007, we continue to increased marketing and promotional efforts related to public relations and business development to capture new business targeted at the media, telecom, grooming and internet interactive sectors/markets.

INTEREST INCOME (EXPENSE) - NET:

Interest income is presented net of interest expense. Interest income is actual cash collected offset by interest expense actually paid. Net interest income was $0 for the 2007 period and $27,304 for the 2006 period.

Interest expense is due primarily from the issuance of long-term debentures and notes payable. Interest expense decreased to $0 for the 2007 period from $281 for the 2006 period. This decrease was due primarily to a payout of our outstanding debentures in the 2006 period which resulted into a $25,000 prepayment premium penalty. Retiring these debentures ceased the issuance of any shares to significant stockholders of the Company and were dilutive to other stockholders.

PROVISION FOR INCOME TAXES:

A provision for state income taxes related primarily to average assets and capital were impacted by net operating losses carryforwards from the 2006 period.

NET INCOME (LOSS) per share:

Net (loss) was $(83,158) or $0.00 per share for the 2007 period versus a net income of $212,731 or $0.00 per share for the 2006 period. In addition, revenue earned during the 2007 period was reduced by 50% due to newly effective provisions in our Amended and Restated Master License Agreement. See Item 5. Other Information. Costs related to payroll and rents were reduced due to changes in management. Net income per share data for both the 2007 and 2006 period is based on net income available to common shareholders divided by the weighted average of the common shares.

10

LIQUIDITY AND CAPITAL RESOURCES

On February 28, 2007, our then President, Chief Executive Officer and Director, Richard Goldring resigned from each of those positions, and terminated his employment with us under an employment agreement, dated April 16, 2003. The terms of such agreement provided that if Mr. Goldring terminated his employment without cause, which he did, we would become obligated to pay him $1 million. We had $231,332 in cash available at December 31, 2006. Given our lack of available cash to make such payment, we are currently negotiating with Mr. Goldring regarding its terms.

We have incurred losses since the inception of our business. Since our inception, we have been dependent on acquisitions and funding from private lenders and investors to conduct operations. As of March 31, 2007 we had an accumulated deficit of $(5,829,613). As of March 31, 2007, we had total current assets of $225,479 and total current liabilities of $164,529 or working capital of $60,950. At December 31, 2006, we had total current assets of $394,538 and total current liabilities of $238,360 or working capital of $156,178.

We will continue to evaluate possible acquisitions of or investments in businesses, products and technologies that are complimentary to ours. These may require the use of cash, which would require us to seek financing. We may sell equity or debt securities or seek credit facilities to fund acquisition-related or other business costs. Sales of equity or convertible debt securities would result in additional dilution to our stockholders. We may also need to raise additional funds in order to support more rapid expansion, develop new or enhanced services or products, respond to competitive pressures, or take advantage of unanticipated opportunities. Our future liquidity and capital requirements will depend upon numerous factors, including the success of our adult entertainment licensing business.

ITEM 3. CONTROLS AND PROCEDURES

Our principal executive officer and principal financial officer evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based on this evaluation, our principal executive officer and principal financial officer have concluded that the our controls and procedures are effective in providing reasonable assurance that the information required to be disclosed in this report has been recorded,processed, summarized and reported as of the end of the period covered by this report.

During the period covered by this report, there have not been any significant changes in our internal controls or, to our knowledge, in other factors that could significantly affect our internal

PART II - OTHER INFORMATION

ITEM 1. LEGAL PROCEEDINGS

In January 2007, the City of New York sought to close Scores West claiming that it presented a public nuisance. The City alleges that this nightclub is used for purposes of prostitution; however, no action has been sought against us.

In February 2007, the New York State Liquor Authority began a review of the license held by Scores West. If adverse action is taken, the license applicable to Scores East may be examined due to the clubs' common ownership.

On March 30, 2007, we, along with several of our affiliates, were named in a suit in connection with an alleged assault by an employee of an affiliate and one of our stockholders and former directors.

On December 11, 2006, our affiliated club in North Miami, Florida, SMG Entertainment, Inc. ("SMG"), filed for bankruptcy with the United States Bankruptcy Court for the Southern District of New York. In connection therewith, it terminated its

license agreement with EMS whereby it was authorized to use our intellectual property. At the time of its filing, SMG owed us $16,611 for unpaid merchandise.

11

On March 31, 2006, Richard K. Goldring, our former president, chief executive officer and current principal shareholder pled guilty to one count of offering a False Instrument for Filing in the First Degree pursuant to a plea agreement with the District Attorney of the County of New York (the "District Attorney"). In the event that within one year of the date of the entry of the guilty plea, Mr. Goldring resigns from all "control management positions" that he holds in publicly traded companies, including ours, and divests himself of all "control ownership positions" in publicly traded companies, including ours, and satisfies certain other conditions, the District Attorney will recommend a sentence of probation. In this context, a "control management position" is a role, official or unofficial, by which he substantially directs the decisions of a company, and a "control ownership position" is a position in which he controls, directly or indirectly more than 9% of the voting stock or other securities of a company, or stock or securities that have the capability of being converted into voting stock or other securities of a company. The plea agreement resolves the District Attorney's investigation against Mr. Goldring and us. No charges were brought against us.

In April, 2007, the District Attorney extended the deadline for Mr. Goldring to divest himself of a control ownership position until June 2007.

In June 2005, we, together with several of our affiliates, commenced litigation regarding title to certain of our intellectual property. In February 2006, counterclaims were asserted and other persons brought third party complaints. In September 2006, we and our affiliates reached a settlement resolving all claims against us for a payment of $175,000 made in monthly installments. In return, the other parties in the litigation disclaimed any right to our intellectual property.

There are no other material legal proceedings pending to which we or any of our property is subject, nor to our knowledge are any such proceedings threatened.

ITEM 5. OTHER INFORMATION

On November 13, 2006, the Company and Entertainment Management Services, Inc. ("EMS") amended and restated the Master License Agreement of March 2003 (the "Amended Master License Agreement"). Under the Amended Master License Agreement, we granted EMS, which is 50% owned by Richard Goldring, our former chief executive officer and director, an exclusive, worldwide license to use and grant sublicenses to use our "Scores" trademark. EMS has entered into sublicense agreements with eight cabaret clubs. seven of which are currently operating under the "Scores" trademark.

Two of the seven, Score East and Scores West in New York, New York, are under common control with us. According to the Master License Agreement, the Company is entitled to receive 100% of the royalties that EMS receives from these affiliated clubs (see Item 2. Management's Discussion and Analysis—Bad Debt Expense). According to the Master License Agreement, we are entitled to 100% of the royalties from unaffiliated clubs so long as a director, officer, or stockholder of EMS is also a director or officer of ours. In February 2007, Richard Goldring, our former chief executive officer and director resigned both positions with us. Thereafter, we are entitled to receive 50% of the royalties actually paid to EMS from the five clubs that are not under common control with us.

ITEM 6. EXHIBITS

| | |
|---|---|
| 10.1 | Employment Agreement, dated March 1, 2007, with Alex Amoriello (1) |
| 10.2 | Lease, dated March 6, 2007, between the Registrant and HQ Global Work Places (2) |
| 10.3 | Sublicense Agreement, dated April 2, 2007, between Entertainment Management Services, Inc. and Silver Bourbon, Inc.(2) |
| 10.4 | Amendment to Employment Agreement, dated May 7, 2007, between the Registrant and Alex Amoriello(3) |
| 31.1 | Rule 13(a)-14(a)/15(d)-14(a) Certification of Principal Executive Officer |
| 31.2 | Rule 13(a)-14(a)/15(d)-14(a) Certification of Principal Financial Officer(4) |
| 32.1 | Section 1350 Certification of Chief Executive Officer |
| 32.2 | Section 1350 Certification of Chief Financial Officer(5) |

(1)  Incorporated by reference to the Registrant's Report on Form 8-K filed on March 8, 2007.
(2)  Incorporated by reference to the Ragistrant's Form 10-K, filed May 17, 2007.
(3)  Incorporated by reference to the Ragistrant's Form 10-K, filed May 17, 2007.
(4)  Incorporated by reference to Exhibit 31.1.
(5)  Incorporated by reference to Exhibit 32.1

12

## SIGNATURES

In accordance with the requirements of the Exchange Act, the registrant caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

Scores Holding Company Inc.

Dated: May 22, 2007

By: /s/ Curtis R. Smith

Curtis R. Smith
Acting Chief Executive Officer

13

10QSB 1 v093976_10qsb.htm

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# FORM 10-QSB

(Mark One)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended September 30, 2007

Or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number 000-16665

## Scores Holding Company, Inc.

(Exact name of small business issuer as specified in its charter)

| **Utah** | **87-0426358** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |

533-535 West 27th Street, New York, NY 10001

(Address of principal executive offices)

(212) 868-4900

(Registrant's telephone number, including area code)

50 Main Street, Suite 1000, White Plains, NY 10606

(Former address if changed since last report)

Check whether the issuer (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐No

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2). ☐Yes ☒No

As of November 8, 2007 there were 165,186,124 shares of the issuer's common stock, par value $0.001, issued and outstanding.

Transitional Small Business Disclosure Format (check one): ☐ Yes ☒No

**SCORES HOLDING COMPANY, INC.**
**SEPTEMBER 30, 2007 QUARTERLY REPORT ON FORM 10-QSB**
**TABLE OF CONTENTS**

|  |  | PAGE |
|---|---|---|
|  | Special Note Regarding Forward Looking Information | 3 |
|  | PART I - FINANCIAL INFORMATION | |
| Item 1. | Financial Statements | 4 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 12 |
| Item 3. | Controls and Procedures | 14 |
|  | PART II - OTHER INFORMATION | |
| Item 1. | Legal Proceedings | 15 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 15 |
| Item 5. | Other Information | 16 |
| Item 6. | Exhibits | 16 |

2

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

Except for historical information, this report contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Such forward-looking statements involve risks and uncertainties, including, among other things, statements regarding our business strategy, future revenues and anticipated costs and expenses. Such forward-looking statements include, among others, those statements including the words "expects," "anticipates," "intends," "believes" and similar language. Our actual results may differ significantly from those projected in the forward-looking statements. Factors that might cause or contribute to such differences include, but are not limited to, those discussed in "Management's Discussion and Analysis". You should carefully review the risks described in the documents we file from time to time with the Securities and Exchange Commission. You are cautioned not to place undue reliance on the forward-looking statements, which speak only as of the date of this report. We undertake no obligation to publicly release any revisions to the forward-looking statements or reflect events or circumstances after the date of this document.

3

**PART 1 - FINANCIAL INFORMATION**

**ITEM 1. FINANCIAL STATEMENTS**

|  | PAGE |
|---|---|
| Consolidated Balance Sheets as of September 30, 2007 (Unaudited) and December 31, 2006 | 5 |
| Consolidated Statements of Operations for the three and nine months Ended September 30, 2007 and 2006 (Unaudited) | 6 |
| Consolidated Statements of Cash Flows for the nine months ended September 30, 2007 and 2006 (Unaudited) | 7 |
| Notes to Consolidated Financial Statements (Unaudited) | 8 |

4

SCORES HOLDING COMPANY, INC. AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

| | September 30, 2007 (Unaudited) | | December 31, 2006 (Audited) | |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **CURRENT ASSETS:** | | | | |
| Cash | $ | 173 | $ | 231,332 |
| Licensee receivable - including affiliates - net | | 24,125 | | 30,789 |
| Prepaid expenses and other | | 941 | | 68,790 |
| Inventory | | 63,166 | | 63,627 |
| Total current Assets | | 88,405 | | 394,538 |
| Intangible assets, net | | 235,880 | | 280,670 |
| | $ | 324,285 | $ | 675,208 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| **CURRENT LIABILITIES:** | | | | |
| Accounts payable and accrued expenses | $ | 90,709 | $ | 111,260 |
| Related party payable | | 15,800 | | 9,600 |
| Due to Related party | | 20,646 | | -- |
| Notes payable - Current | | 60,625 | | 117,500 |
| Total Current Liabilities | | 187,780 | | 238,360 |
| **COMMITMENTS & CONTINGENCIES** | | | | |
| Notes payable - Long Term | | -- | | 20,000 |
| **STOCKHOLDERS' EQUITY** | | | | |
| Preferred stock, $.0001 par value, 10,000,000 shares authorized, -0- issued and outstanding | | -- | | -- |
| Common stock, $.001 par value; 500,000,000 shares authorized, 165,186,124 and 165,186,124 issued and outstanding, respectively | | 165,186 | | 165,186 |
| Additional paid-in capital | | 5,998,117 | | 5,998,117 |
| Accumulated deficit | | (6,026,798) | | (5,746,455) |
| Total stockholder's equity | | 136,505 | | 416,848 |
| | $ | 324,285 | $ | 675,208 |

See notes to financial statements

5

SCORES HOLDING COMPANY, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS

| | Nine months ended September 30, | | Three months ended September 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | (Unaudited) | (Unaudited) | (Unaudited) | (Unaudited) |
| REVENUES | | | | |
| Royalty | $ 347,914 | $ 1,375,233 | $ 92,791 | $ 470,151 |
| Merchandise | 13,331 | 83,520 | 806 | 36,225 |
| Public relations | 8,000 | 9,000 | 2,000 | 3,000 |
| Total | 369,245 | 1,467,753 | 95,597 | 509,376 |
| COST OF MERCHANDISE SOLD | 11,223 | 66,816 | 1,383 | 28,980 |
| GROSS PROFIT | 358,022 | 1,400,937 | 94,214 | 480,396 |
| GENERAL AND ADMINISTRATIVE EXPENSES | 638,366 | 792,112 | 158,130 | 337,466 |
| NET INCOME (LOSS) FROM OPERATIONS | (280,344) | 608,825 | (63,916) | 142,930 |
| INTEREST INCOME | -- | 82,474 | -- | 27,585 |
| NET INCOME (LOSS) BEFORE INCOME TAXES | (280,344) | 691,299 | (63,916) | 170,515 |
| PROVISION FOR INCOME TAXES | -- | 6,000 | -- | -- |
| NET INCOME (LOSS) | $ (280,344) | $ 685,299 | $ (63,916) | $ 170,515 |
| NET INCOME (LOSS) PER SHARE - | | | | |
| Basic and Diluted | $ (0.00) | $ 0.01 | $ (0.00) | $ 0.00 |
| WEIGHTED AVERAGE OF COMMON SHARES OUTSTANDING - Basic and diluted | 165,186,124 | 121,479,911 | 165,186,124 | 144,085,126 |

See notes to financial statements

6

SCORES HOLDING COMPANY, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Nine months ended September 30, | |
| --- | --- | --- |
| | 2007 | 2006 |
| | (Unaudited) | (Unaudited) |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| Net income (loss) | $ (280,344) | 685,299 |
| Adjustments to reconcile net loss to net cash provided by (used) in operating activities: | | |
| Depreciation & Amortization | 44,790 | 26,250 |
| Common stock issued for services | -- | 111,548 |
| Royalty receivable | 6,664 | (371,776) |
| Prepaid expenses | 67,849 | (83,736) |
| Due to related party | 20,646 | -- |
| Inventory | 461 | (23,923) |
| Interest receivable | -- | (29,253) |
| Accounts payable and accrued expenses | (20,551) | (298,198) |
| NET CASH PROVIDED BY (USED IN) OPERATING ACTIVITIES | (160,484) | 16,211 |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Purchase of trademark | -- | (175,000) |
| Cash collected on notes receivable | -- | 81,200 |
| NET CASH PROVIDED BY INVESTING ACTIVITIES | -- | 93,800 |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Related party payable | 6,200 | 158,600 |
| Note for purchase of trademark | -- | 165,625 |
| Repayment of note payable Trademark | (76,875) | -- |
| Repayment of debenture | -- | (66,000) |
| Repayment of notes payable | -- | (28,965) |
| NET CASH PROVIDED BY (USED IN) FINANCING ACTIVITIES | (70,675) | 229,260 |
| NET INCREASE (DECREASE) IN CASH | (231,159) | 151,671 |
| CASH, beginning of the period | 231,332 | 31,185 |
| CASH, end of the period | $ 173 | $ 182,856 |

Supplemental disclosures of cash flow information:

| | | | | |
|---|---|---|---|---|
| Cash paid during the year for interest | $ | -- | $ | 281 |
| Cash paid during the year for taxes | | -- | | 6,000 |
| Non cash financing activities: | | | | |
| Common stock issued for services | $ | -- | $ | 111,548 |
| Common stock issued in connection with debenture conversion | | -- | | 123,300 |

See notes to financial statements

7

Scores Holding Company Inc. and Subsidiaries

Notes To Consolidated Financial Statements
(Unaudited)

Note 1: Basis of Presentation

1. The accompanying unaudited consolidated financial statements of Scores Holding Company Inc., formerly Internet Advisory Corporation and (the Company") have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-QSB and Regulation S-B. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements. In the opinion of management, all adjustments considered necessary for a fair presentation (consisting of normal recurring accruals) have been included. The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. Operating results expected for the nine months ended September 30, 2007 are not necessarily indicative of the results that may be expected for the year ending December 31, 2007. For further information, refer to the financial statements and footnotes thereto included in the Company's Annual Report on Form 10-KSB for the year ended December 31, 2006.

Note 2: Summary of Significant Accounting Principles

8

Fair Value of Financial Instruments

The carrying amounts reported on the balance sheets for cash, accounts payable, accrued expenses, licensee receivable and notes payable approximate fair value based on the short-term maturity of these instruments

Inventory

Inventory consists primarily of finished goods and is valued at the lower of cost or market on a first-in first-out "FIFO" basis. In performing our cost valuation, we consider the condition and salability of our inventory and may adjust the valuation due to anticipated changes that may materially affect its basis.

Concentration of Credit Risk

During the third quarter 2007, the Company earned royalties and merchandise revenues from sub-licensees of which, five (Chicago, Las Vegas, Baltimore, AYA and New Orleans) are unrelated to former management of the Company. For the nine months ended September 30, 2007, royalties earned from these unrelated licensees amounted to $94,791 of which $24,125 is due and outstanding as of September 30, 2007.

Forgone royalties earned during the nine months ended September 30, 2007 from Scores East were $289,394, and $283,541 from Scores West. At December 31, 2006, Scores East owed us $1,230,263 in unpaid royalties and Scores West owed $293,552. Scores West also borrowed $1,636,264 from the company, issuing a 7% promissory note which is in default. At September 30, 2007, $1,867,310 (including $355,189 of accrued interest) remained due under the loan.

As discussed in Item 2 Management Discussion and Analysis, a reserve for the entire $1,524,602 and $1,867,310 was provided for due to both the unstable financial conditions, bankruptcy, and government nuisance matters mentioned in Item 3 Legal Proceedings for both Scores East and Scores West. In addition, any future cash received from these affiliates will result to a reversal of bad debt expense in the period collected. Also, unless financial stability and collection of these receivables can be reasonably assured by management, the Company intends to suspend, for book purposes, all future recognition of royalties and interest income due by these affiliates. The Company has also made plans to examine the books and records of these affiliates.

During the current period 2007, the Company, for reporting purposes did not report revenues from affiliates due to provisions made on these royalties in the prior year 2006.

9

Any future cash received from these affiliates will result in a reversal of bad debt expense in the period collected. Also, unless financial stability and collection of these receivables can be reasonably assured by management, the Company will continue to suspend, for book purposes, all future recognition of royalties and interest income due by these affiliates. The Company has also made plans to examine the books and records of these affiliates.

Note 4: New Accounting Pronouncements

In February 2007, the FASB issued FAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities" (SFAS 159), including an amendment to FASB No. 115. FAS 159 gives entities the irrevocable option to measure eligible financial assets, financial liabilities and firm commitments at fair value, on an instrument-by-instrument basis, that are otherwise not permitted to be accounted for at fair value under other accounting standards. The election, called the fair value option, will enable entities to achieve an offset accounting effect for changes in fair value of certain related assets and liabilities without having to apply complex hedge accounting provisions. SFAS 159 is effective as of the beginning of a company's first fiscal year that begins after November 15, 2007. We are currently evaluating the impact of SFAS 159 on our consolidated financial statements.

Note 5 - Related party Receivable

The current and long term portions of notes receivable including accrued interest amounts to $1,867,310. Such amount relates to a secured receivable from Scores West which is partially owned and operated by a former President and Chief Executive Officer. During the 2007 period, no payments have been made on this outstanding balance through September 30, 2007.

The Company received $35,819 in payments for royalties from Scores West and no payments from Scores East during the 2007 period (See Item 2 Management Discussion (Bad Debt Expense).

Included in royalty receivable are $1,230,263 and $293,552 due from Scores East and West, which both are partially owned and operated by a former President and Chief Executive Officer of the Company. Such receivables from Scores West and Scores East have been fully reserved. Any future cash received from these affiliates will result to a reversal of bad debt in the period collected. Also, unless financial stability and collection of these receivables can be reasonably assured by management, the Company will continue to suspend, for book purposes, all future recognition of royalties and interest income due by these affiliates. The Company has also made plans to examine the books and records of these affiliates.

Note 6 - Sub-licensees

On April 30, 2007, Scores New Orleans "D/B/A Silver Bourbon, Inc." commenced its operations pursuant to an agreement made with Entertainment Management Services, Inc. on April 2, 2007. No royalties were due during as of September 30, 2007.

10

Note 7 - Commitments and Contingencies

As a result of the settlement agreement entered into in September 2006 between the Company and affiliated parties and Scores Entertainment Inc. ("SEI") and Irving Bilzinsky ("Bilzinsky") the Company is obligated to pay Bilzinsky, as sole shareholder of SEI, $175,000 in 18 monthly installments, which commenced on September 24, 2006, of $9,375 for each of the first 8 months and $10,000 for each of the remaining 10 months. This amount is included in notes payable.

During the year the Company entered into a one year lease agreement with D. Ciarello to occupy office space in Ft. Lauderdale, FL. The lease approximates to 700 square feet of office space at $1,000 per month. The Company has an option to renew the lease within 60 days of the June 15, 2008 expiration date.

On October 9, 2007, former Go West bartender Siri Diaz filed a purported class action and collective action on behalf of all tipped employees against the Company and other defendants alleging violations of federal and state wage/hour laws (**Siri Diaz et al. v. Scores Holding Company, Inc.; Go West Entertainment, Inc. a/k/a Scores West Side; and Scores Entertainment, Inc., a/k/a Scores East Side**, Case No. 07 Civ. 8718 (Southern District of New York, Judge Richard M. Berman)). On November 6, 2007, plaintiffs served an amended purported class action and collective action complaint, naming dancers and servers as additional plaintiffs and alleging the same violations of federal and state wage/hour laws. The Company's response to the amended complaint is due December 21, 2007. The amended complaint alleges that the Company and the other defendants are "an integrated enterprise" and that the Company and the other defendants jointly employ the plaintiffs, subjecting all of the defendants to liability for the alleged wage/hour violations. The Company disputes that it is an employer of the plaintiffs and intends to vigorously contest the claimed liability as well as the violations alleged.

On March 30, 2007, the Company, along with several of its affiliates, were named in a suit in connection with alleged assault by an employee of an affiliate and one of the Company's stockholders and former directors. The Company intends to vigorously defend itself in this litigation and does not expect that the outcome will be material.

In February 2007, the City of New York (the "City") sought to close Scores West claiming that it presented a public nuisance. The City alleged that this nightclub was used for purposes of prostitution; the case has been dismissed by the City of New York and no charges had been sought against Scores West or the Company. In March, 2007, the New York State Liquor Authority began a review of the license held by Scores West. The proceedings have been adjourned until November 2007. If Scores West were to be closed, the Company would no longer be entitled to receive royalty revenues from them, which in 2006, amounted to 31% of the Company's royalties. Also, if Scores West were to close, its ability to make payments under an outstanding note issued to the Company by Scores West would be impaired. The note is currently in default.

11

.

**ITEM 2.**  **MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

We recognize revenues as they are earned, not necessarily as they are collected. Direct costs such as hosting expense, design cost, server expense and Diamond Dollar expense was classified as cost of goods sold. General and administrative expenses include accounting, advertising, contract labor, bank charges, depreciation, entertainment, equipment rental, insurance, legal, supplies, payroll taxes, postage, professional fees, rent, telephone and travel.

Nine months ended September 30, 2007 (the "2007 period") compared to the nine months ended September 30, 2006 (the "2006 period").

REVENUES:

Revenues decreased to $369,245 for the 2007 period from $1,467,753 for the 2006 period. During the current year overall revenues remained consistent with those in prior years; however, pursuant to our amended master license agreement with Entertainment Management Services, Inc. ("EMS"), fifty (50) percent of our royalties were reduced by such retainage by EMS. During the 2007 period, the Company recorded no royalty revenue from affiliates (see Bad Debt Expense below). Royalties from our Chicago, Las Vegas and Baltimore sub licensees accounted for 22, 59 and 11 percent of total revenues, respectively, for the 2007 period. During the 2007 period, the Company had temporarily forgone revenue in an amount of $289,394 and $283,541 from the Score East and Scores West operations due to matters discussed in Bad Debt Expense below. We are still unsure as to when the Los Angeles operations will commence.

In January 2007, our website offering, Scoreslive.com (our AYA licensee) debuted. Still a pilot program, without any promotional efforts, the site continues to generate approximately 30,000 page views per week and over $5,000 in monthly gross revenues. We expect our partner to launch and commence operations by November 2007, which we believe will double the number of page views and revenue. Through 2007 we intend to launch several additional internet modules which collaboratively will make up our adult web community. Modules will include online merchandise and e-commerce platforms. We believe that out internet initiatives will generate minimal gross revenues through 2007 as we are and will continue to be in development mode through 2007.

BAD DEBT EXPENSE:

During the 2007 period, the Company has temporarily forgone revenue in the amount of $289,394 and $283,541 from Score East and Scores West operations. During the fourth quarter 2006, bad debt provisions were made by the Company for both Scores East and Scores West which amounted to an aggregate of $3,391,126. Both companies have informed us that their inability to make payments on the amounts owed is due to increased legal costs incurred during investigations together with revenue shortfalls. Based on this information, the Company concluded that future collections of royalties amounting to $293,552 owed by Score West and its ability to make payments under a certain promissory note amounting to $1,867,310 would be impaired. The Company also concluded that future collections of royalties amounting to $1,230,263 owed by Score East would be impaired. The Company also concluded that $17,055 in royalties owed by its Miami affiliate would not be collected due to that club's bankrupty. During the 2007 period, the Company collected $35,819 in royalties from Scores West and no payments from Scores East.

12

Any future cash received from these affiliates will result in a reversal of bad debt expense in the period collected. Also, unless financial stability and collection of these receivables can be reasonably assured by management, the Company will continue to suspend, for book purposes, all future recognition of royalties and interest income due by these affiliates. The Company has also made plans to examine the books and records of these affiliates.

OPERATING EXPENSES:

Operating expenses decreased 24 percent during the 2007 period to $638,366 from $792,112 during the 2006 period. This decrease was primarily due to payroll, legal, insurance, public relations and other expenses related to changes with executive management. During 2007, we continue to increase marketing and promotional efforts related to public relations and business development to capture new business targeted at the media, telecom and internet interactive sectors/markets.

INTEREST INCOME (EXPENSE) - NET:

Interest income is presented net of interest expense for the 2007 period and the 2006, period respectively. Interest income is actual cash collected on notes receivable offset by interest paid on debt which amounted to $0 and $82,755 for the 2007 period and the 2006 period, respectively. The Company, based on the matters as discussed above in Bad debt Expense, has temporarily forgone accrued interest on the Scores West notes for the 2007 period.

Interest expense is due primarily from the issuance of long-term debentures and notes payable. Interest expense decreased to $0 for the 2007 period from $280 for the 2006 period. This decrease was due primarily to a prepayment of outstanding debenture principle during the 2006 period that resulted into a prepayment premium penalty in the amount of $25,000. Retiring these debentures ceased the issuance of any anti-dilution shares. This penalty was necessary to help stabilize shareholder value by reducing the issuance of anti-dilution shares related to the conversion of debt in connection with the unwinding agreement.

PROVISION FOR INCOME TAXES:

A provision for state income taxes related primarily to average assets and capital were impacted by net operating losses carry forwards from the 2006, period.

13

NET INCOME (LOSS) per share:

Net (Loss) was $(280,344) or $(0.00) per share for the 2007 period versus a net income of $685,299 or $0.01 per share for the 2006 period. In addition, revenue earned during the 2007 period was reduced by a fifty percent retainage by EMS in March 2007. Cost related to payroll, public relations, legal, insurance and marketing increased due to changes in key level management. Net income per share data for both the 2007 and 2006 period is based on net income available to common shareholders divided by the weighted average of the common shares.

LIQUIDITY AND CAPITAL RESOURCES

We have incurred losses since the inception of our business. Since our inception, we have been dependent on acquisitions and funding from private lenders and investors to conduct operations. As of September 30, 2007 we had an accumulated deficit of $(6,026,798). As of September 30, 2007, we had total current assets of $88,405 and total current liabilities of $187,780 or working capital of $(99,375). At December 31, 2006, we had total current assets of $394,538 and total current liabilities of $238,360 or working capital of $156,178.

We will continue to evaluate possible acquisitions of or investments in businesses, products and technologies that are complimentary to ours. These may require the use of cash, which would require us to seek financing. We may sell equity or debt securities or seek credit facilities to fund acquisition-related or other business costs. Sales of equity or convertible debt securities would result in additional dilution to our stockholders. We may also need to raise additional funds in order to support more rapid expansion, develop new or enhanced services or products, respond to competitive pressures, or take advantage of unanticipated opportunities. Our future liquidity and capital requirements will depend upon numerous factors, including the success of our adult entertainment licensing business.

**ITEM 3.    CONTROLS AND PROCEDURES**

(a) *Evaluation of Disclosure Controls and Procedures.* Under the supervision and with the participation of our senior management, consisting of Curtis Smith, our chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, as of the end of the period covered by this report (the "Evaluation Date"). Based on this evaluation, our chief executive officer and chief financial officer concluded as of the Evaluation Date that our disclosure controls and procedures were effective such that the information relating to us, including our consolidated subsidiaries, required to be disclosed in our Securities and Exchange Commission ("SEC") reports (i) is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and (ii) is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

14

(b) *Changes in Internal Control over Financial Reporting.* There were no changes in our internal control over financial reporting that occurred during the period covered by this report that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.

## PART II

### ITEM 1.    LEGAL PROCEEDINGS

On October 9, 2007, former Go West bartender Siri Diaz filed a purported class action and collective action on behalf of all tipped employees against us and other defendants alleging violations of federal and state wage/hour laws (**Siri Diaz et al. v. Scores Holding Company, Inc.; Go West Entertainment, Inc. a/k/a Scores West Side; and Scores Entertainment, Inc., a/k/a Scores East Side**, Case No. 07 Civ. 8718 (Southern District of New York, Judge Richard M. Berman)). On November 6, 2007, plaintiffs served an amended purported class action and collective action complaint, naming dancers and servers as additional plaintiffs and alleging the same violations of federal and state wage/hour laws. Our response to the amended complaint is due December 21, 2007. The amended complaint alleges that we and the other defendants are "an integrated enterprise" and that we jointly employ the plaintiffs, subjecting all of the defendants to liability for the alleged wage/hour violations. We dispute that we are an employer of the plaintiffs and intend to vigorously contest the claimed liability as well as the violations alleged.

On March 30, 2007, we, along with several of our affiliates, were named in a suit in connection with alleged assault by an employee of an affiliate and one of our stockholders and former directors. We will vigorously defend ourselves in this litigation and do not expect that the outcome will be material.

In February 2007, the City of New York (the "City") sought to close Scores West claiming that it presented a public nuisance. The City alleged that this nightclub was used for purposes of prostitution; the case has been dismissed by the City of New York and no charges had been sought against Scores West or us. In March, 2007, the New York State Liquor Authority began a review of the license held by Scores West. The proceedings have been adjourned until November 2007. If Scores West were to be closed, we would no longer be entitled to receive royalty revenues from them, which in 2006, amounted to 31% of our royalties. Also, if Scores West were to close, its ability to make payments under an outstanding note issued to us by Scores West would be impaired. The note is currently in default.

### ITEM 2.    UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

None

15

## ITEM 5.    OTHER INFORMATION

Pursuant to a plea agreement between Richard Goldring and the District Attorney of the County of New York, the District Attorney has extended the deadline for Mr. Goldring to divest himself of a control ownership position in the Company until December 20, 2007. If Mr. Goldring were to attempt to sell his ownership position on the open market, it could depress the market price of our common stock.

On August 31, 2007 Alex Amoriello resigned as our Chief Operating Officer. His resignation was not the result of any disagreement between him and us.

On May 30, 2007, Entertainment Management Services, Inc. ("EMS") entered into a Sublicense Agreement (the "Agreement") with Lake Geneva Entertainment, Inc. d/b/a. Sugar Schack. The Sublicense granted under the Agreement authorized Sugar Schack to use the "SCORES" brand name at its adult nightclub in Lake Geneva, Wisconsin. Sugar Schack paid minimum royalties to EMS equal to $5,000 monthly during the peak season April thru September and $3,000 monthly during the non-peak season October thru March. Due to unforeseeable differences within common management at Sugar Schack, proper written notice was given to EMS of its termination of the agreement pursuant to the terms of the agreement. As of September 30, 2007, the Company is owed $16,892 of unpaid royalties.

As discussed in greater detail in "Management's Discussion and Analysis of Financial Condition and Results of Operations - Bad Debt Expense", during fiscal 2007, including the quarter ended September 30, 2007 we had received no royalty payments with respect to Scores East and have received $35,819 royalty payments and no note payments with respect to Scores West.

## ITEM 6.    EXHIBITS

(a)  Exhibits.

| Exhibit No. | Description |
|---|---|
| 31.1/31.2 | Rule 13(a)-14(a)/15(d)-14(a) Certification of Principal Executive and Financial Officer |
| 32.1/32.2 | Rule 1350 Certification of Chief Executive and Financial Officer |

**SIGNATURES**

In accordance with Section 13 or 15(d) of the Exchange Act, the Registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

SCORES HOLDING COMPANY, INC.

Dated: November 14, 2007                    By:    /s/ Curtis Smith

Curtis Smith
Principal Executive Officer

17