86395.TXT

1

```
 1   UNITED STATES DISTRICT COURT

 2   SOUTHERN DISTRICT OF NEW YORK
     ------------------------------------x
 3   SIRI DIAZ, CAROLYN SIEGEL, TALIA BUMB,
     BLERTA VIKKI, DANIELLE OWIMRIN, on
 4   behalf of themselves and all others
     similarly situated,
 5
                                    Plaintiffs,
 6
                - against -
 7
     SCORES HOLDING COMPANY, INC., GO WEST
 8   ENTERTAINMENT, INC., a/k/a SCORES WEST
     SIDE; and SCORES ENTERTAINMENT, INC.,
 9   a/k/a SCORES EAST SIDE,

10                                  Defendants.
     Case No. 07 Civ. 8718 (RMB)
11   ------------------------------------x

12
                    200 Park Avenue
13                  New York, New York

14
                    January 8, 2008
15                  10:25 a.m.

16

17           Deposition of CAROLYN J. SIEGEL,

18   before Marlene Lee, CSR, CRR, a Notary Public

19   of the State of New York.

20

21

22

23       ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
24             New York, New York 10022
                    212-750-6434
25                  REF: 86395
```

2

```
 1   A P P E A R A N C E S:
```

```
                              86395.TXT
 2

 3   OUTTEN & GOLDEN LLP

 4   Attorneys for the Witness and Plaintiffs

 5        Three Park Avenue
          New York, New York  10016
 6
     BY:  TAMMY MARZIGLIANO, ESQ.
 7        212-245-1000                 (Telephone)
          tm@outtengolden.net          (E-mail)
 8        212-977-4005                 (Fax)

 9

10

11   GREENBERG TRAURIG LLP

12   Attorneys for the Defendants

13        200 Park Avenue
          New York, New York  10166
14
     BY:  NEIL A. CAPOBIANCO, ESQ.
15        212-801-9302                 (Telephone)
          capobiancon@gtlaw.com        (E-mail)
16        212-805-5501                 (Fax)

17

18

19

20

21

22

23

24

25
```

```
                                                              3


 1   ------------------ I N D E X ------------------
 2   WITNESS                 EXAMINATION BY          PAGE
 3   CAROLYN J. SIEGEL       MR. CAPOBIANCO            4
 4
```

```
                              86395.TXT
 5
 6       ---------------- E X H I B I T S ----------------
 7       SIEGEL       DESCRIPTION                         PAGE
 8       EXHIBIT 1    CALENDAR                              6
 9       EXHIBIT 2    DOCUMENT                             20
10       EXHIBIT 3    APPLICATION                          31
11       EXHIBIT 4    DOCUMENT                             45
12       EXHIBIT 5    DOCUMENT                             52
13       EXHIBIT 6    DOCUMENT, W-4 FORM                   54
14       EXHIBIT 7    DOCUMENT, FORM REGARDING             54
15                    SEXUAL MISCONDUCT
16       EXHIBIT 8    DOCUMENT, DIAMOND DOLLAR             68
17       EXHIBIT 9    DOCUMENT, PHOTOCOPY OF               77
18                    PAY STUBS
19
20            (EXHIBITS RETAINED BY COUNSEL)
21
22
23
24
25
```

                                                              4

```
 1   C A R O L Y N  J.  S I E G E L ,
 2        having been called as a witness and duly
 3        sworn by the notary (Marlene Lee), was
 4        examined and testified as follows:
 5   EXAMINATION BY
 6   MR. CAPOBIANCO:
 7        Q.   Good morning, Ms. Siegel.  My name
```

86395.TXT

```
 2   informed of that?
 3        A.   I don't.
 4        Q.   Do you remember when your first
 5   night of work was?
 6        A.   Yes.  It was a Wednesday.  The
 7   beginning of May.  I don't know the date.
 8        Q.   If you look at Siegel Exhibit 1,
 9   does that help you identify what day it was?
10        A.   Yes, it does.
11        Q.   What day was it?
12        A.   Wednesday, May 2nd.
13        Q.   What happened -- who told you what
14   time you were supposed to come to work?
15        A.   I don't remember.
16        Q.   Do you remember seeing a schedule?
17        A.   No.
18        Q.   Do you remember seeing a schedule
19   at any point that you were there?
20        A.   No.
21        Q.   How did you generally know when you
22   were supposed to go to work next?
23        A.   I know I got my schedule from Gus.
24   I don't remember if it was over the phone or in
25   person.
```

                                        45


```
 1             SIEGEL
 2        Q.   So at some point Gus told you
 3   verbally when to come in?
 4        A.   Yes.
```

86395.TXT

5    Q.    When you were in any of the
6  non-customer areas of the club, did you ever
7  notice any postings on the wall?
8    A.    No. Actually, to amend that, yes.
9  The dancer dressing room had a poster that I
10 noticed.
11   Q.    Of what?
12   A.    Of the stage fees.
13   Q.    Anything else?
14   A.    Not that I recall.
15   Q.    I'd like to show you --
16         MR. CAPOBIANCO:  I'd like to have
17      this marked as Siegel Exhibit 4.
18         (Siegel Exhibit 4 for
19      identification, document.)
20   Q.    With respect to Siegel Exhibit 4,
21 did you ever notice while you were working at
22 Go West that this document was posted on any
23 wall in any of the non-customer areas of the
24 club?
25   A.    No.

46

1                    SIEGEL
2    Q.    Did you come to have an
3  understanding that you would be making 4.60 per
4  hour plus tips?
5    A.    Yes.
6    Q.    When did you arrive at that
7  understanding?

Page 41

86395.TXT

```
 8       A.    I don't remember.
 9       Q.    Do you remember how you came to
10  understand that?
11       A.    I think it was just an assumption
12  that I made.
13       Q.    An assumption based on what?
14       A.    Based on previous employment.
15       Q.    So your first day of employment was
16  May 2nd.
17       A.    Yes.
18       Q.    What happened on May 2nd when you
19  appeared at the club?  Well, let me ask you
20  this.  Did you come in what you called your
21  uniform?
22       A.    No.
23       Q.    You did not?
24       A.    No.
25       Q.    Did you bring it with you?
```

                                                  47

```
 1                  SIEGEL
 2       A.    Yes.
 3       Q.    So you came in street clothes and
 4  changed into it in -- where?
 5       A.    In the women's bathroom.
 6       Q.    In the women's bathroom.  Okay.
 7  Did you clock in on that occasion?
 8       A.    Yes.
 9       Q.    Is that the first time that you
10  clocked in?
```

86395.TXT

20   Q.   Did Gus also tell you there was a
21  black outfit that they would provide you with?
22   A.   I don't remember.
23   Q.   This black outfit that you were
24  required to wear, did you ever wear it outside
25  of work?

                                              51

1                SIEGEL
2    A.   No.
3    Q.   Did you ever wear it to or from
4   work?
5    A.   No.
6    Q.   Did you pay for it?
7    A.   No.
8    Q.   Do you still have it?
9    A.   No.
10   Q.   What did you do with it?
11   A.   I returned it to the establishment
12  upon leaving.
13   Q.   On the day you left?
14   A.   Yes.
15   Q.   Is the work outfit that you were
16  given something that you felt you could wear
17  outside of the establishment?
18   A.   No.
19   Q.   Why not?
20   A.   It was too revealing.
21   Q.   Too revealing for your personal
22  taste?

86395.TXT

22  were working for Go West?
23      A.   Yes.
24      Q.   In what form were the tips you
25  received?

62

1                SIEGEL
2       A.   They were in three different forms.
3       Q.   What were those three different
4   forms?
5       A.   Cash, credit card -- which would
6   come in a paycheck, and diamond dollars.
7       Q.   Tell me about the diamond dollars.
8       A.   What would you like to know about
9   them?
10      Q.   Well, first of all, how many did
11  you receive?
12      A.   I received three bills which
13  amounted to $60.
14      Q.   Three bills, $60 in diamond
15  dollars?
16      A.   So they were in $20 increments.
17      Q.   And who did you receive them from?
18      A.   One I received personally from a
19  customer.  And then the others I believe, if I
20  remember, were acquired through the tip-sharing
21  process.  They'd been given to another waitress
22  I was working with.
23      Q.   What was your process at the end of
24  the evening for accounting for tips?

```
                        86395.TXT
5    tips.  You reported to the host how much you
6    had, as did the other waitresses, presumably,
7    and the bartenders?
8         A.    Yes.
9         Q.    Did you notice if the host was
10   writing these numbers down?
11        A.    He was.
12        Q.    And then you said the host told you
13   how much to give the busers and the bartenders.
14        A.    Yes.
15        Q.    And how much was it?  Was it a
16   fixed percent of what you took in?  Or was it a
17   variable amount?  Or did you --
18        A.    I think it was a fixed percent.
19        Q.    Do you know what that was?
20        A.    Twenty percent to the bartenders,
21   and 10 percent to the busers.
22        Q.    You said 20 percent to the
23   bartenders and -- how much to the busers?
24        A.    Ten percent.
25        Q.    Did you ever attempt to exchange a
```

                                                    67

```
1                      SIEGEL
2    diamond dollar?
3         A.    Yes.
4         Q.    Tell me about that.
5         A.    I started my shift, and I asked, if
6    I remember -- I think it was a waitress -- how
7    we exchange them.  And she said listen for the
```

86395.TXT

8   announcement from the DJ. And at the end of
9   the night I hadn't heard it. And so I asked a
10  host -- I don't know if it was that same night
11  or the next time I went in. And he said, "Oh,
12  it can only be done at that specific time of
13  the night. You have to listen for the
14  announcement," which, again, I never heard.
15          And on a third occasion, I asked --
16  I believe it was another host. And he said,
17  "You have to wait for the announcement." And
18  again, I was unable to exchange them.
19      Q.  In the tip-counting process, did
20  you ever see anyone give in diamond dollars at
21  that point?
22      A.  No.
23      Q.  So do I understand correctly you
24  asked three different people, two hosts and one
25  waitress, how you exchange diamond dollars, and

68

1               SIEGEL
2   they all said you have to wait for an
3   announcement by the DJ?
4       A.  Yes.
5       Q.  And you never heard an
6   announcement?
7       A.  No.
8       Q.  Did you ever ask anyone else?
9       A.  Yes. After I had left and went
10  back to pick up a paycheck, I asked if I could

Page 61

86395.TXT

5   A.   No.
6   Q.   When you worked for Scores, did you
7   get to know any of the dancers?
8   A.   No.
9   Q.   Have you sent any e-mails to any
10  current or former employees of Scores?
11  A.   No.
12  Q.   Have you received any such e-mails?
13  A.   No.
14  Q.   Why did you bring this lawsuit?
15  A.   I don't think it's fair that people
16  aren't compensated for their work.
17  Q.   Well, you were provided with some
18  compensation for your work; right?
19  A.   Fully compensated.
20  Q.   What would be your definition of
21  full compensation?
22  A.   To the extent that the law sets out
23  and the full amount of gratuities that are
24  given by customers.
25  Q.   So do I understand you to say that

88

1            SIEGEL
2   you objected to the tip-sharing?
3   A.   That's not exactly fair to say.
4   Q.   What would you -- explain to me
5   what -- how your pay, your compensation from Go
6   West differed from what you would consider full
7   compensation for your work.

86395.TXT

8   A.   Well, the number of hours that I
9   worked that I wasn't paid for, including
10  training days, as well as their failure to
11  allow me to exchange diamond dollars.
12      Q.   Anything else?
13      A.   Can you repeat the main question?
14      Q.   Sure.  How is it that you feel that
15  the compensation you received from Go West
16  differed from what you would consider full
17  compensation for your work?
18      A.   Oh.  Also that I had to provide
19  elements of what they required me to wear as a
20  uniform.
21      Q.   That you had to provide elements?
22      A.   Yes.
23      Q.   What elements are those?
24      A.   They required me to wear tights and
25  boots which, had I not owned, I would have had

89

1                SIEGEL
2   to purchase.  And there were also theme nights
3   that required additional clothing.
4       Q.   Did you work any of those theme
5   nights?
6       A.   I did.
7       Q.   What theme night did you work?
8       A.   I worked the American Beauties
9   promotion --
10      Q.   Okay.

Page 80

86395.TXT

10  other than what's recorded as a deduction and
11  reimbursement here on this document?
12      A.   Not that I know of, but it could
13  have happened without my knowledge.
14      Q.   Well, what could have happened
15  without your knowledge?
16      A.   I didn't know the total credit card
17  tip number. I only know what came in my
18  paycheck. So anything is possible.
19      Q.   Any other aspect of what you don't
20  know that could have resulted in a deduction
21  from your wage?
22      A.   I don't understand your question.
23      Q.   You gave me an example of something
24  that you don't know but could have resulted in
25  a deduction from your wage.

                                          100

1                SIEGEL
2       A.   Yes.
3       Q.   I'm asking if there's any other
4   theoretical possibility you have that something
5   was improperly deducted from your wages.
6       A.   Well, had I cashed in diamond
7   dollars, there would have been deductions.
8       Q.   How do you know that?
9       A.   It was what two different people
10  said.
11      Q.   And who were they?
12      A.   One was a waitress and one was a

Page 90

86395.TXT

13  bus boy.
14      Q.    And what did they tell you?
15      A.    They said that 10 percent was taken
16  off the top by the club.  And then taxes were
17  also taken out.
18      Q.    So did you understand that when you
19  cashed in diamond dollars, you would be
20  receiving cash right then and there?
21      A.    That was my understanding.
22      Q.    Did you ever work at any other
23  clubs that have the Scores name?
24      A.    No.
25      Q.    Do you have any knowledge of the

101

1                    SIEGEL
2   practices at the other clubs that used the
3   Scores name?
4       A.    No.
5       Q.    Who would you consider to be your
6   supervisors when you worked at Go West?
7       A.    Gus and Spiro.
8       Q.    Gus and Spiro.  Anyone else?
9       A.    Not that I can recall.
10      Q.    Did you take instructions or
11  receive instructions on how to do your job from
12  anyone else?
13      A.    What kind of instructions?
14      Q.    Any type of instruction.
15  Work-related instruction.

Page 91