# EXHIBIT 3

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

No. 07 civ. 8718 (RMB)

----------------------------------x

SIRI DIAZ, CAROLYN SIEGEL, TALIA BUMB,

BLERTA VIKKI, DANIELLE OWIMRIN, on behalf

of themselves and all others similarly

situated,

        Plaintiffs,

  - against -

SCORES HOLDING COMPANY, INC.; GO WEST

ENTERTAINMENT, INC., a/k/a SCORES WEST

SIDE; and SCORES ENTERTAINMENT, INC.,

a/k/a SCORES EAST SIDE,

        Defendants.

----------------------------------x

        February 7, 2008

        10:00 a.m.


        Deposition of CURTIS SMITH,
taken by Plaintiffs, pursuant to Notice,
held at the offices of Outten & Golden
LLP, 3 Park Avenue, New York, New York,
before Jineen Pavesi, a Registered
Professional Reporter, Registered Merit
Reporter, Certified Realtime Reporter and
Notary Public of the State of New York.

1

2    A P P E A R A N C E S :

3

4    OUTTEN & GOLDEN LLP

5    3 Park Avenue

6    New York, New York 10016

7                Attorneys for Plaintiffs

8

9    BY:        ADAM T. KLEIN, ESQ.

10               TAMMY MARZIGLIANO, ESQ.

11               tm@outtengolden.com

12

13

14   GREENBERG TRAURIG, LLP

15   200 Park Avenue

16   New York, New York 10166

17               Attorneys for Defendants

18

19   BY:        NEIL CAPOBIANCO, ESQ.

20

21

22

23

24

25

1                    SMITH

2     company Go West Entertainment?

3         A.       Yes, sir.

4         Q.       Can you tell me what it is.

5         A.       Go West Entertainment is a

6     sublicensee of Entertainment Management

7     Services, Inc..

8         Q.       What is your understanding of

9     Scores Entertainment, Inc.?

10        A.       I don't have an understanding

11    of Scores Entertainment, Inc.

12        Q.       Do you know who the

13    shareholders of Scores Entertainment,

14    Inc., are?

15        A.       I have never come in contact

16    with Scores Entertainment, Inc.

17        Q.       Do you know who the

18    shareholders of Go West Entertainment are?

19        A.       Richard Goldring and Elliot

20    Osher.

21        Q.       Who is Mr. Goldring?

22        A.       Shareholder.

23        Q.       Does he have any relationship

24    with Scores Holding Company?

25        A.       Yes, he is the shareholder in

1                    SMITH
2    Scores Holding Company.
3        Q.       Who are the shareholders in
4    Scores Holding Company at the present?
5        A.       Scores Holding Company is a
6    public company, we have many shareholders.
7        Q.       Can you name the shareholders
8    of Scores Holding Company that own more
9    than 10 percent of the shares of the
10   company at present?
11       A.       Richard Goldring.
12       Q.       Any others?
13       A.       Not to my understanding.
14       Q.       What is his ownership interest
15   at the present of Scores Holding Company?
16       A.       46 percent.
17       Q.       Are you familiar whether there
18   are articles of incorporation of Scores
19   Holding Company?
20       A.       Yes, sir.
21       Q.       Do you know where they are
22   physically maintained at present?
23       A.       At our West 27th Street
24   address.
25       Q.       Are there any other officers of

1                    SMITH
2    Scores Holding Company at the present?
3        A.        Yes, there is a secretary; do
4    you consider a president an officer?
5        Q.        Yes.
6        A.        President.
7        Q.        That would be a president
8    separate from the CEO?
9        A.        Yes.
10        Q.        Who is the president of Scores
11    Holding Company?
12        A.        John Neilson.
13        Q.        How long has Mr. Neilson been
14    president of Scores Holding Company?
15        A.        Probably less than six months,
16    about six months or so.
17        Q.        Prior to that, did Scores
18    Holding Company have a president?
19        A.        Richard Goldring.
20        Q.        Was there any arrangement
21    whereby Scores Entertainment, Inc., makes
22    payments to Scores Holding Company?
23        A.        No, sir.
24        Q.        Is there a licensing
25    arrangement between Scores Holding Company

1                     SMITH

2    and Scores Entertainment, Inc.?

3         A.        No, sir.

4         Q.        To your knowledge, there is no

5    relationship whatsoever between Scores

6    Holding Company and Scores Entertainment,

7    Inc.?

8         A.        No, sir.

9                   Entertainment, Inc.?

10        Q.        Sorry?

11        A.        Scores Holding and Scores

12   Entertainment?

13        Q.        Right.

14        A.        No.

15        Q.        Is that true for the present?

16        A.        There isn't any relationship

17   between Scores Holding Company and Scores

18   Entertainment, Inc.

19        Q.        Let me ask you a series of

20   questions that relate back to the start of

21   the six-year liability period, from the

22   date the lawsuit we're here to discuss

23   commenced.

24                  So roughly speaking, sometime

25   in January of 2002 to present, has there

1                    SMITH

2    been any business dealings or business

3    relationships between Scores Holding

4    Company and Scores Entertainment, Inc.?

5         A.      Can you repeat the dates.

6         Q.      Last six years roughly, has

7    there been any business affiliation or

8    relationship between Scores Holding

9    Company and Scores Entertainment, Inc.?

10        A.      Not to my knowledge, no.

11        Q.       When was Scores Holding

12   Company first formed?

13        A.      It was formed in 2002 --  2001

14   or 2002.

15        Q.      Were you an officer or employee

16   of Scores Holding Company at the time of

17   its formation?

18        A.      No, sir.

19        Q.      Sorry?

20        A.      No, sir.

21        Q.      When did you first start

22   working for Scores Holding Company?

23        A.      August 2005.

24        Q.      Prior to that did you have any

25   dealings with the company or businesses?

1                    SMITH

2        A.        No, sir.

3        Q.        Where did you work prior to

4    August 2005?

5        A.        I worked for Cornick Garber

6    Sandler, public accounting firm.

7        Q.        You mentioned earlier someone

8    by the name of Elliot Osher, do you recall

9    that?

10       A.        Yes.

11       Q.        What is Mr. Osher's current

12   relationship, if any, with Scores Holding

13   Company?

14       A.        He is a shareholder.

15       Q.        Do you know what his interest

16   in Scores Holding Company is at the

17   present?

18       A.        Last I recall, he was an 8.8

19   percent.

20       Q.        Do you know if Mr. Osher is a

21   shareholder of Go West Entertainment?

22       A.        I believe he is.

23       Q.        What is the basis of your

24   knowledge?

25       A.        Just through inquiry.

1                     SMITH

2      Q.       Have you met Mr. Osher?

3      A.       Yes, sir.

4      Q.       How frequently do you interact

5    with Mr. Osher?

6      A.       Not often.

7      Q.       Are you aware of any other

8    shareholders of Go West Entertainment?

9      A.       No.

10     Q.       Do you know whether

11   Mr. Goldring is an officer of that

12   company?

13     A.       I am not really sure.

14     Q.        Do you know whether or not

15   Mr. Goldring is an officer or shareholder

16   of Scores Entertainment, Inc.?

17     A.       No.

18     Q.       Are you familiar with a Scores

19   club operated in the City of New York?

20     A.       Yes.

21     Q.       What is the basis of your

22   knowledge?

23     A.       They are sublicensees of EMS

24   and they pay a royalty to EMS and EMS pays

25   a royalty to Scores Holding Company.

1                    SMITH

2        Q.        What is EMS?

3        A.        Entertainment Management

4    Services, Inc..

5        Q.        Who are the shareholders of

6    EMS?

7        A.        Richard Goldring, Elliot Osher

8    and Harvey Osher.

9        Q.        Do you know what their

10   respective ownership interest of EMS are?

11       A.        No, sir.

12       Q.        Do you have any relationship

13   with with Entertainment Management

14   Services at the present?

15       A.        Me personally?

16       Q.        Yes, you personally.

17       A.        No, sir.

18       Q.        Do you know who the officers of

19   Entertainment Management Services are?

20       A.        No, sir.

21       Q.        Do you know who the

22   stockholders of that company are?

23       A.        Elliot Osher, Harvey Osher and

24   Richard Goldring.

25       Q.        You just testified that there

1                       SMITH
2     is a licensing agreement between Go West
3     Entertainment and Entertainment Management
4     Services, is that correct?
5          A.       Yes, sir.
6          Q.       What is the basis of your
7     knowledge?
8          A.       I have a copy of the sublicense
9     agreement.
10         Q.       Do you know whether payments
11    are made between those two entities?
12         A.       Can you repeat the question.
13         Q.       Do you know whether there are
14    payments made between those two entities?
15         A.       Yes, sir.
16         Q.       What is the basis of your
17    knowledge?
18         A.       I see payment from them on a
19    monthly basis.
20         Q.        Do you know how much money is
21    paid on a periodic basis between the two
22    companies?
23         A.       I would have to check my books
24    and records, I don't know offhand.
25         Q.       Do you know where those books

1                          SMITH
2    and records are located?
3         A.       West 27th Street office.
4         Q.       Which office is that?
5         A.       Scores Holding Company, Inc.
6         Q.       Do you know where Entertainment
7    Management Services' office is located?
8         A.       I recall it being on West 27th
9    Street.
10        Q.       Have you been there?
11        A.       We share office space.
12        Q.       It is one and the same with
13   Scores Holding Company?
14        A.       No, we have an office and
15   Entertainment Management Services has
16   another office within the office.
17        Q.       What is the physical proximity
18   between the office maintained by Scores
19   Holding Company and the office maintained
20   by Entertainment Management Services?
21        A.       Scores Holding Company --  I
22   don't know what the proximity is with EMS,
23   but we operate maybe 1,200 square feet of
24   the space.
25        Q.       Within this office you have an

1                      SMITH

2          Q.       Who in particular at Cozen

3      O'Connor handles this matter for your

4      company --

5          A.       Well, there really --

6          Q.       You may anticipate the answer

7      to my question, but it is important for

8      the court reporter to record what I'm

9      saying so that we have a clean record, so

10     if you could just hold off in answering

11     until after I finish.

12                  You were saying?

13         A.       It really wasn't a settlement

14     between the holding company and SEI

15     exclusively; I think it was a joint

16     settlement with the holding company and

17     other parties, I believe, Go West and 333

18     and I think Richard Gorman and some

19     individuals, so it may have been a

20     settlement that was probably settled

21     through their attorney, through their

22     counsel, on behalf of Scores Holding

23     Company, which named them party to that

24     agreement.

25         Q.       You just mentioned an entity

1                    SMITH

2      333 East 60th Street, Inc., do you recall

3      that?

4          A.      Yes, sir.

5          Q.      Can you tell me what that is.

6          A.      That is a club operated on East

7      60th Street which has a sublicense with

8      EMS.

9          Q.      At present, do you know who the

10     corporate officers of 333 East 60th Street

11     Incorporated are?

12         A.      I don't know.

13         Q.      Do you know who works or is

14     employed by that company?

15         A.      What do you mean?

16         Q.      I want to know if you know 333

17     East 60th Street Incorporated employs

18     anyone.

19         A.      It is a club that operates, it

20     probably employs individuals, yes.

21         Q.      Do you know who they are?

22         A.      I do not.

23         Q.      Do you know whether

24     Mr. Goldring has any association with 333

25     East 60th Street, Inc., at the present?

                       SMITH
1
2       A.       I believe Mr. Goldring is a
3    shareholder.
4       Q.       What is the basis of your
5    knowledge?
6       A.       Direct inquiry.
7       Q.       Do you interact with
8    Mr. Goldring from time to time?
9       A.       No, sir.
10      Q.       Have you met Mr. Goldring?
11      A.       I have.
12      Q.       When was that?
13      A.       The last I met him?
14      Q.       Yes.
15      A.       The last I spoke with him?
16      Q.       Yes.
17      A.       I don't recall the last I spoke
18    with Mr. Goldring.
19      Q.       Was it this year?
20      A.       Yes.
21      Q.       How frequently do you interact
22    with Mr. Goldring?
23      A.       We do not interact with
24    Mr. Goldring quite often.
25      Q.       Why is that?

1                    SMITH

2        A.        Mr. Goldring at the present

3    time had to divest himself from any public

4    dealing with Scores Holding Company, Inc.,

5    pursuant to a plea agreement with the D.A.

6        Q.        But nonetheless Mr. Goldring is

7    a 46 percent shareholder of Scores Holding

8    Company?

9        A.        Yes, sir.

10       Q.        And he is also a shareholder of

11   Go West Entertainment, is that correct?

12       A.        Yes, sir.

13       Q.        And also a shareholder of 333

14   East 60th Street, Inc., correct?

15       A.        Yes, sir.

16       Q.        Aside from Mr. Goldring, are

17   there any other shareholders of 333 East

18   60th Street, Inc.?

19       A.        I believe it is Elliot Osher.

20       Q.        Is Mr. Osher also a shareholder

21   of Go West Entertainment, Inc.?

22       A.        Yes, sir.

23       Q.        And that's also true of

24   Mr. Osher, he is also a shareholder of

25   Scores Holding Company?

1                        SMITH

2          A.       Yes, sir.

3          Q.       Are you familiar with the

4     management structure of Go West

5     Entertainment, Inc., at the present?

6          A.       No, sir.

7          Q.       Do you know whether

8     Mr. Goldring has any active role in the

9     running of Go West Entertainment, Inc.?

10         A.       No, sir.

11         Q.       Do you know what the principal

12    asset of Go West Entertainment, Inc., is?

13         A.       No, sir.

14         Q.       Are you familiar with the

15    Scores strip club in New York City?

16         A.       I know it is a sublicensee of

17    EMS; I don't get too involved with the

18    operations of the club.

19         Q.       Do you know whether Go West

20    Entertainment runs the strip club in New

21    York?

22         A.       Yes.

23         Q.       You do know that?

24         A.       Yes.

25         Q.       Have you been to the Go West

1                         SMITH
2        which is a trademark wholly-owned by
3        Scores Holding Company, for the usage of
4        that trademark to be used for adult
5        entertainment establishment purposes and
6        for merchandising exclusively.
7             Q.        Is there a document that
8        describes that business arrangement?
9             A.        Yes, that's on the master
10       license agreement.
11            Q.        Do you have a copy of the
12       master license agreement?
13            A.        No, I don't.
14            Q.        Does that document exist in
15       Scores Holding Company's business records?
16            A.        It is in our public filings,
17       yes.
18            Q.        Generally speaking, what are
19       the terms of the master license agreement?
20            A.        To my understanding, it is for
21       20 years and I think for ten consecutive
22       20-year periods thereafter.
23                      I believe it may have been six
24       years and --  something like that, that's
25       what I recall to my understanding.

1                     SMITH

2            I don't know exactly what it

3    is, but I know it has got consecutive

4    20-year period after the first six years.

5        Q.        You testified earlier that

6    Mr. Goldring was a shareholder of

7    Entertainment Management Services, is that

8    correct?

9        A.        Yes, sir.

10       Q.        I don't recall, are there any

11   other shareholders of Entertainment

12   Management Services, to your knowledge?

13       A.        Richard Goldring, Elliot Osher

14   and Harvey Osher.

15       Q.        Were you an officer of Scores

16   Holding Company at the time that the

17   master license agreement you just

18   described between Scores Holding Company

19   and Entertainment Management Services was

20   executed?

21       A.        No, sir.

22       Q.        Who was the CEO at the time

23   that the master license agreement between

24   Scores Holding Company and Entertainment

25   Management Serviceses was executed?

1                          SMITH

2        A.        As I recall, it may have been

3    Mr. Richard Goldring.

4        Q.        So at the time the master

5    license agreement in place between Scores

6    Holding Company was executed, Mr. Goldring

7    was both the CEO of Scores Holding Company

8    and also a shareholder of Entertainment

9    Management Services, correct?

10       A.        Yes, sir.

11       Q.        Do you know when that master

12   license agreement was first executed, the

13   date, between Scores Holding Company and

14   Entertainment Management Services?

15       A.        I believe it was in 2003,

16   March.

17       Q.        What is the basis of your

18   knowledge?

19       A.        Examining the document.

20       Q.        At the time in March of 2003,

21   are you aware of Mr. Goldring's interest

22   in Scores Holding Company?

23       A.        No --  say that again, sir.

24       Q.        At the time in March 2003, do

25   you know what Mr. Goldring's ownership

                          SMITH

1

2        Q.        How long have you been the CEO

3   of Scores Holding Company?

4        A.        I am the acting CEO.

5        Q.        Who was the actual CEO of

6   Scores Holding Company?

7        A.        Alex Amoriello.

8        Q.        For what period of time was

9   that?

10        A.        Alex was the CEO from March of

11   '07 through maybe June of '07.

12        Q.        Is there a reason that he is no

13   longer the CEO of Scores Holding Company?

14        A.        He had resigned, he had taken

15   on a different endeavor.

16        Q.        How many hours a week do you

17   spend working for Scores Holding Company?

18        A.        It varies.

19        Q.        Can you give me an estimate.

20        A.        Maybe 30 hours.

21        Q.        Is that on a week-by-week

22   basis?

23        A.        On average I can spend anywhere

24   between 20 and 30 hours a week.

25        Q.        Are there any employees of

1                    SMITH

2    Scores Holding Company at the present?

3        A.        One.

4        Q.        Who is that?

5        A.        Myself.

6        Q.        Who hired you at Scores Holding

7    Company?

8        A.        I was hired by Mr. Goldring.

9        Q.        When was that?

10       A.        August of 2005.

11       Q.        At the time did you obtain an

12   employment agreement of some sort?

13       A.        I have a consulting agreement

14   with Scores Holding Company.

15       Q.        Where is the consulting

16   agreement at the present?

17       A.        It is in our West 27th Street

18   location.

19       Q.        Generally what are the terms of

20   the consulting agreement between you and

21   Scores Holding Company?

22       A.        It was initially for one year

23   and then it renewed in September of '06,

24   I came in as a controller, I came in as

25   the controller in August of '05 and in

1                          SMITH

2    September of  '06 a new agreement where I

3    am the CFO.

4         Q.      Can you tell me who the CEO of

5    Scores Holding Company was as of January

6    12, 2007.

7         A.      The CEO as of January 12th was

8    Mr. Richard Goldring.

9         Q.      Who was the president of Scores

10   Holding Company on that same date, January

11   12, 2007?

12        A.      Richard Goldring.

13        Q.      How much are you paid by Scores

14   Holding Company at the present?

15        A.      Annually, 60,000.

16        Q.      To your knowledge, does

17   Entertainment Management Services, Inc.,

18   have employees working for the company?

19        A.      I don't know.

20        Q.      You testified earlier that

21   Entertainment Management Services has an

22   office physically located in the same

23   office suite that you reside as the

24   current acting CEO of Scores Holding

25   Company.

1                    SMITH

2              Do you recall that testimony?

3      A.      Yes, sir.

4      Q.      Have you had occasion to walk

5   over to their office and see if anyone is

6   physically working for Entertainment

7   Management Services?

8      A.      No, sir.

9      Q.      You earlier testified that the

10  office you're in is 1,200 square feet, is

11  that right?

12     A.      Scores Holding.

13     Q.      How many square feet does

14  Entertainment Management Services occupy

15  at the present?

16     A.      Entertainment Management

17  Services does not share office space with

18  Scores Holding Company; Scores Holding

19  Company operates approximately 1,200, I am

20  estimating, square feet of space;

21  Entertainment Management Services, I do

22  not know who, what, where, and when,

23  personnel represents Entertainment

24  Management Services; we share in overhead

25  space, kitchen, conference room, but I

<sup>1</sup>                    SMITH

<sup>2</sup>    know that Scores Holding Company has two

<sup>3</sup>    physical offices within the West 27th

<sup>4</sup>    Street location that I can identify as

<sup>5</sup>    Scores Holding Company.

<sup>6</sup>        Q.        How do you identify those two

<sup>7</sup>    or three offices of Scores Holding

<sup>8</sup>    Company?

<sup>9</sup>        A.        One is for myself, the other is

<sup>10</sup>   room for a consultant who handles some

<sup>11</sup>   Internet work, some merchandising on a

<sup>12</sup>   part-time basis as a consultant, and the

<sup>13</sup>   other is a print room.

<sup>14</sup>        Q.        I am a little confused, let me

<sup>15</sup>   try this again.

<sup>16</sup>                  Where are the physical offices

<sup>17</sup>   of Entertainment Management Services?

<sup>18</sup>        A.        West 27th Street location.

<sup>19</sup>        Q.        Is that the same business

<sup>20</sup>   address as Scores Holding Company?

<sup>21</sup>        A.        Yes, sir.

<sup>22</sup>        Q.        But you're not aware of who

<sup>23</sup>   works within the offices of Entertainment

<sup>24</sup>   Management Services?

<sup>25</sup>        A.        No, sir.

1                     SMITH

2    encountered any employee of Entertainment

3    Management Services during your time at

4    Scores Holding Company?

5         A.       At that location, no.

6         Q.       At any location?

7         A.       No.

8         Q.       Do you interact with a

9    representative of Entertainment Management

10   Services at any point?

11        A.       Sometimes, you know, I speak

12   with Mr. John Neilson, but I don't know if

13   he is acting on behalf of Entertainment

14   Management Services, but I know he is the

15   one who orchestrates the sublicense

16   agreements between EMS and the

17   sublicensees and usually I consult to

18   Mr. Neilson in terms of payment for

19   royalties.

20              But Mr. Neilson is not always

21   physically located in the office, he is in

22   Florida and sometimes he is in New York.

23        Q.       Does Scores Holding Company

24   receive payments from Entertainment

25   Management Services?

1                          SMITH
2          A.          Yes, sir.
3          Q.          How often?
4          A.          Monthly.
5          Q.          Who signs the checks that are
6     issued by Entertainment Management
7     Services made payable to Scores Holding
8     Company?
9          A.          Richard Goldring.
10         Q.          Is Mr. Goldring also a
11    signatory on business bank accounts
12    maintained by Scores Holding Company?
13         A.          No, sir.
14         Q.          Has Scores Holding Company
15    issued checks to Mr. Goldring from time to
16    time?
17         A.          During what period?
18         Q.          At any point.
19         A.          Yes.
20         Q.          Can you describe those
21    payments, please.
22         A.          Payments for salary.
23         Q.          Mr. Goldring is a salaried
24    employee of Scores Holding Company?
25         A.          Not at the present moment.

1              SMITH

2       Q.      When was the last time
3  Mr. Goldring was an employee of Scores
4  Holding Company?

5       A.      Mr. Goldring resigned on
6  February 28, 2007.

7       Q.      Prior to that time was
8  Mr. Goldring an employee of Scores Holding
9  Company?

10      A.      Yes, sir.

11      Q.      For what period of time was
12 that?

13      A.      Mr. Goldring had an employment
14 agreement from I believe it was 2003 up
15 until the point he resigned, March of '03.

16      Q.      During that time frame, how
17 much was Mr. Goldring paid as an employee
18 of Scores Holding Company?

19      A.      He was paid approximately
20 $104,000.

21      Q.      For that can you describe
22 Mr. Goldring's services that he provided
23 for Scores Holding Company?

24      A.      He was president of the
25 company.

1               SMITH

2      Q.      Other than having a corporate

3   officer title, did Mr. Goldring perform

4   any day-to-day duties for Scores Holding

5   Company?

6      A.      No, sir.

7      Q.      Why was Mr. Goldring paid a

8   salary for a corporate officer title only?

9      A.      He was paid as the president of

10   the holding company.

11      Q.      As the president of the holding

12   company, did he have any duties and

13   responsibilities to the shareholders of

14   Scores Holding Company?

15      A.      As CEO and president, yes.

16      Q.      Can you describe generally his

17   duties and functions as the president of

18   Scores Holding Company during the time

19   period that he was employed by that

20   company, Scores Holding Company?

21      A.      I guess he acted as a fiduciary

22   of the public company, to insure he would

23   get into contracts, I believe he got into

24   a contract with EMS, he would bind the

25   company in a capacity that would seem

1                    SMITH

2    Under the master license agreement, we

3    granted EMS, which is 50 percent owned by

4    Richard Goldring, our former chief

5    executive officer and director, an

6    exclusive worldwide license to use and

7    grant sublicenses to use our Scores

8    trademark.  EMS has entered into

9    sublicense agreements with eight cabaret

10   clubs, seven of which are currently

11   operated under the Scores trademark."

12            Do you see that reference?

13       A.       Yes, sir.

14       Q.       Were you an officer of Scores

15   Holding Company at the time that Scores

16   Holding Company negotiated the master

17   license agreement referenced here?

18       A.       No, sir.

19            The original master license

20   agreement?

21       Q.       I am asking about the amended

22   and restated master license agreement.

23       A.       Yes, the restated master

24   license agreement, yes.

25       Q.       Who did you negotiate with, who

```
1                    SMITH
2    was representing EMS at that time?
3         A.      Mr. Goldring.
4         Q.      Did Mr. Goldring have counsel?
5         A.      Yes, sir.
6         Q.      Who was that?
7         A.      Steve Gutstein.
8         Q.      Who is Mr. Gutstein?
9         A.      Mr. Goldring's counsel.
10        Q.      Do you know which firm he is
11   with?
12        A.      No, sir.
13        Q.      Did Scores Holding Company have
14   counsel at the time that the amended and
15   restated master license agreement
16   referenced in the SEC filing before you,
17   Plaintiffs' Exhibit 2, was there counsel
18   present as well?
19        A.      Yes, sir.
20        Q.      Who was that?
21        A.      Gotbetter & Partners.
22        Q.      Generally can you describe the
23   nature of the negotiation between Scores
24   Holding Company and EMS on or about
25   November 13, 2006, that led to the
```

1                    SMITH
2    execution of an amended and restated
3    master license agreement.
4         A.       Yes.
5                   Mr. Goldring, who was the
6    president and CEO of Scores Holding
7    Company at the time, and was a shareholder
8    of EMS, we were collecting --  the holding
9    company was collecting from EMS a hundred
10   percent of the royalties; pursuant to the
11   original master license agreement, it read
12   that EMS was to retain 50 percent and the
13   holding company was to receive 50 percent.
14                  EMS had forwarded all of its
15   royalties over to the holding company and
16   the reason as such is because --  the
17   reason that the restatement came about is
18   due to Mr. Goldring having two controlling
19   positions in the holding company and in
20   EMS.
21                  We said for so long as you have
22   a position as president, CEO, or any type
23   of officer in the holding company, and you
24   have assumed a role in EMS, we were going
25   to continue to retain the 100 percent of

1                      SMITH
2       the royalties, including --  in addition
3       to that, because Mr. Goldring had received
4       a salary from Scores Holding Company, it
5       would appear that he was double-dipping.
6              Once Mr. Goldring resigned,
7       that is at the point when EMS started to
8       retain his 50 percent, once Mr. Goldring
9       resigned from Scores Holding Company, EMS
10      then therefore retained his 50 percent, he
11      no longer took a salary in Scores Holding,
12      he kept his 50 percent retainage in EMS
13      and that's what the nature of the
14      restatement is.
15          Q.      Would you describe the
16      negotiation between Scores Holding Company
17      and Entertainment Management Services on
18      or about November 13, 2006, as an arm's
19      length negotiation?
20          A.      Can you repeat that.
21              (Record read.)
22          A.      Yes.
23          Q.      Yes?
24          A.      I believe it was an arm's
25      length negotiation.

1                      SMITH

2        Q.        Isn't it also true at the time

3    in November 2006 Mr. Goldring was the

4    majority shareholder of both Scores

5    Holding Company and Entertainment

6    Management Services?

7        A.        He is --  I don't know what --

8    it says he was 50 percent here in EMS, so

9    I don't know if that's the majority.

10                I believe he is equal, but he

11   was the majority in Scores Holding

12   Company.

13       Q.        Notwithstanding that fact, you

14   considered the negotiation between these

15   two entities to be an arm's length

16   transaction?

17       A.        Sure.

18       Q.        You do?

19       A.        Sure.

20       Q.        Are you a certified public

21   accountant?

22       A.        Yes, sir.

23       Q.        Are you familiar with the GAAP

24   rules on accounting?

25       A.        Yes, sir.

1                    SMITH

2     Holding Company?

3          A.       As majority shareholder.

4          Q.       Has he received a check?

5          A.       No, sir.

6          Q.       Does he receive any form of

7     payment from any of the entities we have

8     been talking about today, either Scores

9     Holding Company, Entertainment Management

10    Services or the sublicensees, Go West or

11    Go East or Go West Entertainment or 333

12    East 60th Street, Inc.?

13         A.       All I know, he does not get

14    paid from Scores Holding Company.

15         Q.       When is the last time Scores

16    Holding Company made a payment to Mr.

17    Goldring?

18         A.       I believe it was in February of

19    2007.

20         Q.       How was that payment physically

21    delivered to Mr. Goldring?

22         A.       Could have been wired or

23    physical check.

24         Q.       It Mr. Goldring pick up the

25    check or was it delivered by mail or some

1                    SMITH
2    other means of service?
3        A.      It could have been a wire or it
4    could have been picked up.
5        Q.      Do you know where Mr. Goldring
6    resides at the present?
7        A.      No, sir.
8        Q.      Do you know if he resides
9    within the City of New York?
10       A.      I don't know.
11       Q.      Does Scores Holding Company owe
12   Mr. Goldring any money at the present?
13       A.      Scores Holding Company,
14   pursuant to Mr. Goldring's employment
15   agreement, is indebted to Mr. Goldring for
16   a million dollars.
17               MR. KLEIN:  I call for the
18   production of any documents that relate to
19   Mr. Goldring that are maintained by Scores
20   Holding Company.
21       Q.      Are there annual or periodic
22   shareholders meetings of Scores Holding
23   Company?
24       A.      Yes, sir.
25       Q.      When was the last such meeting?

1                         SMITH

2        A.        January.

3        Q.        Did Mr. Goldring attend that

4    meeting?

5        A.        No, sir.

6        Q.        Do you anticipate having

7    another shareholder meeting of Scores

8    Holding Company?

9        A.        We do anticipate, I am not sure

10    as to when.

11        Q.        Do you expect Mr. Goldring to

12    attend that meeting?

13        A.        I don't expect him to attend; I

14    am not sure what Mr. Goldring is going to

15    do.

16        Q.        Does Mr. Goldring have any

17    input into the operations of Scores

18    Holding Company at the present?

19        A.        No, sir.

20        Q.        Why did Mr. Goldring resign as

21    an employee of Scores Holding Company?

22        A.        He had to resign pursuant to

23    the D.A.'s office, he was asked to resign.

24        Q.        Do you know why he was asked to

25    resign?

1                        SMITH

2        Q.        Do you know what the corporate

3    entity that operates Scores Miami is?

4        A.        No, Mr. Goldring has an

5    interest, he is a shareholder, I don't

6    know what his interest is.

7        Q.        Mr. Goldring has an ownership

8    interest in Scores Miami?

9        A.        Yes, sir.

10       Q.        Does EMS or Scores Holding

11   Company receive payments directly from

12   Scores Miami?

13       A.        No.

14       Q.        Item 5 of Plaintiffs' Exhibit 2

15   for identification, "According to the

16   master license agreement, Scores Holding

17   Company, the Company, is entitled to

18   receive 100 percent of the royalties that

19   EMS receives from these affiliated

20   companies."

21                 Do you see that reference?

22       A.        Yes.

23       Q.        That would mean any payment

24   received in the form of a royalty from

25   Scores Miami would flow directly to Scores

1                      SMITH
2    Holding Company at the present, is that a
3    fair statement?
4         A.      It would flow through EMS to
5    the holding company, yes.
6         Q.      Who at EMS would receive the
7    royalties payments from Scores Miami and
8    other affiliated clubs?
9         A.      I guess Mr. Goldring.
10        Q.      Do you know that to be the
11   case.
12        A.      I am not sure.
13        Q.      Are royalty checks made payable
14   to Scores Holding Company by EMS?
15        A.      Yes, sir.
16        Q.      And who is the signatory on
17   those payments?
18        A.      Mr. Goldring.
19        Q.      Are you familiar with any other
20   affiliated clubs referenced in Plaintiffs'
21   Exhibit 2 other than the ones you just
22   testified, Scores East, Scores West and
23   now Scores Miami?
24        A.      No, sir.
25        Q.      Note that there is a reference

Page 64

1                          SMITH

2    to eight cabaret clubs, seven of which

3    currently operate the Scores trademark; do

4    you see that reference, item 5, last

5    sentence --

6         A.      Yes, sir.

7         Q.      You are not familiar with the

8    other four clubs that have the word Scores

9    or use the trademark of Scores?

10        A.      I am.

11        Q.      What are those?

12        A.      Las Vegas, Chicago, Baltimore,

13   and New Orleans.

14        Q.      Do you know whether Mr.

15   Goldring has any ownership interest in the

16   clubs you just identified using the Scores

17   name operated and located in Las Vegas,

18   Chicago, Baltimore and New Orleans?

19        A.      He doesn't have any interest in

20   those clubs, to my understanding.

21        Q.      Is it a fair statement Mr.

22   Goldring is a shareholder of clubs

23   operated using the Scores trademark in Las

24   Vegas, is that true?

25        A.      No.

1                    SMITH

2      Q.      It is not?

3      A.      No.

4      Q.      Do you know if that's true for

5  Chicago?

6      A.      He does not own or have any

7  interest in any of those clubs I just

8  mentioned, the four, New Orleans, Chicago,

9  Baltimore or Las Vegas.

10     Q.      Do you know who the

11  shareholders or owners of the entities

12  using the Scores trademark in those four

13  cities, Las Vegas, Chicago, Baltimore and

14  New Orleans?

15     A.      Yes.

16     Q.      Who are they?

17     A.      One is Dennis Degori for

18  Chicago and Las Vegas; Brian Shulman for

19  Baltimore; and Guy Olano for New Orleans.

20     Q.      Does Mr. Degori have any

21  interest in Scores Holding Company, to

22  your knowledge?

23     A.      No, sir.

24     Q.      Does Mr. Degori have any

25  ownership interest in Entertainment

a180bd42-f02c-42ec-856c-86be60a55fd9

1                    SMITH

2    Management Services, to your knowledge?

3        A.       No, sir.

4        Q.       Is that also true for

5    Mr. Shulman and Olano?

6        A.       They have no interest in Scores

7    Holding Company.

8                 I am not sure about

9    Entertainment Management Services.

10       Q.       There is a reference to the

11   Scores trademark.

12                Can you describe generally what

13   the Scores trademark is.

14       A.       Where is that reference?

15       Q.       Item 5 on Plaintiffs' Exhibit

16   2, the document we have been reading.

17                (Witness perusing document.)

18       A.       We have many trademarks,

19   trademarks for key chains, hats,

20   merchandise, diamond dollar program and

21   the Scores name itself.

22       Q.       Who are the owners of those

23   various trademarks?

24       A.       Scores Holding Company.

25       Q.       Is there a document that

1                    SMITH

2    memorializes that ownership interest in

3    the various trademark items that you just

4    referenced?

5        A.        Yes, sir.

6        Q.        What is that document?

7        A.        I am not sure what the name is,

8    but it is patent documents that we have

9    filed in different countries.

10       Q.        Does Scores Holding Company

11   maintain records of the various trademarks

12   and patents it owns at the present?

13       A.        Yes, sir.

14       Q.        Where would that physically be

15   located?

16       A.        West 27th Street location.

17                 MR. KLEIN:  I call for the

18   production of those documents.

19                 MR. CAPOBIANCO:  Let me just

20   state for the record, please put it in a

21   request.

22                 MR. KLEIN:  I will do that.

23       Q.        Has Scores Holding Company

24   obtained any kind of appraisal on the

25   various trademarks and patents it holds at

1                    SMITH

2    the present?

3         A.        No, sir, not to my

4    understanding.

5         Q.        Do you have any sense of the

6    fair market value of the trademarks and

7    patents?

8         A.        No.

9         Q.        I would like to go back; there

10   is a reference to Scores East and Scores

11   West, again item 5, do you see that

12   reference?

13        A.        Yes.

14        Q.        Are those former corporate

15   names or some other description of the

16   clubs operated by Scores?

17        A.        Say that again.

18        Q.        Do you know whether Go West

19   Entertainment, Inc., operates Scores club

20   using the word Scores East or Scores West?

21        A.        It could also be known as

22   Scores West, Go West Entertainment.

23        Q.        To your knowledge, Go West

24   Entertainment, Inc., is synonymous with an

25   alternate name for Scores West?

1                    SMITH

2        A.      No.

3        Q.      I would like to direct your

4    attention to the balance sheet, page 5 in

5    of Plaintiffs' Exhibit 2.

6                Do you see this reference?

7        A.      Yes, sir.

8        Q.      At the bottom there is a

9    reference to stockholders equity, do you

10   see that?

11       A.      Yes.

12       Q.      There is something called

13   additional paid-in capital, 5.999 million,

14   do you see that?

15       A.      Yes.

16       Q.      What is that?

17       A.      We had an antidilution clause

18   in the holding company whereas any stock

19   that was issued to any individual, Mr.

20   Goldring and the Oshers would retain a

21   percentage in the company of 46 percent, 8

22   and 8, Mr. Goldring, Mr. Osher Elliot and

23   Mr. William Osher would retain a

24   percentage.

25                So if we issued some stock for

1          SMITH

2    services or we issued some stock for -- I

3    guess for legal services, for example,

4    that stock issued would be utilized --

5    Mr. Goldring, Mr. Elliot Osher and

6    Mr. Billy Osher would receive the

7    equivalent amount of stock issued to

8    retain their percentages in the company.

9         Q.       Since the inception of Scores

10   Holding Company, how much money has Mr.

11   Goldring and the two Mr. Oshers you just

12   referenced been paid?

13        A.       Sorry?

14                 (Record read.)

15        A.       I am not really sure.

16        Q.       Are there documents that would

17   provide that information?

18        A.       Payroll records.

19        Q.       Where are those payroll records

20   physically maintained?

21        A.       West 27th Street location.

22                 MR. KLEIN:  I will formalize in

23   writing, but I call for that information

24   or those documents to be produced.

25        Q.       Other than the payments that

1                         SMITH
2    you just described to Mr. Goldring and the
3    two Oshers, were any dividends issued by
4    Scores Holding Company to the shareholders
5    of the company?
6         A.        No, sir, not to my
7    understanding.
8         Q.        Any other special payments made
9    to the shareholders of Scores Holding
10   Company, to your knowledge?
11        A.        No, sir.
12        Q.        Did Mr. Goldring or any other
13   shareholders loan money to Scores Holding
14   Company?
15        A.        I am not sure.
16        Q.        You don't know?
17        A.        No.
18        Q.        Could you take a look and see
19   if such a loan --
20        A.        I am not sure as to -- from my
21   tenure with the company, no.
22        Q.        To your knowledge, does the
23   license agreement entered into by Scores
24   Holding Company and Entertainment
25   Management Services provide for any

1                          SMITH

2       A.        Mr. Goldring was the president

3    and CEO at the time, he was acting on

4    behalf of Scores Holding.

5                 Mr. Goldring failed to

6    communicate that to me, but he is the

7    president and CEO; once him and I spoke --

8    when I say we had no idea, I didn't have

9    an idea, but the president and CEO of the

10   company was clear on what the position

11   was.

12                So when we filed our K, he had

13   brought it to my attention and brought it

14   to our attorney's attention that a

15   settlement was going on with the holding

16   company.

17      Q.        Does Scores Holding Company

18   maintain a list of its current

19   shareholders?

20      A.        Yes, sir.

21      Q.        Where is that physically

22   maintained?

23      A.        With our stock transfer agent.

24      Q.        Who is that?

25      A.        Atlas Stock Transfer.

1                          SMITH

2        Q.        Where are they located?

3        A.        They are located in Utah.

4        Q.        Do you have access to that

5    information?

6        A.        Absolutely.

7        Q.        Do you have a copy in your

8    office of the names of the shareholders

9    and shareholder interests in Scores

10   Holding Company?

11       A.        How current?

12       Q.        Sorry?

13       A.        I have a copy, but I don't know

14   how current it is.

15                 MR. KLEIN:  I call for

16   production and I will memorialize it in

17   writing.

18       Q.        I assume it is a thinly traded

19   corporation?

20       A.        What do you mean by thinly?

21       Q.        Are there many changes in the

22   ownership interest of the shareholders of

23   Scores Holding Company?

24       A.        Depends.

25       Q.        What does it depends on?

1             SMITH

2      A.        You know, we no longer have the

3   antidilution clause, so we had a lot of

4   changes at that time, but now that that

5   has been terminated, we don't have that

6   much volume in the stock.

7      Q.        Do you know if Scores Holding

8   Company maintains copies of sublicense

9   agreements entered into by Scores

10  Entertainment, Inc., and sublicensees that

11  operate Scores clubs?

12     A.        Scores Holding Company does not

13  have copies of any agreements with any

14  sublicensees in Scores Entertainment, Inc.

15     Q.        Is there any document that

16  describes an oversight role by Scores

17  Holding Company on Scores Entertainment,

18  Inc., other than a master license

19  agreement?

20     A.        You keep referring to Scores

21  Entertainment; are you sure you're saying

22  Scores Entertainment or EMS.

23     Q.        I keep doing that.

24             What I want to know is aside

25  from a master license agreement between

1                       SMITH

2       understanding there aren't any other,

3       other than what is between EMS and Scores

4       Holding Company, that is the master, it is

5       called master for that reason, that is the

6       agreement.

7           Q.       If a sublicensee of

8       Entertainment Management Services wanted

9       to use the club to open a cattle range,

10      would that be okay?

11          A.       I am not really sure which

12      direction you're going with that question,

13      sir.

14                  Scores Holding Company would

15      not have any involvement in whether a

16      cattle ranch would be open as a Scores,

17      but if that was --  if it had the proper

18      zoning and fit all the requirements to

19      operate as Scores, meaning you satisfy --

20      you have the proper liquor license, you

21      have the square footage and you have the

22      proper zoning, I don't see why it should

23      be a problem.

24                  MR. KLEIN:  Mark that as

25      Plaintiffs' Exhibit 3.

1              SMITH

2              (Plaintiffs' Exhibit 3, payroll

3    check, was marked for identification, as

4    of this date.)

5        Q.      Mr. Smith, I am handing you

6    what's been marked as Plaintiffs' Exhibit

7    3 for identification, it is a one-page

8    document that is a payroll check.

9              Do you recognize this document?

10             (Witness perusing document.)

11       A.      No, sir.

12       Q.      On the top it says Go West

13   Entertainment; you're familiar generally

14   with that corporate entity?

15       A.      Yes, sir.

16       Q.      On the bottom right do you see

17   there is a check signed by a person; do

18   you recognize the signature?

19       A.      Yes, sir.

20       Q.      Who is it?

21       A.      It appears to be Richard

22   Goldring.

23       Q.      Same Richard Goldring we have

24   heard testimony about today?

25       A.      Yes, sir.

SMITH

1

2    Q.      You can put that to the side.

3            (Witness complying.)

4    Q.      Are you familiar with a Scores

5    club located in Lake Geneva, Wisconsin?

6    A.      Yes, sir.

7    Q.      What is that?

8    A.      It is an operation that's

9    independently owned, which is sublicensed

10   under the EMS agreement to operate as a

11   Scores.

12   Q.      Do you know who the

13   shareholders of Lake Geneva Entertainment,

14   Inc., d/b/a Sugar Schack?

15   A.      I do not know who the

16   shareholders are.

17           MR. KLEIN:  Let's take a break.

18           (Recess taken.)

19   BY MR. KLEIN:

20   Q.      I am going to show you what's

21   been marked Plaintiffs' Exhibits 4 and 5

22   for identification.

23           (Plaintiffs' Exhibit 4,

24   sublicense agreement, was marked for

25   identification, as of this date.)

1                    SMITH

2      Licensing Corporation?

3          A.      Scores Licensing Corporation is

4      inactive, it just holds the trademarks for

5      the diamond dollar program in the Scores

6      name.

7          Q.      Do you know whether Scores

8      Licensing Corporation is a corporation

9      incorporated in the State of New York?

10         A.      I believe Scores Licensing

11     Company is incorporated in Delaware.

12         Q.      Are there periodic reports

13     filed with the State of Delaware

14     memorializing the corporation of Scores

15     Licensing Corporation?

16         A.      Tax return.

17         Q.      You're guessing or do you know?

18         A.      Tax returns, yes.

19         Q.      Who signs the tax returns on

20     behalf of Scores Licensing Corporation?

21         A.      It is a consolidated return

22     with Scores Holding Company.

23         Q.      Do you sign the tax return for

24     both Scores Holding Company and Scores

25     Licensing Corporation?

SMITH

1

2      A.      Yes, sir.

3      Q.      Turn to the last page of this

4   document, page 7, do you see that

5   reference, there is a signature on behalf

6   of Scores Holding Company and there is a

7   signature, do you see that?

8      A.      Yes.

9      Q.      Is that Richard Goldring who

10   signed the document before you,

11   Plaintiffs' Exhibit 5 for identification,

12   on behalf of Scores Holding Company?

13      A.      Yes, sir.

14      Q.      And to the right there is a

15   signature by somebody representing

16   Entertainment Management Services, do you

17   see that?

18      A.      Yes, sir.

19      Q.      Do you know who that signature

20   belongs to?

21      A.      I believe that's William Osher.

22      Q.      Who is that?

23      A.      At the time William was a 50

24   percent shareholder in EMS.

25      Q.      Do you know whether he

1                     SMITH

2    currently maintains an ownership interest

3    in EMS?

4         A.      He does not.

5         Q.      When did that ownership

6    interest terminate?

7         A.      I believe it was sometime in

8    the latter part of 2006.

9         Q.      Do you know why that

10   affiliation with Entertainment Management

11   Services terminated?

12        A.      No.

13        Q.      Do you know where Mr. Osher is

14   presently located?

15        A.      Mr. Osher is deceased.

16        Q.      Do you know who the current

17   officers of Entertainment Management

18   Services are?

19        A.      No.

20        Q.      I direct your attention to

21   Plaintiffs' Exhibit 4 for identification,

22   the sublicense agreement.

23                Do you recognize this document?

24        A.      Yes, sir.

25        Q.      Can you generally describe what

1                    SMITH

2    it is.

3        A.        This is the license agreement

4    that binds independent operators to take

5    on a license to operate as a Scores for

6    EMS, through EMS.

7        Q.        Turning your attention to page

8    6 of this document, Plaintiffs' Exhibit 4,

9    do you see a signature under Entertainment

10   Management Services on behalf of the

11   company?

12       A.        Yes, sir.

13       Q.        And who is that signature?

14       A.        Looks like Mr. Richard

15   Goldring.

16       Q.        To the right, on behalf of Go

17   West Entertainment, Inc., there is a

18   signature, do you recognize it?

19       A.        Yes, sir.

20       Q.        Who is that?

21       A.        It appears to be Mr. William

22   Osher.

23       Q.        I would like to go back to the

24   master license agreement, Exhibit 5.

25                 There is a reference on page 1

1                    SMITH
2    under license grant, it is Paragraph No.
3    1, do you see that reference?
4         A.        Yes, sir.
5         Q.        It describes the use of Scores'
6    trademark in connection with the business
7    located at 333 East 60th Street, do you
8    see that reference?
9         A.        Yes, sir.
10        Q.        It describes it as "the
11   original Scores nightclub," do you know
12   what that means?
13        A.        The marquise, the model.
14        Q.        There are other provisions that
15   describe the payment of royalties,
16   paragraph 2, master license agreement,
17   Exhibit 5, do you see that?
18        A.        Yes, sir.
19        Q.        Generally can you describe how
20   those royalty payments are made?
21        A.        Which royalty payments?
22        Q.        It says on page 2, paragraph 2,
23   that the licensee, which appears to be 333
24   East 60th Street, would make payment to
25   EMS?

1                    SMITH

2     licensor?

3                    MR. CAPOBIANCO:  I was fine

4     with page 2, but then when you went to the

5     next page, we have SH 003?

6                    MR. KLEIN:  Yes.

7                    MR. CAPOBIANCO:  The next words

8     are "EMS business"?

9                    MR. KLEIN:  Yes, I didn't

10    finish the sentence.

11        Q.    Mr. Smith, let me refer you

12    back to Plaintiffs' Exhibit 5 for

13    identification, the master license

14    agreement between Scores Holding Company

15    and Entertainment Management Services, the

16    document before you, and specifically

17    direct your attention to paragraph 4, page

18    2, 0002.

19                    Are you with me so far?

20        A.    Yes.

21        Q.    There is a bullet under that,

22    do you see that?

23        A.    Yes.

24        Q.    Can you generally describe what

25    this provision requires of the

1                    SMITH

2    sublicensees.

3         A.      Yes.

4                 This doesn't require any

5    provision of sublicensees.

6                 In this particular situation

7    licensee would be EMS and licensor would

8    be Scores Holding Company and it would be

9    that Scores Holding Company and EMS would

10   negotiate as it relates to marketing,

11   advertising and promotion activity, any

12   usage of that so as it preserves the value

13   and goodwill of the trademark Scores

14   itself on how that is being used.

15        Q.      There has been prior testimony

16   by you about a restated or revised master

17   license agreement executed sometime in

18   2006.

19                Do you recall that testimony?

20        A.      Yes.

21        Q.      Does that document physically

22   reside within the offices of Scores

23   Holding Company?

24        A.      Yes, sir.

25                MR. KLEIN:  I call for the

```
 1                         SMITH
 2     production.
 3               I have nothing further.
 4               (Time noted:  11:58 a.m.)
 5
 6
 7
 8
 9
10         _____
11           CURTIS SMITH
12
13     Subscribed and sworn to before me
14     this     day of             , 2008.
15
16
17
18
19
20
21
22
23
24
25
```

Page 98

1

2            C E R T I F I C A T I O N

3

4

5

6       I, Jineen Pavesi, a Registered

7    Professional Reporter, Registered Merit

8    Reporter, Certified Realtime Reporter and

9    a Notary Public, do hereby certify that

10    the foregoing witness, CURTIS SMITH, was

11    duly sworn on the date indicated, and that

12    the foregoing is a true and accurate

13    transcription of my stenographic notes.

14       I further certify that I am not employed

15    by nor related to any party to this

16    action.

17

18

19

20

21

22

23        JINEEN PAVESI, RPR, RMR, CRR

24

25

a180bd42-f02c-42ec-856c-86be60a55fd9