# EXHIBIT 4

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

No. 07 civ. 8718 (RMB)

------------------------------------x

SIRI DIAZ, CAROLYN SIEGEL, TALIA BUMB,

BLERTA VIKKI, DANIELLE OWIMRIN, on behalf

of themselves and all others similarly

situated,

        Plaintiffs,

   - against -

SCORES HOLDING COMPANY, INC.; GO WEST

ENTERTAINMENT, INC., a/k/a SCORES WEST

SIDE; and SCORES ENTERTAINMENT, INC.,

a/k/a SCORES EAST SIDE,

        Defendants.

------------------------------------x

       February 7, 2008

       2:00 p.m.


       Deposition of JOHN NEILSON,
taken by Plaintiffs, pursuant to Notice,
held at the offices of Outten & Golden
LLP, 3 Park Avenue, New York, New York,
before Jineen Pavesi, a Registered
Professional Reporter, Registered Merit
Reporter, Certified Realtime Reporter and
Notary Public of the State of New York.

Page 2

1

2    A P P E A R A N C E S :

3

4    OUTTEN & GOLDEN LLP

5    3 Park Avenue

6    New York, New York 10016

7              Attorneys for Plaintiffs

8

9    BY:        TAMMY MARZIGLIANO, ESQ.

10             tm@outtengolden.com

11

12

13    GREENBERG TRAURIG, LLP

14    200 Park Avenue

15    New York, New York 10166

16              Attorneys for Defendants

17

18    BY:        JERROLD F. GOLDBERG, ESQ.

19

20

21

22

23

24

25

1

2    J O H N    N E I L S O N,

3    having first been duly sworn by a Notary

4    Public of the State of New York, was

5    examined and testified as follows:

6    EXAMINATION BY

7    MS. MARZIGLIANO:

8        Q.        Good afternoon, my name is

9    Tammy Marzigliano, we met earlier, I

10   represent the plaintiffs in this matter.

11             Have you ever been deposed

12   before?

13       A.        Yes.

14       Q.        When were you deposed most

15   recently?

16       A.        2006.

17       Q.        What was the matter in which

18   you were deposed?

19       A.        I can't remember.

20       Q.        Was it involving your

21   employment or was it a personal matter?

22       A.        No, it was involving a business

23   matter, not related to these matters,

24   these entities.

25       Q.        What entity was it related to?

1                    NEILSON

2        A.        Private business matter, no

3    relationship to any of these entities.

4        Q.        How many times have you been

5    deposed?

6        A.        In how long?

7        Q.        Ever.

8        A.        20, 30.

9        Q.        So you're very familiar with

10   this process.

11       A.        Unfortunately.

12       Q.        I will go through some of the

13   ground rules, but obviously you have been

14   through this process before and you're

15   familiar with it.

16                 As you know, this is under oath

17   and I need for you to answer all of my

18   questions verbally, because, as you know,

19   the court reporter can't take down if you

20   nod your head or go uh-huh or anything

21   like that.

22                 Also just to keep things easy

23   for the court reporter, I just ask that

24   you let me finish my question before you

25   answer and we can keep a nice straight

1                    NEILSON
2    the Scores trademark to adult and
3    entertainment nightclubs, I work with EMS
4    to determine if a potential licensee
5    should or shouldn't become a licensee.
6         Q.      What does EMS stand for?
7         A.      Entertainment Management
8    Systems, I believe, Services.
9         Q.      Entertainment Management
10   Services?
11        A.      That's the way you have it
12   here, we always refer to it as EMS.
13        Q.      But is that correct, sir, is
14   Services correct?
15        A.      I couldn't tell you whether it
16   is services or systems, it is one of the
17   two.
18        Q.      Does anyone report to you in
19   your position as director and president?
20        A.      No, Scores Holding has no
21   employees.
22        Q.      Who do you report to?
23        A.      Board of directors.
24        Q.      Who is on the board of
25   directors?

1                         NEILSON

2       A.          Curtis Smith, Elda Auerbach,

3   and myself.

4       Q.          You're also on the board of

5   directors?

6       A.          Yes.

7       Q.          Who owns Scores Holding

8   Company?

9       A.          It is a public company trading

10  on the --  over-the-counter bulletin

11  board, it has approximately 630 plus

12  shareholders.

13      Q.          Who is the majority

14  shareholder?

15      A.          You would have to define

16  majority.

17      Q.          Who owns the most amount of

18  shares, to the best of your knowledge, in

19  Scores Holding Company?

20      A.          Again, that's not a very clear

21  question.

22      Q.          Do you know whether there is

23  someone that owns a majority, a higher

24  percentage of shares --

25      A.          There is nobody in Scores

1                        NEILSON

2    Holding that owns over 50 percent.

3        Q.        If you know, how many shares

4    does Richard Goldring own?

5        A.        He would probably own around 40

6    percent; if you look it up in the last

7    10-K you will see the exact number, it is

8    filed with the SEC.

9        Q.        Where is Scores Holding Company

10   incorporated?

11       A.        Utah.

12       Q.        When was it incorporated?

13       A.        Probably in the early

14   Seventies.

15       Q.        Where is the corporate offices

16   located?

17       A.        New York City.

18       Q.        What is the address?

19       A.        533 West 27th Street.

20       Q.        Who owns the building?

21       A.        A company called Westside

22   Realty of New York, Inc.

23       Q.        Who leases the building?

24       A.        Actually, let me go back.

25       Q.        Sure.

NEILSON

1

2      A.      The actual registered office
3  address is in Fort Lauderdale, not in New
4  York.
5              Again, if you define the
6  question, it has an office in New York,
7  but the registered office, the office in
8  which all correspondence relating to the
9  company is sent on an official basis, is
10  in Fort Lauderdale.
11      Q.      What's that address?
12      A.      901 Northeast 3rd Street, Fort
13  Lauderdale, Florida 33301.
14      Q.      The office in New York, the 533
15  West 27th Street, what's there?
16      A.      What's there?
17      Q.      Yes.
18      A.      An office comprising
19  approximately 300 square feet.
20      Q.      Are there any employees there?
21      A.      Curtis Smith works out of that.
22      Q.      Curtis Smith?
23      A.      Curtis Smith.
24      Q.      What's his title?
25      A.      He is the CEO, and if I am in

1                     NEILSON
2    New York City, I may use it.
3        Q.        How many offices are in that
4    building?
5        A.        Offices?
6        Q.        Yes, or in that space.
7        A.        The space that Scores Holding
8    occupies is about 200 something square
9    feet, it is about the size of that box
10   here, it has one desk, one filing cabinet
11   and one chair.
12       Q.        So Curtis Smith is there every
13   day?
14       A.        He sometimes works out of his
15   home.
16       Q.        Other than Curtis Smith and you
17   occasionally, does anyone else work out of
18   that office?
19       A.        No.
20       Q.        Right now I am talking about
21   Scores Holding Company, and when I move on
22   I will make that distinction, so you know
23   who I am referring to.
24                 Does Scores Holding Company own
25   any properties?

1                          NEILSON

2        A.        No.

3        Q.        Do they manage any properties?

4        A.        No.

5                  MR. GOLDBERG:  Property

6    referring to real property?

7                  MS. MARZIGLIANO:  Yes.

8        Q.        Does the corporation have any

9    bank accounts?

10       A.        Yes.

11       Q.        What banks?

12       A.        I would have to verify that

13   with Curtis Smith.

14       Q.        Do you know how many accounts?

15       A.        No.

16       Q.        Does the corporation have an

17   accountant?

18       A.        Yes, it does.

19       Q.        Do you know who the accountant

20   is?

21       A.        I am having a block; again, if

22   you look at the filings, it is on there.

23                 The account manager is Carl

24   Voght, but they have changed the name of

25   the firm recently, I can't remember.

1                    NEILSON

2        Q.        If it comes to you let me know

3    at that point and then we can always ask

4    for information to supplement and also to

5    verify the bank accounts.

6                  Does this corporation issue any

7    payroll checks?

8        A.        Yes, it does.

9        Q.        For whom does it issue payroll

10   checks?

11       A.        I believe just Curtis Smith.

12                 I make the statement now

13   because it may save us a lot of time in

14   messing around; Scores Holding Company is

15   a public company, it is a fully reporting

16   company that files 10-Qs and 10-Ks and has

17   done so since the early Seventies.

18                 You would be much better

19   informed printing out the last Form 10-K

20   that we filed or actually the most recent

21   10-Q that we filed, all your answers will

22   be on there, it will be more accurate than

23   me trying to remember information and it

24   would save us all a lot of time and legal

25   fees if you did that.

1                        NEILSON

2        Q.        I can ask you to produce that

3    information.

4        A.        Or you can go on-line now and

5    print it up, go to Yahoo and print it up,

6    it will take you all of five minutes.

7        Q.        I appreciate that, in directing

8    me, but we still have this process that we

9    need to go through to get this

10   information.

11       A.        It would be much more efficient

12   for you to rely on the Ks and Qs than my

13   memory.

14       Q.        We can also verify some of

15   that.

16                 Would that have the bank

17   account information on there?

18       A.        It has all pertinent financial

19   reporting information.

20       Q.        Speaking of Scores Holding

21   Company, what, if you know, are the

22   corporation's assets?

23       A.        The trademark, the license

24   agreements that are in place at this time.

25       Q.        Anything else?

1                      NEILSON
2        A.        No.
3        Q.        Does the corporation have a
4    human resource department or any other
5    departments?
6        A.        No.
7        Q.        Does it negotiate service
8    contracts?
9        A.        It has done in the past, yes.
10       Q.        Does it purchase merchandise?
11       A.        Define merchandise.
12       Q.        Any kind of itemses, tangible
13   items?
14       A.        Such as?
15       Q.        The diamond dollars or hats?
16       A.        No.
17       Q.        Or bar glasses?
18       A.        It does manufacture baseball
19   caps and T shirts and other item, it does
20   not manufacture or buy or sell bar
21   glasses.
22       Q.        The hats --
23       A.        Novelty type.
24       Q.        What do you do with these
25   novelty type items?

1                    NEILSON

2        A.        It sells them to clubs that use

3    the Scores trademark.

4        Q.        Does it have any subsidiaries;

5    again, talking about Scores Holding

6    Company?

7        A.        Without referring to the 10-K

8    and to the relevant legal counsel, I can't

9    respond to that at this time.

10        Q.        Who is the relevant legal

11    counsel?

12        A.        That would be Gotbetter &

13    Partners, our corporate legal counsel.

14            Again, if you go and print off

15    the 10-K, the history of the company from

16    1999 is there in very clear, succinct,

17    written English and would save my time,

18    your time, my attorney's time, this very

19    good young lady on my right here, and it

20    would certainly be more effective than

21    relying on my memory which, due to my

22    age --

23        Q.        Are you suggesting that it is

24    maybe more efficient to postpone this for

25    us to review it and have you come back

1                         NEILSON

2    tomorrow?

3         A.       I am telling you if you want

4    answers to these questions in a clear way,

5    go to the documents that we file with the

6    government every quarter, that's why we do

7    it and it will save a lot of time, because

8    you are asking me questions that I can't

9    remember, I would have to go to those

10   documents to refer to them to answer them.

11                 MS. MARZIGLIANO:  Off the

12   record.

13                 (Discussion off the record.)

14                 MS. MARZIGLIANO:  I expect that

15   you will produce all relevant documents

16   and whatever documents that you're

17   referring to, if we need to, we will call

18   you back.

19                 As a 30(b)(6) witness, you're

20   here to testify about this information, so

21   we assume that you have this knowledge.

22                 MR. GOLDBERG:  He does, I don't

23   think he has indicated he doesn't, just

24   some of the specifics obviously he doesn't

25   recall and he has indicated may be

1              NEILSON

2    reflected, but we will produce the 10-Ks

3    and 10-Qs.

4              MS. MARZIGLIANO:  Thank you.

5        Q.      Again, speaking about Scores

6    Holding Company, I believe I had asked

7    whether there are any subsidiaries?

8        A.      Without referring to the 10-Qs

9    or 10-Ks, I can't answer that question

10   accurately.

11       Q.      To the best of your knowledge?

12       A.      Without referring to the

13   documents, I can't answer that question

14   accurately.

15       Q.      Moving on to Entertainment

16   Management Services, what is the

17   relationship between Entertainment

18   Management Services and Scores Holding

19   Company?

20       A.      Scores Holding Company gave a

21   master license agreement to EMS, giving it

22   the right to market, promote, advertise,

23   and enter into licensing agreements with

24   adult entertainment nightclubs to use the

25   Scores trademark.

1                        NEILSON

2          Q.        Who owns Entertainment

3     Management Services?

4          A.        It is owned by three

5     individuals.

6          Q.        What are their names?

7          A.        Richard Goldring, Elliot Osher

8     and Harvey Osher.

9          Q.        Is there a relation between

10    those two, Harvey and Elliot?

11         A.        Yes, there is.

12         Q.        Who operates and manages

13    Entertainment Management Services?

14         A.        Richard Goldring.

15         Q.        What kind of company is

16    Entertainment Management Services?

17                   MR. GOLDBERG:  Can you be more

18    specific?

19         Q.        What is its responsibilities,

20    what does it do?

21         A.        All it does is enter into

22    license agreements with potential

23    licensees to use the Scores trademark in

24    the area of adult entertainment and

25    nightclubs in exchange for a fee.

1                      NEILSON

2        Q.        Where is its office?

3        A.        Its office, I believe it is at

4   533 West 27th Street.

5        Q.        Has it always been located

6   there, to the best of your knowledge?

7        A.        As far as I am aware.

8        Q.        Who is in that office, who

9   physically works in that office?

10        A.        Richard Goldring.

11        Q.        How many employees does

12   Entertainment Management Services have?

13        A.        I don't know.

14        Q.        Again, for purposes of these

15   questions, I am referring to Entertainment

16   Management Services, which you referred to

17   as EMS, correct?

18        A.        Yes.

19        Q.        Where is it incorporated?

20        A.        I don't know.

21        Q.        Do you know when it was

22   incorporated?

23        A.        No.

24        Q.        Do you know if the corporation

25   manages any properties?

1                       NEILSON

2       A.       No, it does not.

3       Q.       Who are the corporate officers

4    of the corporation?

5       A.       I don't know.

6       Q.       Do you know who the president

7    is?

8       A.       I know that Richard Goldring is

9    a corporate officer, but I can't tell you

10   exactly what his specific title is.

11      Q.       Do you know who the CEO is?

12      A.       No.

13      Q.       The controller?

14      A.       They don't have one, as far as

15   I know.

16      Q.       Do you know if this

17   corporation, referring to EMS, has any

18   bank accounts?

19      A.       Again, I couldn't tell you

20   specifically without reviewing the

21   relevant documents to determine if it does

22   or doesn't.

23      Q.       When you say relevant

24   documents, you're referring to what?

25      A.       Bank accounts pertaining to

1                      NEILSON

2    EMS.

3         Q.        The only way you can get this

4    information is if you reviewed the bank

5    accounts of EMS?

6         A.        By saying do you have any bank

7    accounts, show me the statements, and then

8    I would look at the statements and say,

9    oh, you have bank accounts.

10        Q.        Does EMS have an accountant?

11        A.        I don't know.

12        Q.        Do you know if EMS issues any

13   payroll checks?

14        A.        I don't know.

15        Q.        Do you know if there is any

16   employees of EMS?

17        A.        I don't know.

18        Q.        Do you know what EMS' corporate

19   assets are?

20        A.        No.

21        Q.        Do you know if EMS purchases

22   merchandise?

23        A.        I don't know.

24        Q.        Do you know if it oversees any

25   budgets, EMS?

1                          NEILSON

2        A.        What do you mean by budgets?

3        Q.        Any budgets of any other

4    entities.

5        A.        I don't know what you mean by

6    the term budgets.

7        Q.        Do you know if EMS has any

8    subsidiaries?

9        A.        No.

10       Q.        No, you don't know or, no, they

11   don't have any?

12       A.        No, I don't know.

13       Q.        Do you know which entities EMS

14   has entered into license agreements with?

15       A.        Yes.

16       Q.        Who are those entities?

17       A.        Scores Baltimore, Scores

18   Chicago, Scores Las Vegas, Scores

19   Westside, Scores Eastside, Scores New

20   Orleans, Scores Miami.

21                 That's it, I believe.

22       Q.        What is your relationship with

23   with EMS, if any?

24       A.        I oversee as part of my

25   responsibilities in Scores Holding that

1                    NEILSON

2    they are not doing anything that would be

3    deemed detrimental to the trademark and

4    they and I work together on the license

5    agreements.

6        Q.        What do you mean detrimental to

7    the trademark, can you give me an example.

8        A.        That they are not using the

9    trademark in a detrimental way.

10       Q.        What would you define as

11   detrimental, can you give me an example of

12   what you would think would be detrimental?

13       A.        Licensing the trademark to a

14   business that is not  -- that does not

15   portray the right image for the trademark.

16       Q.        What is the image?

17       A.        Upscale, expensive.

18       Q.        Expensive what?

19       A.        An expensive place to go.

20       Q.        Going through these entities,

21   starting with Scores Baltimore, do you

22   know who owns that entity?

23       A.        Not without referring to the

24   license agreement, I can't give you the

25   specific name of the entity that owns it.

1                      NEILSON

2        Q.       Do you know who runs it and

3    operates it?

4        A.       Andrew Ali.

5        Q.       Who is responsible for the

6    day-to-day operation?

7        A.       Andrew Ali.

8        Q.       Who has the authority to hire

9    workers there?

10       A.       I don't know.

11       Q.       What process, if any, do you

12   know they go through to hire workers?

13       A.       I don't know.

14       Q.       At the Scores Baltimore?

15       A.       I don't know.

16       Q.       Who determines the rate of pay

17   for workers at Scores Baltimore?

18       A.       I don't know.

19       Q.       Do you know who sets the rate

20   of pay for workers at any of the entities

21   that you just named?

22       A.       No.

23       Q.       Do you know whether anyone

24   outside that work at any of these entities

25   that you just named, Scores Baltimore,

1                   NEILSON

2    Scores Chicago, Las Vegas, Westside,

3    Eastside, Scores New Orleans and Scores

4    Miami, who has the power to set the rate

5    of pay?

6        A.      No.

7        Q.      Going back to Scores Baltimore,

8    is this incorporated, Scores Baltimore?

9        A.      I don't understand the

10   question.

11       Q.      Is it a corporation?

12       A.      I don't know.

13       Q.      You don't understand the

14   question or you don't know if it is a

15   corporation?

16       A.      I don't know without referring

17   to the relevant license agreement and

18   seeing the exact corporate name whether it

19   is incorporated or not incorporated.

20               If when I review the license

21   agreement I can't tell whether or not it

22   is incorporated or not, my answer would be

23   that I would have to refer to the owner to

24   get that information.

25       Q.      Is that your position with

1               NEILSON
2    Scores Baltimore, Scores Chicago, Scores
3    Las Vegas, Scores Westside, Scores
4    Eastside, Scores New Orleans and Scores
5    Miami?
6       A.       The only information that we
7    have in Scores Holding and through the
8    conversations and negotiations that take
9    place with EMS in relation to these
10   licensing agreements is that we deal
11   directly with the owner, we do not
12   participate in their operation, we do not
13   participate in their policies, we do not
14   advise or discuss with them how they run
15   their businesses.
16               Our pure and sole
17   responsibility is that we let them enter
18   in a license agreement that allows them to
19   use the name; in return they pay a fee,
20   and the only control factor that we have
21   is to maintain that the trademark is not
22   damaged in any way by the licensee, that
23   the licensee only uses the trademark in
24   the way in which they have licensed it
25   for.

1                            NEILSON
2        Q.        Are you privy, though, to the
3    policies and procedures that go on?
4        A.        No, absolutely not; two
5    reasons; firstly, it is illegal in most
6    states for anybody who isn't on the liquor
7    license and we are on no liquor licenses,
8    to participate in those areas.
9                 Secondly, as a licensing
10   company, we're not involved in the
11   day-to-day management or operation of
12   those businesses.
13       Q.        Are you --
14       A.        Nor do we desire to be.
15       Q.        Are you privy to the day-to-day
16   operations of Scores Westside?
17       A.        Minimally.
18       Q.        Tell me what you are privy to,
19   talking about Scores Westside?
20       A.        They operate as an adult
21   entertainment club in New York City using
22   the name Scores West.
23       Q.        Their name is Scores West?
24       A.        Scores West.
25       Q.        Do you know who owns Scores

1                    NEILSON

2    West?

3         A.        Yes.

4         Q.        Who owns Scores West?

5         A.        Richard Goldring, Elliot Osher.

6         Q.        Where is Scores West located?

7         A.        528 West 28th Street.

8         Q.        Do you know whether Scores West

9    is incorporated?

10        A.        Yes, it is.

11        Q.        Do you know when it was

12   incorporated?

13        A.        Without referring to the

14   corporate documents, I couldn't verify the

15   exact date.

16        Q.        Do you know whether Scores West

17   owns any properties?

18        A.        Define properties.

19        Q.        Real property.

20        A.        Define real property.

21        Q.        Any land, any buildings, any

22   other entities.

23        A.        No, Go West only owns the

24   fixtures and fittings and equipment in the

25   location.

NEILSON

1

2    Q.      Who is the corporate officers

3    of Scores West?

4    A.      Richard Goldring and Elliot

5    Osher.

6    Q.      Who is the president of Scores

7    West?

8    A.      Richard Goldring.

9    Q.      Who is the CEO of Scores West?

10   A.      I don't know if they have one.

11   Q.      Do you know if they have a

12   controller at Scores West?

13   A.      I don't think they have a

14   controller.

15   Q.      Do you know whether Scores West

16   has any bank accounts?

17   A.      I don't know.

18   Q.      Do you know whether Scores West

19   has an accountant?

20   A.      I don't know.

21   Q.      Do you know whether Scores West

22   issues any paychecks?

23   A.      Yes, it does.

24   Q.      Do you know for whom?

25   A.      Employees of Go West.

1                    NEILSON

2      Q.       So I'm clear, the employees at

3  Go West, their paychecks are from Go West,

4  it says from Go West, is that what you're

5  saying?

6      A.       I believe so.

7      Q.       Do you know how many employees

8  work at Go West?

9      A.       No.

10     Q.       Scores West?

11     A.       No.

12     Q.       I want to be clear; is it Go

13  West or Scores West?

14     A.       Corporate name is Go West

15  Entertainment, Inc.; establishment's name

16  is Scores West, refers to as Scores West

17  or Scores Westside.

18     Q.       Do you know Go West, the

19  corporation's assets, what they are?

20     A.       No.

21     Q.       Do you know if Go West has an

22  employee handbook?

23     A.       Yes.

24     Q.       Does Scores Holding Company

25  have an employee handbook?

1                   NEILSON

2      A.        No.

3      Q.        Does EMS have an employee

4  handbook?

5      A.        Not to my knowledge.

6      Q.        Do you know if Go West has a

7  human resource department?

8      A.        Not to my knowledge.

9      Q.        Do you know whether Go West can

10  purchase merchandise?

11      A.        I don't understand the

12  question.

13      Q.        Similar merchandise, novelty

14  items, baseball caps, things like that?

15      A.        Still don't understanding the

16  question.

17      Q.        Do you know whether they

18  purchase merchandise, do they purchase

19  merchandise, for example, with the Scores

20  logo from Scores Holding Company or do

21  they purchase it elsewhere?

22      A.        From Scores Holding Company.

23      Q.        Who runs Scores Westside, Go

24  West?

25      A.        Richard Goldring.

1                           NEILSON
2          Q.         Who runs the day-to-day
3     operations of Go West?
4          A.         Richard Goldring.
5          Q.         Who has authority at Go West to
6     hire workers?
7          A.         I don't know.
8          Q.         Who sets the rate of pay for
9     workers at Go West?
10         A.         I don't know.
11         Q.         Do you know who signs the
12    paychecks for Go West employees?
13         A.         Richard Goldring.
14         Q.         Would it be fair to say that he
15    sets the rate of pay for these employees
16    at Go West?
17         A.         I don't know.
18         Q.         If he did not, who do you
19    believe would set the rate of pay for
20    employees at Go West?
21         A.         Mr. Goldring or one of his
22    subordinate managers.
23         Q.         Who tells workers what to do at
24    Go West?
25         A.         Managers.

1                    NEILSON

2      Q.        How many managers are at Go

3   West?

4      A.        I couldn't give you an exact

5   number at this time.

6      Q.        An estimate, is there more than

7   12?

8      A.        I am not going to estimate a

9   number that I don't know.

10      Q.        Is it more than 12, to the best

11   of your knowledge?

12      A.        I doubt it.

13      Q.        What role, if any, do you play

14   in Go West?

15      A.        Mr. Goldring will from time to

16   time ask my advice on certain matters.

17      Q.        Like what?

18      A.        Business decisions, decisions

19   relating to the operation of the business,

20   ideas, suggestions.

21      Q.        Could you give me an example,

22   please.

23      A.        Should we make this invitation

24   red or blue, should I talk to this person

25   about doing a promotion, how can I make

NEILSON

1    the club more profitable, how can I deal

2    with competitive issues, things like that.

3         Q.        Thank you.

4                   Who has the power at Go West to

5    fire employees?

6         A.        I don't know.

7         Q.        If it is not Mr. Goldring, who

8    do you believe would have the power to

9    fire employees?

10        A.        One of his managers.

11        Q.        Would the ultimate decision, if

12   you know, fall on Mr. Goldring?

13        A.        I doubt it.

14        Q.        The other entity that you

15   mentioned was Scores Eastside.

16                  Is there another name for it or

17   is that it, Scores Eastside?

18        A.        Scores East, Scores Eastside;

19   if you look at the license agreement, you

20   will see the specific name we gave them.

21        Q.        Is it 333 East 60th Street?

22        A.        That's the corporation.

23        Q.        Is it incorporated; that would

24   be yes?

1                    NEILSON

2        A.       Yes.

3        Q.       Do you know where it is

4    incorporated, referring now to Scores

5    Eastside?

6        A.       New York.

7        Q.       Do you know the address?

8        A.       Which address?

9        Q.       Its principal place of

10   business.

11       A.       333 East 60th Street, strangely

12   enough.

13       Q.       Do you know whether Scores

14   Eastside, whether the corporation owns any

15   properties?

16       A.       Again, define properties.

17       Q.       Real property, do they own any

18   buildings, any land.

19       A.       No.

20       Q.       Does Scores Eastside manage any

21   properties?

22       A.       No.

23       Q.       Who is the owner of Scores

24   Eastside?

25       A.       Richard Goldring and Elliot

1                     NEILSON
2    Osher.
3        Q.        Who is the president of the
4    corporation?
5        A.        Richard Goldring.
6        Q.        Who is the CEO of the
7    corporation?
8        A.        I don't know that they have
9    one.
10       Q.        Do you know if they have a
11   controller?
12       A.        I don't know.
13       Q.        Do you know if this corporation
14   has any bank accounts?
15       A.        I don't know.
16       Q.        Do you know if this corporation
17   has an accountant?
18       A.        I don't know.
19       Q.        Do you know if this corporation
20   issues any payroll checks?
21       A.        Yes, it does.
22       Q.        To whom do they issue checks?
23       A.        Employees.
24       Q.        Do you know how many employees
25   are at Scores Eastside?

1                   NEILSON

2        A.        No.

3        Q.        Do you know from what bank

4   account these payroll checks are issued

5   from?

6        A.        No.

7        Q.        Do you know whether Scores

8   Eastside has a human resource department?

9        A.        Don't know.

10       Q.        Do you know whether this

11  corporation, Scores Eastside, has any

12  assets?

13       A.        Define assets.

14       Q.        Property, equipment, money.

15       A.        The only assets it has is the

16  fixtures, fittings and property at the

17  location.

18       Q.        Do you know whether Scores

19  Eastside has an employee handbook?

20       A.        Yes, it does.

21       Q.        Is it the same employee

22  handbook that Scores Westside has?

23       A.        Similar.

24       Q.        What are the differences?

25       A.        The Scores East handbook refers

1                          NEILSON
2        to Scores East and the Scores West refers
3        to Scores West.
4            Q.        But the policies and procedures
5        within it are the same substantively
6        speaking?
7            A.        Substantively speaking, yes.
8            Q.        Do you know whether Scores
9        Eastside has any subsidiaries?
10           A.        No.
11           Q.        Do they purchase their
12       merchandise from Scores Holding Company?
13           A.        Yes.
14           Q.        Who runs the day-to-day
15       operations of Scores Eastside?
16           A.        Richard Goldring.
17           Q.        Who has the authority to hire
18       the workers at Scores Eastside?
19           A.        I don't know.
20           Q.        Who has authority to fire
21       workers at Scores Eastside?
22           A.        I don't know.
23           Q.        Who issues the paychecks at
24       Scores Eastside?
25           A.        I don't know.

1                          NEILSON

2      Q.       Who signs the paychecks at

3  Scores Eastside?

4      A.       Richard Goldring.

5      Q.       Who directs the workers on what

6  to do?

7      A.       Management team.

8      Q.       At Scores Eastside?

9      A.       The management team.

10      Q.       Does anyone else have the power

11  to direct the workers at the Scores

12  Eastside?

13      A.       Not that I know of.

14      Q.       Would Mr. Goldring have the

15  power to direct the workers at Scores

16  Eastside?

17      A.       He owns the business, I would

18  imagine so.

19      Q.       Do you know whether Mr.

20  Goldring sets the company policies at the

21  Scores Eastside?

22      A.       I don't know.

23      Q.       Do you know whether he does at

24  the Scores Westside?

25      A.       I don't know.

1                    NEILSON

2        Q.        Who determines the hours of

3    operation for the Scores Eastside?

4        A.        Richard Goldring and the law.

5        Q.        Who sets the hours of operation

6    for the Scores Westside?

7        A.        Richard Goldring and the law.

8        Q.        Are they the same hours of

9    operation?

10        A.        I believe so, but I haven't

11    checked recently.

12        Q.        Who determines what merchandise

13    Scores Holding Company is going to

14    purchase, in other words, the hat, the

15    logos and novelty items that you mentioned

16    before, who makes that decision?

17        A.        Myself and Curtis Smith and

18    Elda Auerbach.

19        Q.        Are the other entities, Scores

20    Eastside and Westside, required to

21    purchase that merchandise from Scores

22    Holding Company?

23        A.        If it is an item that Scores

24    Holding has, yes.

25        Q.        Does Mr. Goldring participate

1              NEILSON

2    in negotiating contracts?

3        A.      What sort of contracts?

4        Q.      These licensing agreements.

5        A.      As the president of EMS, yes.

6        Q.      To the best of your knowledge,

7    does he visit Scores Eastside?

8        A.      I imagine so.

9        Q.      To the best of your knowledge,

10   does Mr. Goldring visit Scores Westside?

11       A.      I imagine so.

12       Q.      Do you know of any incidents in

13   the Scores Eastside that Mr. Goldring has

14   fired or disciplined an employee?

15       A.      No.

16       Q.      Do you know of any incidents in

17   the Scores Westside that Mr. Goldring has

18   fired or disciplined an employee?

19       A.      No.

20       Q.      Scores Entertainment

21   Incorporated, are you familiar with that

22   entity?

23       A.      Yes.

24       Q.      What was that entity?

25       A.      It was a prior owner of Scores

1                    NEILSON
2      East before it was acquired by 333 East
3      60th Street, Inc.
4          Q.      Who owned that entity?
5          A.      Irving Bilzinsky.
6          Q.      What was the time period in
7      which he owned that entity?
8          A.      1990 through 2001 or 2002.
9          Q.      What is the relationship
10     between Scores Entertainment, Inc., and
11     EMS?
12         A.      None that I am aware of; I
13     would have to review the license
14     agreements to see if EMS actually entered
15     into a license agreement with Scores
16     Entertainment, Inc., or whether its
17     license agreement was only with 333 East
18     60th Street, Inc.
19         Q.      You said 333 East 60th Street
20     took over Scores Entertainment, Inc., is
21     that correct?
22         A.      Over the location, the
23     business, that was owned by Scores
24     Entertainment, Inc.
25         Q.      So if Scores Entertainment,

1                    NEILSON

2    Inc., didn't have an agreement with EMS,

3    would it have one with Scores Holding

4    Company?

5       A.      I would have to review the

6    documents to answer that question.

7       Q.      What documents would you need

8    to review to answer that?

9       A.      The licensing agreements.

10        MS. MARZIGLIANO:  Can you mark

11    this as Plaintiffs' Exhibit 6.

12        (Plaintiffs' Exhibit 6, Rule

13    7.1 of the Federal Rules of Civil

14    Procedure, was marked for identification,

15    as of this date.)

16       Q.      Showing you what's been marked

17    as Plaintiffs' Exhibit 6.

18        Have you ever seen this

19    document before?

20        (Witness perusing document.)

21       A.      No.

22       Q.      What is this document?

23       A.      Statement pursuant to Rule 7.1

24    of the Federal Rules of Civil Procedure.

25       Q.      If you can take a minute and

VERITEXT/NEW YORK REPORTING COMPANY
212-267-6868                      516-608-2400
b1b0377c-488a-49ed-a2d4-3e812409068b

1                         NEILSON

2      read the document.

3                   (Witness perusing document.)

4         A.      Okay.

5         Q.      Have you had an opportunity to

6      read it?

7         A.      Yes.

8         Q.      Is the information in there

9      accurate?

10        A.      Yes, it is.

11        Q.      Is there anything that's not

12     listed on this statement that should be

13     listed?

14                   MR. GOLDBERG:  Objection, this

15     is a legal document that's submitted to

16     the court for purposes of determining

17     disqualification of the judges and I don't

18     think the witness should be answering a

19     legal question about whether the document

20     contains something that is or isn't

21     required.

22                   I think it is an inappropriate

23     question and I will direct him not to

24     answer that.

25        Q.      The information that is in

1                        NEILSON
2   there is accurate, correct?
3        A.        Well, I can't tell you whether
4   the Rule 7.1 is accurate, but I can tell
5   you that 1 and 2 are accurate.
6        Q.        Thank you?
7                  MS. MARZIGLIANO:  I just need
8   five minutes.
9                  (Recess taken.)
10  BY MS. MARZIGLIANO:
11       Q.        We talked about Scores
12  Eastside, we spoke about Scores Westside.
13                 We started speaking about
14  Scores Baltimore; is it my understanding
15  that you're not aware regarding Scores
16  Baltimore about whether or not it is
17  incorporated or who the owner is?
18       A.        I don't believe that's what I
19  answered.
20                 What I answered was if I look
21  at the relevant license agreements, I can
22  verify to you who is the corporate owner
23  and who is the corporate officer that
24  signed the license agreement.
25       Q.        Which we don't have and has not

1                     NEILSON

2    been produced to us.

3        A.        Again, if you go online to

4    Scores Holding and look in the 10-Q and

5    10-Q filings, all the license agreements

6    are attached in the relevant quarter in

7    which they were signed and you can see all

8    the documents.

9                 MR. GOLDBERG:  We will provide

10   that document; I think the witness earlier

11   testified he knew the individual who was

12   the responsible person for Scores

13   Baltimore, but he didn't know if the

14   corporation was the actual licensee.

15       Q.        Who is the owner of Scores

16   Baltimore?

17       A.        The question you actually asked

18   was who is responsible for the day-to-day

19   management of Scores Baltimore and I

20   answered Andrew Ali.

21       Q.        Is Andrew Ali also the owner?

22       A.        I couldn't tell you.

23       Q.        Do you know who the owner is?

24       A.        Yes, I do.

25       Q.        Who is the owner?

1                    NEILSON

2        A.        It is a corporation.

3        Q.        Do you know who the corporate

4    officers are and directors?

5        A.        No.

6        Q.        Do you know when it was

7    incorporated?

8        A.        No.

9        Q.        Do you know where the corporate

10   officers are located regarding Scores

11   Baltimore?

12       A.        No.

13       Q.        Do you know whether Scores

14   Baltimore manages any properties, real

15   properties, businesses?

16       A.        No, we do not involve ourselves

17   in the operation, ownership, of these

18   businesses.

19                 Our only relationship is that

20   we license the Scores name to them in

21   exchange for a fee and our only

22   relationship to those entities is, A, to

23   receive a fee for the use of the name

24   whilst they use it; B, make sure that the

25   money they pass is correct, make sure the

1                          NEILSON
2        fee they pay is correct, in other words,
3        they send the statements and say we owe
4        you X and we make sure they pay us X, and,
5        3, that they do not do anything that's
6        detrimental to the trademark or would be
7        an infringement on the license agreement.
8                    That is the extent of our
9        relationship with any licensee, we do not
10       manage their business, do not advise them
11       on their businesses, do not set policies
12       on their business, we do not involve
13       ourselves in the day-to-day management of
14       their businesses at any level at all.
15            Q.      When you say "they," who are
16       you referring to?
17            A.      The licensees.
18            Q.      When you say "licensees" who
19       are you referring to?
20            A.      Anybody who is using the Scores
21       trademark.
22            Q.      I understand that, but you're
23       here today to give testimony on the
24       ownership, management, and organizational
25       structure of various different

1                   NEILSON

2       corporations, you understand that,

3       correct?

4           A.      Yes, and the corporations you

5       have listed here are Scores Holding

6       Company, Go West Entertainment, Inc.,

7       Scores Entertainment, Inc., Entertainment

8       Management Services, and that's it, four

9       corporations.

10                  That is the limit of this.

11          Q.      So --

12          A.      Of this notice of deposition

13      pursuant to Rule 30(b)(6).

14          Q.      So we're talking about the

15      different entities.

16                  Going back to this Scores

17      Baltimore, and if you know the

18      information, great, if you don't, just let

19      me know, do you know whether Scores

20      Baltimore has any bank accounts?

21          A.      No.

22          Q.      Do you know who Scores

23      Baltimore's accountant is?

24          A.      No.

25          Q.      Do you know whether Scores

1              NEILSON

2    Baltimore issues any paychecks?

3         A.      No.

4         Q.      Does Mr. Goldring have any

5    involvement, to the best of your

6    knowledge, with Scores Baltimore?

7         A.      No, he does not.

8         Q.      You don't know or you know he

9    doesn't?

10        A.      Mr. Goldring has no involvement

11   with Scores Baltimore, Scores Chicago,

12   Scores Las Vegas, Scores New Orleans or --

13        Q.      Does he have any involvement in

14   Scores Miami?

15        A.      That business is currently

16   closed.

17        Q.      Scores Miami is currently

18   closed?

19        A.      Yes.

20        Q.      When did it close?

21        A.      A year ago.

22        Q.      Who owns Scores Miami?

23        A.      A corporation.

24        Q.      What is the name of the

25   corporation?

Page 55

```
 1                    NEILSON
 2      A.        Scores --  SMG Entertainment,
 3  Inc..
 4      Q.        Do you know who the officers
 5  and directors were of that corporation,
 6  SMG Entertainment?
 7      A.        Not without referring to the
 8  relevant paperwork.
 9      Q.        Do you know why it closed, SMG
10  Entertainment, Inc.?
11      A.        Because they were --  the
12  owners were looking to redevelop that
13  location, that piece of real estate.
14      Q.        What do you mean the owners,
15  the owners of the building where it was
16  located or the owners of SMG?
17      A.        The owners of the real estate.
18      Q.        Did SMG --
19      A.        For SMG, I don't have the
20  information, it is not on the notice of
21  deposition, it is not listed as a
22  corporation on there, it is not part of
23  the corporation, and as I have stated in
24  relation to all of those relevant
25  corporations, Baltimore, Chicago, Las
```

1                    NEILSON

2    Vegas, et cetera, other than the person

3    who signed the license agreement, other

4    than the corporate name that is on the

5    license agreement, other than discussions

6    about the license agreement, I have no

7    knowledge of anything to do with those

8    businesses, they are independently owned,

9    operated, managed, and run.

10       Q.       So you have no testimony to

11   give today regarding Scores Baltimore?

12       A.       I can't give you any testimony.

13       Q.       And you have no --

14       A.       We succinctly and clearly --

15   Scores Holding and EMS clearly and

16   succinctly avoid, intentionally do not get

17   involved, in how these people run and

18   manage their businesses.

19               All we do is license the name,

20   the only parameter we require from the

21   operator of that club is two-fold; one,

22   all actions that they take in the club

23   must be legal or they risk losing the use

24   of the license agreement, and, secondly,

25   that they must conform to an operating