# EXHIBIT F

Case 1:07-cv-08718-RMB-THK   Document 54-7   Filed 03/28/2008   Page 1 of 8

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SIRI DIAZ, CAROLYN SIEGEL, TALIA BUMB, BLERTA VIKKI, DANIELLE OWIMRIN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br>SCORES HOLDING COMPANY, INC.; GO WEST ENTERTAINMENT, INC. a/k/a SCORES WEST SIDE; and SCORES ENTERTAINMENT, INC., a/k/a SCORES EAST SIDE.; ENTERTAINMENT MANAGEMENT SERVICES, INC.; and 333 EAST 60th STREET, INC., a/k/a SCORES EAST SIDE.<br><br>Defendants. | No. 07-8718 (RMB)<br><br>DECLARATION OF DANIELLE OWIMRIN |

I, DANIELLE OWIMRIN, declare, upon personal knowledge and under penalty of perjury, pursuant to 28 U.S.C. Section 1746, that the following is true and correct:

1. I worked at Scores' clubs from approximately March 2004 through approximately April 2007 primarily in Scores' West Side ("Scores West") location but also occasionally at Scores' East Side location ("Scores East").

2. During the first year and a half of my employment with Scores, I worked as a dancer. I worked as a shot girl for the remainder of my employment with Scores.

3. Scores West and Scores East employed the same policies and practices.

4. Scores West and Scores East employed many of the same supervisors and personnel. Employees were permitted to freely work between the two

locations.

5. Throughout my employment as a dancer and as a shot girl for Scores, I was not paid any hourly wages. My compensation was entirely comprised of customer tips.

6. As a dancer, Scores required me to pay a "house fee" for every shift that I worked. The amount of this fee ranged from $40 to $180. Scores' policy was for me to pay this fee to the "house mother" at the start of my shift. However, I would usually pay the house fee at the end of the night. If I did not pay this fee to Scores on the night that I worked, I would have to pay it during my next shift, or they would deduct it from my money when I later redeemed my Diamond Dollars.

7. As a shot girl, I was also required to pay a "house fee" for every shift that I worked. The amount of the fee ranged from $120 to $160.

8. Nobody at Scores ever informed me about a federal law regarding a tip credit at any time during my employment at Scores. Nobody at Scores ever told me that I would be paid less than the minimum wage because I would receive tips. Nobody at Scores ever told me that my tips would be used as a credit against the minimum wage that Scores was required to pay me.

9. When I started working at Scores and during the entire course of my employment, nobody ever gave me or showed me a copy of any laws, rules, or regulations regarding the tip credit and minimum wages. While working at Scores, I never saw any posters, signs, or notices regarding any

law, rule, or regulation regarding the tip credit or an employer's deductions from wages and tips.

10. Throughout my employment at Scores, I was not allowed to retain all of the tips that I received.

11. As a dancer, Scores required me to give a portion of my tips to other employees, including the DJ, the house mother, the floor host, the person who cashed out Diamond Dollars, and the makeup artist. No one from Scores told me that I could choose to not pay these individuals some of my tips. Neither the DJ, the house mother, the person who cashed out Diamond Dollars, nor the makeup artist had customer service duties and none of them had any contact with customers while they were working.

12. During my employment at Scores, I received most of my tips in Diamond Dollars.

13. Diamond Dollars are imitation currency in denominations of $20.00 that customers can buy from Scores using their credit cards. Many customers used Diamond Dollars to tip workers, including myself, other dancers, bartenders, servers, and cocktail waitresses.

14. When workers, including myself, and other dancers, bartenders, servers, and cocktail waitresses, attempted to redeem our Diamond Dollars for cash, we would only receive a portion of the value of our tips. The remainder of our tips was retained by Scores. For every $20.00 in Diamond Dollars that we attempted to redeem, Scores retained $2.00 for itself. We only received 90 cents on the dollar. At some point, Scores

retained $4.00 for itself out of each $20.00 Diamond Dollar that we attempted to redeem.

15. Scores made it difficult for me and other workers to exchange Diamond Dollars for a check, or on rare occasions for cash. It permitted us to redeem our Diamond Dollars only during designated times (usually between 7:00 p.m. and 9:00 p.m., or 8:00 p.m. and 10:00 p.m. on weeknights), and only through designated personnel.

16. Additionally, Scores limited how much I could redeem in Diamond Dollars each night. We were only permitted to redeem $1,000.00 in Diamond Dollars per shift.

17. Scores' policies and practices with respect to Diamond Dollars apply to all workers who receive Diamond Dollars as tips, including all dancers, servers, cocktail waitresses, and bartenders.

18. Scores enforced a strict uniform policy, requiring all dancers, including me, to wear either a long gown or short dress; a garter belt and stockings; a specific type of underwear; and high heeled shoes.

19. I would bring my dress and accessories to Scores and change in the dressing room before my shift would begin.

20. Occasionally, Scores held theme nights and required dancers, including me, to wear uniforms consistent with the theme. For example, on Superbowl Night Scores required us to wear a sports-related shirt. During the week of Valentine's Day, we were required to wear lingerie. At Christmas time, we were required to wear something red or that was

4

Christmas related. During Spring Break in 2007, we were required to wear school girl uniforms sold exclusively by Scores.

21. Scores never reimbursed me (or any other worker, to my knowledge) for the cost of purchasing, laundering, or maintaining uniforms.

22. Scores sold dresses that the dancers could purchase to fulfill the uniform requirement. These dresses cost at least $160.00.

23. Over the course of my employment with Scores, I purchased approximately 4 or 5 dresses, at least 72 pairs of underwear, at least 72 garters from Scores to meet their uniform requirement.

24. I estimate that I spent over $2,000.00 to purchase clothing and accessories to satisfy the uniform requirement.

25. Scores controlled many aspects of my employment and the employment of other dancers.

26. For example, Scores told dancers, including me, what to wear to work and had to approve our dress attire.

27. Scores also dictated dancers' schedules, including mine. Scores scheduled dancers, including me, for certain shifts, and required us to obtain permission to work shifts other than our scheduled shifts. If I did not show up for my scheduled shift, I was subject to discipline, including termination. Dancers, including me, were required to contact a manager if we were going to be late for our shift. If we failed to do so, we could be subjected to discipline, including termination. Scores also required dancers, including myself, to dance on stage at certain times.

28. Scores prohibited dancers, including myself, from working as a dancer at other clubs while employed by Scores.

29. Scores set the prices for private dances and would determine how much customers would have to pay for VIP sessions with me and other dancers.

30. Neither other dancers nor I were allowed to negotiate a different price for dances or VIP sessions.

31. Scores had the power to terminate my employment at will. I had no contractual protection against termination at will. I know that Scores terminated the employment of other dancers who worked at the same location that I did.

32. Scores unilaterally determined my method of compensation – they required me to work exclusively for tips.

33. I performed all of my work as a dancer and as a shot girl for Scores on Scores' premises.

34. Scores dictated the way in which I interacted with customers and informed us of what constituted appropriate conduct. For example, a manager told me not to get too close to customers when performing lap dances.

35. Scores encouraged dancers to sell bottles of alcohol when they worked in the VIP room. We were also encouraged not to refuse drinks from customers when they were offered.

36. Approximately once a month, I was required to attend a meeting with the other dancers. During that meeting, we were told to sell more bottles of alcohol in the VIP room and reminded not to get too close to the

customers. I was not compensated for my time at these meetings.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, NY
       March 28, 2008

_Danielle Owimrin_

FROM : QUIK SHOP      PHONE NO. : +201 599 0258      Mar. 28 2008 04:16PM P07