# EXHIBIT G

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

No. 07 civ. 8718 (RMB)

----------------------------------x

SIRI DIAZ, CAROLYN SIEGEL, TALIA BUMB,

BLERTA VIKKI, DANIELLE OWIMRIN, on behalf

of themselves and all others similarly

situated,

        Plaintiffs,

  - against -

SCORES HOLDING COMPANY, INC.; GO WEST

ENTERTAINMENT, INC., a/k/a SCORES WEST

SIDE; and SCORES ENTERTAINMENT, INC.,

a/k/a SCORES EAST SIDE,

        Defendants.

----------------------------------x

        February 7, 2008

        10:00 a.m.


        Deposition of CURTIS SMITH,
taken by Plaintiffs, pursuant to Notice,
held at the offices of Outten & Golden
LLP, 3 Park Avenue, New York, New York,
before Jineen Pavesi, a Registered
Professional Reporter, Registered Merit
Reporter, Certified Realtime Reporter and
Notary Public of the State of New York.

Page 2

1

2    A P P E A R A N C E S :

3

4    OUTTEN & GOLDEN LLP

5    3 Park Avenue

6    New York, New York 10016

7                 Attorneys for Plaintiffs

8

9    BY:        ADAM T. KLEIN, ESQ.

10               TAMMY MARZIGLIANO, ESQ.

11               tm@outtengolden.com

12

13

14   GREENBERG TRAURIG, LLP

15   200 Park Avenue

16   New York, New York 10166

17               Attorneys for Defendants

18

19   BY:        NEIL CAPOBIANCO, ESQ.

20

21

22

23

24

25

1                    SMITH

2    company Go West Entertainment?

3        A.       Yes, sir.

4        Q.       Can you tell me what it is.

5        A.       Go West Entertainment is a

6    sublicensee of Entertainment Management

7    Services, Inc..

8        Q.        What is your understanding of

9    Scores Entertainment, Inc.?

10       A.       I don't have an understanding

11   of Scores Entertainment, Inc.

12       Q.       Do you know who the

13   shareholders of Scores Entertainment,

14   Inc., are?

15       A.       I have never come in contact

16   with Scores Entertainment, Inc.

17       Q.       Do you know who the

18   shareholders of Go West Entertainment are?

19       A.       Richard Goldring and Elliot

20   Osher.

21       Q.       Who is Mr. Goldring?

22       A.       Shareholder.

23       Q.       Does he have any relationship

24   with Scores Holding Company?

25       A.       Yes, he is the shareholder in

1              SMITH

2    Scores Holding Company.

3        Q.        Who are the shareholders in

4    Scores Holding Company at the present?

5        A.        Scores Holding Company is a

6    public company, we have many shareholders.

7        Q.        Can you name the shareholders

8    of Scores Holding Company that own more

9    than 10 percent of the shares of the

10   company at present?

11       A.        Richard Goldring.

12       Q.        Any others?

13       A.        Not to my understanding.

14       Q.        What is his ownership interest

15   at the present of Scores Holding Company?

16       A.        46 percent.

17       Q.        Are you familiar whether there

18   are articles of incorporation of Scores

19   Holding Company?

20       A.        Yes, sir.

21       Q.        Do you know where they are

22   physically maintained at present?

23       A.        At our West 27th Street

24   address.

25       Q.        Are there any other officers of

1                    SMITH
2    Scores Holding Company at the present?
3         A.      Yes, there is a secretary; do
4    you consider a president an officer?
5         Q.      Yes.
6         A.      President.
7         Q.      That would be a president
8    separate from the CEO?
9         A.      Yes.
10        Q.      Who is the president of Scores
11   Holding Company?
12        A.      John Neilson.
13        Q.      How long has Mr. Neilson been
14   president of Scores Holding Company?
15        A.      Probably less than six months,
16   about six months or so.
17        Q.      Prior to that, did Scores
18   Holding Company have a president?
19        A.      Richard Goldring.
20        Q.      Was there any arrangement
21   whereby Scores Entertainment, Inc., makes
22   payments to Scores Holding Company?
23        A.      No, sir.
24        Q.      Is there a licensing
25   arrangement between Scores Holding Company

1                         SMITH

2    been any business dealings or business

3    relationships between Scores Holding

4    Company and Scores Entertainment, Inc.?

5         A.        Can you repeat the dates.

6         Q.        Last six years roughly, has

7    there been any business affiliation or

8    relationship between Scores Holding

9    Company and Scores Entertainment, Inc.?

10        A.        Not to my knowledge, no.

11        Q.         When was Scores Holding

12   Company first formed?

13        A.        It was formed in 2002 --  2001

14   or 2002.

15        Q.        Were you an officer or employee

16   of Scores Holding Company at the time of

17   its formation?

18        A.        No, sir.

19        Q.        Sorry?

20        A.        No, sir.

21        Q.        When did you first start

22   working for Scores Holding Company?

23        A.        August 2005.

24        Q.        Prior to that did you have any

25   dealings with the company or businesses?

1              SMITH

2        A.      No, sir.

3        Q.      Where did you work prior to

4   August 2005?

5        A.      I worked for Cornick Garber

6   Sandler, public accounting firm.

7        Q.      You mentioned earlier someone

8   by the name of Elliot Osher, do you recall

9   that?

10       A.      Yes.

11       Q.      What is Mr. Osher's current

12   relationship, if any, with Scores Holding

13   Company?

14       A.      He is a shareholder.

15       Q.      Do you know what his interest

16   in Scores Holding Company is at the

17   present?

18       A.      Last I recall, he was an 8.8

19   percent.

20       Q.      Do you know if Mr. Osher is a

21   shareholder of Go West Entertainment?

22       A.      I believe he is.

23       Q.      What is the basis of your

24   knowledge?

25       A.      Just through inquiry.

1                       SMITH

2        Q.        Have you met Mr. Osher?

3        A.        Yes, sir.

4        Q.        How frequently do you interact

5    with Mr. Osher?

6        A.        Not often.

7        Q.        Are you aware of any other

8    shareholders of Go West Entertainment?

9        A.        No.

10        Q.        Do you know whether

11    Mr. Goldring is an officer of that

12    company?

13        A.        I am not really sure.

14        Q.        Do you know whether or not

15    Mr. Goldring is an officer or shareholder

16    of Scores Entertainment, Inc.?

17        A.        No.

18        Q.        Are you familiar with a Scores

19    club operated in the City of New York?

20        A.        Yes.

21        Q.        What is the basis of your

22    knowledge?

23        A.        They are sublicensees of EMS

24    and they pay a royalty to EMS and EMS pays

25    a royalty to Scores Holding Company.

1                          SMITH

2         Q.        Who in particular at Cozen

3    O'Connor handles this matter for your

4    company --

5         A.        Well, there really --

6         Q.        You may anticipate the answer

7    to my question, but it is important for

8    the court reporter to record what I'm

9    saying so that we have a clean record, so

10   if you could just hold off in answering

11   until after I finish.

12              You were saying?

13        A.        It really wasn't a settlement

14   between the holding company and SEI

15   exclusively; I think it was a joint

16   settlement with the holding company and

17   other parties, I believe, Go West and 333

18   and I think Richard Gorman and some

19   individuals, so it may have been a

20   settlement that was probably settled

21   through their attorney, through their

22   counsel, on behalf of Scores Holding

23   Company, which named them party to that

24   agreement.

25        Q.        You just mentioned an entity

1              SMITH

2    333 East 60th Street, Inc., do you recall

3    that?

4        A.      Yes, sir.

5        Q.      Can you tell me what that is.

6        A.      That is a club operated on East

7    60th Street which has a sublicense with

8    EMS.

9        Q.      At present, do you know who the

10   corporate officers of 333 East 60th Street

11   Incorporated are?

12       A.      I don't know.

13       Q.      Do you know who works or is

14   employed by that company?

15       A.      What do you mean?

16       Q.      I want to know if you know 333

17   East 60th Street Incorporated employs

18   anyone.

19       A.      It is a club that operates, it

20   probably employs individuals, yes.

21       Q.      Do you know who they are?

22       A.      I do not.

23       Q.      Do you know whether

24   Mr. Goldring has any association with 333

25   East 60th Street, Inc., at the present?

a180bd42-f02c-42ec-856c-86be60a55fd9

1                         SMITH

2        A.        I believe Mr. Goldring is a

3    shareholder.

4        Q.        What is the basis of your

5    knowledge?

6        A.        Direct inquiry.

7        Q.        Do you interact with

8    Mr. Goldring from time to time?

9        A.        No, sir.

10       Q.        Have you met Mr. Goldring?

11       A.        I have.

12       Q.        When was that?

13       A.        The last I met him?

14       Q.        Yes.

15       A.        The last I spoke with him?

16       Q.        Yes.

17       A.        I don't recall the last I spoke

18    with Mr. Goldring.

19       Q.        Was it this year?

20       A.        Yes.

21       Q.        How frequently do you interact

22    with Mr. Goldring?

23       A.        We do not interact with

24    Mr. Goldring quite often.

25       Q.        Why is that?

1          SMITH

2       A.        Mr. Goldring at the present

3    time had to divest himself from any public

4    dealing with Scores Holding Company, Inc.,

5    pursuant to a plea agreement with the D.A.

6       Q.        But nonetheless Mr. Goldring is

7    a 46 percent shareholder of Scores Holding

8    Company?

9       A.        Yes, sir.

10       Q.        And he is also a shareholder of

11    Go West Entertainment, is that correct?

12       A.        Yes, sir.

13       Q.        And also a shareholder of 333

14    East 60th Street, Inc., correct?

15       A.        Yes, sir.

16       Q.        Aside from Mr. Goldring, are

17    there any other shareholders of 333 East

18    60th Street, Inc.?

19       A.        I believe it is Elliot Osher.

20       Q.        Is Mr. Osher also a shareholder

21    of Go West Entertainment, Inc.?

22       A.        Yes, sir.

23       Q.        And that's also true of

24    Mr. Osher, he is also a shareholder of

25    Scores Holding Company?

1                          SMITH

2          A.       Yes, sir.

3          Q.       Are you familiar with the

4   management structure of Go West

5   Entertainment, Inc., at the present?

6          A.       No, sir.

7          Q.       Do you know whether

8   Mr. Goldring has any active role in the

9   running of Go West Entertainment, Inc.?

10          A.       No, sir.

11          Q.       Do you know what the principal

12   asset of Go West Entertainment, Inc., is?

13          A.       No, sir.

14          Q.       Are you familiar with the

15   Scores strip club in New York City?

16          A.       I know it is a sublicensee of

17   EMS; I don't get too involved with the

18   operations of the club.

19          Q.       Do you know whether Go West

20   Entertainment runs the strip club in New

21   York?

22          A.       Yes.

23          Q.       You do know that?

24          A.       Yes.

25          Q.       Have you been to the Go West

1          SMITH

2    which is a trademark wholly-owned by

3    Scores Holding Company, for the usage of

4    that trademark to be used for adult

5    entertainment establishment purposes and

6    for merchandising exclusively.

7          Q.        Is there a document that

8    describes that business arrangement?

9          A.        Yes, that's on the master

10   license agreement.

11         Q.        Do you have a copy of the

12   master license agreement?

13         A.        No, I don't.

14         Q.        Does that document exist in

15   Scores Holding Company's business records?

16         A.        It is in our public filings,

17   yes.

18         Q.        Generally speaking, what are

19   the terms of the master license agreement?

20         A.        To my understanding, it is for

21   20 years and I think for ten consecutive

22   20-year periods thereafter.

23                   I believe it may have been six

24   years and --  something like that, that's

25   what I recall to my understanding.

a180bd42-f02c-42ec-856c-86be60a55fd9

```
 1                      SMITH
 2              I don't know exactly what it
 3      is, but I know it has got consecutive
 4      20-year period after the first six years.
 5          Q.         You testified earlier that
 6      Mr. Goldring was a shareholder of
 7      Entertainment Management Services, is that
 8      correct?
 9          A.       Yes, sir.
10          Q.        I don't recall, are there any
11      other shareholders of Entertainment
12      Management Services, to your knowledge?
13          A.         Richard Goldring, Elliot Osher
14      and Harvey Osher.
15          Q.         Were you an officer of Scores
16      Holding Company at the time that the
17      master license agreement you just
18      described between Scores Holding Company
19      and Entertainment Management Services was
20      executed?
21          A.       No, sir.
22          Q.        Who was the CEO at the time
23      that the master license agreement between
24      Scores Holding Company and Entertainment
25      Management Serviceses was executed?
```

1                           SMITH

2          A.          As I recall, it may have been

3     Mr. Richard Goldring.

4          Q.          So at the time the master

5     license agreement in place between Scores

6     Holding Company was executed, Mr. Goldring

7     was both the CEO of Scores Holding Company

8     and also a shareholder of Entertainment

9     Management Services, correct?

10         A.          Yes, sir.

11         Q.          Do you know when that master

12    license agreement was first executed, the

13    date, between Scores Holding Company and

14    Entertainment Management Services?

15         A.          I believe it was in 2003,

16    March.

17         Q.          What is the basis of your

18    knowledge?

19         A.          Examining the document.

20         Q.          At the time in March of 2003,

21    are you aware of Mr. Goldring's interest

22    in Scores Holding Company?

23         A.          No -- say that again, sir.

24         Q.          At the time in March 2003, do

25    you know what Mr. Goldring's ownership

a180bd42-f02c-42ec-856c-86be60a55fd9

1          SMITH

2    encountered any employee of Entertainment

3    Management Services during your time at

4    Scores Holding Company?

5          A.        At that location, no.

6          Q.        At any location?

7          A.        No.

8          Q.        Do you interact with a

9    representative of Entertainment Management

10   Services at any point?

11         A.        Sometimes, you know, I speak

12   with Mr. John Neilson, but I don't know if

13   he is acting on behalf of Entertainment

14   Management Services, but I know he is the

15   one who orchestrates the sublicense

16   agreements between EMS and the

17   sublicensees and usually I consult to

18   Mr. Neilson in terms of payment for

19   royalties.

20              But Mr. Neilson is not always

21   physically located in the office, he is in

22   Florida and sometimes he is in New York.

23         Q.        Does Scores Holding Company

24   receive payments from Entertainment

25   Management Services?

1                          SMITH

2         A.        Yes, sir.

3         Q.        How often?

4         A.        Monthly.

5         Q.        Who signs the checks that are

6    issued by Entertainment Management

7    Services made payable to Scores Holding

8    Company?

9         A.        Richard Goldring.

10        Q.        Is Mr. Goldring also a

11   signatory on business bank accounts

12   maintained by Scores Holding Company?

13        A.        No, sir.

14        Q.        Has Scores Holding Company

15   issued checks to Mr. Goldring from time to

16   time?

17        A.        During what period?

18        Q.        At any point.

19        A.        Yes.

20        Q.        Can you describe those

21   payments, please.

22        A.        Payments for salary.

23        Q.        Mr. Goldring is a salaried

24   employee of Scores Holding Company?

25        A.        Not at the present moment.

1                         SMITH

2          Q.         When was the last time

3     Mr. Goldring was an employee of Scores

4     Holding Company?

5          A.         Mr. Goldring resigned on

6     February 28, 2007.

7          Q.         Prior to that time was

8     Mr. Goldring an employee of Scores Holding

9     Company?

10         A.         Yes, sir.

11         Q.         For what period of time was

12    that?

13         A.         Mr. Goldring had an employment

14    agreement from I believe it was 2003 up

15    until the point he resigned, March of '03.

16         Q.         During that time frame, how

17    much was Mr. Goldring paid as an employee

18    of Scores Holding Company?

19         A.         He was paid approximately

20    $104,000.

21         Q.         For that can you describe

22    Mr. Goldring's services that he provided

23    for Scores Holding Company?

24         A.         He was president of the

25    company.

1                      SMITH

2      Q.        Other than having a corporate

3  officer title, did Mr. Goldring perform

4  any day-to-day duties for Scores Holding

5  Company?

6      A.        No, sir.

7      Q.        Why was Mr. Goldring paid a

8  salary for a corporate officer title only?

9      A.        He was paid as the president of

10  the holding company.

11      Q.        As the president of the holding

12  company, did he have any duties and

13  responsibilities to the shareholders of

14  Scores Holding Company?

15      A.        As CEO and president, yes.

16      Q.        Can you describe generally his

17  duties and functions as the president of

18  Scores Holding Company during the time

19  period that he was employed by that

20  company, Scores Holding Company?

21      A.        I guess he acted as a fiduciary

22  of the public company, to insure he would

23  get into contracts, I believe he got into

24  a contract with EMS, he would bind the

25  company in a capacity that would seem

1                          SMITH

2    Under the master license agreement, we

3    granted EMS, which is 50 percent owned by

4    Richard Goldring, our former chief

5    executive officer and director, an

6    exclusive worldwide license to use and

7    grant sublicenses to use our Scores

8    trademark.  EMS has entered into

9    sublicense agreements with eight cabaret

10   clubs, seven of which are currently

11   operated under the Scores trademark."

12             Do you see that reference?

13        A.     Yes, sir.

14        Q.     Were you an officer of Scores

15   Holding Company at the time that Scores

16   Holding Company negotiated the master

17   license agreement referenced here?

18        A.     No, sir.

19             The original master license

20   agreement?

21        Q.     I am asking about the amended

22   and restated master license agreement.

23        A.     Yes, the restated master

24   license agreement, yes.

25        Q.     Who did you negotiate with, who

1                          SMITH

2    was representing EMS at that time?

3        A.      Mr. Goldring.

4        Q.      Did Mr. Goldring have counsel?

5        A.      Yes, sir.

6        Q.      Who was that?

7        A.      Steve Gutstein.

8        Q.      Who is Mr. Gutstein?

9        A.      Mr. Goldring's counsel.

10       Q.      Do you know which firm he is

11   with?

12       A.      No, sir.

13       Q.      Did Scores Holding Company have

14   counsel at the time that the amended and

15   restated master license agreement

16   referenced in the SEC filing before you,

17   Plaintiffs' Exhibit 2, was there counsel

18   present as well?

19       A.      Yes, sir.

20       Q.      Who was that?

21       A.      Gotbetter & Partners.

22       Q.      Generally can you describe the

23   nature of the negotiation between Scores

24   Holding Company and EMS on or about

25   November 13, 2006, that led to the

                              SMITH

1       execution of an amended and restated

2       master license agreement.

3           A.      Yes.

4                   Mr. Goldring, who was the

5       president and CEO of Scores Holding

6       Company at the time, and was a shareholder

7       of EMS, we were collecting --  the holding

8       company was collecting from EMS a hundred

9       percent of the royalties; pursuant to the

10      original master license agreement, it read

11      that EMS was to retain 50 percent and the

12      holding company was to receive 50 percent.

13                  EMS had forwarded all of its

14      royalties over to the holding company and

15      the reason as such is because --  the

16      reason that the restatement came about is

17      due to Mr. Goldring having two controlling

18      positions in the holding company and in

19      EMS.

20                  We said for so long as you have

21      a position as president, CEO, or any type

22      of officer in the holding company, and you

23      have assumed a role in EMS, we were going

24      to continue to retain the 100 percent of

Page 49

SMITH

1
2    the royalties, including --  in addition
3    to that, because Mr. Goldring had received
4    a salary from Scores Holding Company, it
5    would appear that he was double-dipping.
6            Once Mr. Goldring resigned,
7    that is at the point when EMS started to
8    retain his 50 percent, once Mr. Goldring
9    resigned from Scores Holding Company, EMS
10   then therefore retained his 50 percent, he
11   no longer took a salary in Scores Holding,
12   he kept his 50 percent retainage in EMS
13   and that's what the nature of the
14   restatement is.
15      Q.      Would you describe the
16   negotiation between Scores Holding Company
17   and Entertainment Management Services on
18   or about November 13, 2006, as an arm's
19   length negotiation?
20      A.      Can you repeat that.
21              (Record read.)
22      A.      Yes.
23      Q.      Yes?
24      A.      I believe it was an arm's
25   length negotiation.

a180bd42-f02c-42ec-856c-86be60a55fd9

Page 50

1                        SMITH

2        Q.        Isn't it also true at the time

3   in November 2006 Mr. Goldring was the

4   majority shareholder of both Scores

5   Holding Company and Entertainment

6   Management Services?

7        A.        He is --  I don't know what --

8   it says he was 50 percent here in EMS, so

9   I don't know if that's the majority.

10                  I believe he is equal, but he

11  was the majority in Scores Holding

12  Company.

13       Q.        Notwithstanding that fact, you

14  considered the negotiation between these

15  two entities to be an arm's length

16  transaction?

17       A.        Sure.

18       Q.        You do?

19       A.        Sure.

20       Q.        Are you a certified public

21  accountant?

22       A.        Yes, sir.

23       Q.        Are you familiar with the GAAP

24  rules on accounting?

25       A.        Yes, sir.

1                        SMITH

2          Q.        Do you know what the corporate

3    entity that operates Scores Miami is?

4          A.        No, Mr. Goldring has an

5    interest, he is a shareholder, I don't

6    know what his interest is.

7          Q.        Mr. Goldring has an ownership

8    interest in Scores Miami?

9          A.        Yes, sir.

10         Q.        Does EMS or Scores Holding

11   Company receive payments directly from

12   Scores Miami?

13         A.        No.

14         Q.        Item 5 of Plaintiffs' Exhibit 2

15   for identification, "According to the

16   master license agreement, Scores Holding

17   Company, the Company, is entitled to

18   receive 100 percent of the royalties that

19   EMS receives from these affiliated

20   companies."

21                   Do you see that reference?

22         A.        Yes.

23         Q.        That would mean any payment

24   received in the form of a royalty from

25   Scores Miami would flow directly to Scores

1                    SMITH

2    Holding Company at the present, is that a

3    fair statement?

4        A.        It would flow through EMS to

5    the holding company, yes.

6        Q.        Who at EMS would receive the

7    royalties payments from Scores Miami and

8    other affiliated clubs?

9        A.        I guess Mr. Goldring.

10       Q.        Do you know that to be the

11   case.

12       A.        I am not sure.

13       Q.        Are royalty checks made payable

14   to Scores Holding Company by EMS?

15       A.        Yes, sir.

16       Q.        And who is the signatory on

17   those payments?

18       A.        Mr. Goldring.

19       Q.        Are you familiar with any other

20   affiliated clubs referenced in Plaintiffs'

21   Exhibit 2 other than the ones you just

22   testified, Scores East, Scores West and

23   now Scores Miami?

24       A.        No, sir.

25       Q.        Note that there is a reference

1                    SMITH
2      to eight cabaret clubs, seven of which
3      currently operate the Scores trademark; do
4      you see that reference, item 5, last
5      sentence --
6          A.       Yes, sir.
7          Q.       You are not familiar with the
8      other four clubs that have the word Scores
9      or use the trademark of Scores?
10         A.       I am.
11         Q.       What are those?
12         A.       Las Vegas, Chicago, Baltimore,
13     and New Orleans.
14         Q.       Do you know whether Mr.
15     Goldring has any ownership interest in the
16     clubs you just identified using the Scores
17     name operated and located in Las Vegas,
18     Chicago, Baltimore and New Orleans?
19         A.       He doesn't have any interest in
20     those clubs, to my understanding.
21         Q.       Is it a fair statement Mr.
22     Goldring is a shareholder of clubs
23     operated using the Scores trademark in Las
24     Vegas, is that true?
25         A.       No.

```
1                    SMITH
2    Licensing Corporation?
3         A.        Scores Licensing Corporation is
4    inactive, it just holds the trademarks for
5    the diamond dollar program in the Scores
6    name.
7         Q.        Do you know whether Scores
8    Licensing Corporation is a corporation
9    incorporated in the State of New York?
10        A.        I believe Scores Licensing
11   Company is incorporated in Delaware.
12        Q.        Are there periodic reports
13   filed with the State of Delaware
14   memorializing the corporation of Scores
15   Licensing Corporation?
16        A.        Tax return.
17        Q.        You're guessing or do you know?
18        A.        Tax returns, yes.
19        Q.        Who signs the tax returns on
20   behalf of Scores Licensing Corporation?
21        A.        It is a consolidated return
22   with Scores Holding Company.
23        Q.        Do you sign the tax return for
24   both Scores Holding Company and Scores
25   Licensing Corporation?
```

1                          SMITH

2         A.       Yes, sir.

3         Q.       Turn to the last page of this

4    document, page 7, do you see that

5    reference, there is a signature on behalf

6    of Scores Holding Company and there is a

7    signature, do you see that?

8         A.       Yes.

9         Q.       Is that Richard Goldring who

10   signed the document before you,

11   Plaintiffs' Exhibit 5 for identification,

12   on behalf of Scores Holding Company?

13        A.       Yes, sir.

14        Q.       And to the right there is a

15   signature by somebody representing

16   Entertainment Management Services, do you

17   see that?

18        A.       Yes, sir.

19        Q.       Do you know who that signature

20   belongs to?

21        A.       I believe that's William Osher.

22        Q.       Who is that?

23        A.       At the time William was a 50

24   percent shareholder in EMS.

25        Q.       Do you know whether he

1                          SMITH

2    currently maintains an ownership interest

3    in EMS?

4         A.        He does not.

5         Q.        When did that ownership

6    interest terminate?

7         A.        I believe it was sometime in

8    the latter part of 2006.

9         Q.        Do you know why that

10   affiliation with Entertainment Management

11   Services terminated?

12        A.        No.

13        Q.        Do you know where Mr. Osher is

14   presently located?

15        A.        Mr. Osher is deceased.

16        Q.        Do you know who the current

17   officers of Entertainment Management

18   Services are?

19        A.        No.

20        Q.        I direct your attention to

21   Plaintiffs' Exhibit 4 for identification,

22   the sublicense agreement.

23                  Do you recognize this document?

24        A.        Yes, sir.

25        Q.        Can you generally describe what

1          SMITH

2    it is.

3          A.      This is the license agreement

4    that binds independent operators to take

5    on a license to operate as a Scores for

6    EMS, through EMS.

7          Q.      Turning your attention to page

8    6 of this document, Plaintiffs' Exhibit 4,

9    do you see a signature under Entertainment

10   Management Services on behalf of the

11   company?

12         A.      Yes, sir.

13         Q.      And who is that signature?

14         A.      Looks like Mr. Richard

15   Goldring.

16         Q.      To the right, on behalf of Go

17   West Entertainment, Inc., there is a

18   signature, do you recognize it?

19         A.      Yes, sir.

20         Q.      Who is that?

21         A.      It appears to be Mr. William

22   Osher.

23         Q.      I would like to go back to the

24   master license agreement, Exhibit 5.

25                 There is a reference on page 1

1                           SMITH

2       under license grant, it is Paragraph No.

3       1, do you see that reference?

4            A.        Yes, sir.

5            Q.        It describes the use of Scores'

6       trademark in connection with the business

7       located at 333 East 60th Street, do you

8       see that reference?

9            A.        Yes, sir.

10           Q.        It describes it as "the

11      original Scores nightclub," do you know

12      what that means?

13           A.        The marquise, the model.

14           Q.        There are other provisions that

15      describe the payment of royalties,

16      paragraph 2, master license agreement,

17      Exhibit 5, do you see that?

18           A.        Yes, sir.

19           Q.        Generally can you describe how

20      those royalty payments are made?

21           A.        Which royalty payments?

22           Q.        It says on page 2, paragraph 2,

23      that the licensee, which appears to be 333

24      East 60th Street, would make payment to

25      EMS?