# EXHIBIT P

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---------------------------------------------------------------x

SCORES HOLDING COMPANY INC.; 333
EAST 60TH STREET INC.; GO WEST
ENTERTAINMENT, INC.; RICHARD
GOLDRING; ELLIOT OSHER, WILLIAM
OSHER and HARVEY OSHER,

           **Plaintiffs,**

    -against-

SCORES ENTERTAINMENT, INC.; IRVING
BILZINSKY; NIKAC SANDER; NERIM
GJONBALAJ; DRITION GJONBALAJ;
JETON GJONBALAJ; DENIS KOLENOVIC;
GEMA KOLENOVIC; SEDAT DJEKOVIC and
ARTHUR PRAKOPETS,

           **Defendants.**

---------------------------------------------------------------x

**COMPLAINT**

05602720

Index No.

FILED

JUL 26 2005

NEW YORK
COUNTY CLERKS OFFICE

Plaintiffs Scores Holding Company Inc. ("Scores Holding"), 333 East 60th Street

Inc. ("333 East 60th"), Go West Entertainment, Inc. ("Go West"); Richard Goldring, Elliot

Osher, William Osher and Harvey Osher (collectively, "Plaintiffs"), by their attorneys, Cozen

O'Connor, allege as and for their Complaint against Defendants Scores Entertainment, Inc.

("SEI"), and the individuals Irving Bilzinsky, Nikac Sander, Nerim Gjonbalaj, Drition Gjonbalaj,

Jeton Gjonbalaj, Denis Kolenovic, Gema Kolenovic, Sedat Djekovic and Arthur Prakopets (these

individuals hereinafter collectively the "Individual Defendants") as follows:

//

//

//

## THE PARTIES

1.     Plaintiff Scores Holding is a Utah corporation, authorized to do business in New York, with its principal place of business located at 533-535 West 27th Street, New York, New York 10001.

2.     Plaintiff 333 East 60th is a New York corporation with its principal place of business located at 333 East 60th Street, New York, New York 10022.

3.     Plaintiff Go West is a New York corporation with its principal place of business located at 533-535 West 27th Street, New York, New York 10001.

4.     Plaintiffs Elliot Osher and William Osher are individuals, residing in New York; Plaintiff Harvey Osher is an individual, residing in New Jersey (hereinafter collectively, the "Oshers").  Plaintiff Richard Goldring is an individual, residing in New Jersey.

5.     Plaintiffs are informed and believe, and on that basis allege, that Defendant SEI is a New York corporation with its principal place of business located at 150 East 58th Street, 25th Floor, New York, New York 10022.

6.     Plaintiffs are informed and believe, and on that basis allege, that Defendants Irving Bilzinsky, Nerim Gjonbalaj, Drition Gjonbalaj; Jeton Gjonbalaj; Denis Kolenovic, Gema Kolenovic and Arthur Prakopets are individuals, each of them residing in Brooklyn, New York; that Defendant Nikac Sander is an individual residing in Chappaqua, New York; and that Defendant Sedat Djekovic is an individual residing in Middle Village, New York.

7.     At all times relevant to this action, each Defendant, was the agent, servant, employee, partner, joint venturer, co-conspirator or surety of the other Defendants and was acting within the scope of that agency, employment, partnership, joint venture, conspiracy or

suretyship with the knowledge and consent or ratification of each of the other Defendants in doing the things alleged in this complaint.

## FACTS COMMON TO ALL CAUSES OF ACTION

8.    This action results from a breakdown in the business relationship between several entities and individuals who have been involved over the last few years in the ownership and/or administration of the Scores gentlemen's club at 333 East 60th Street in New York City. Several of the Defendants have taken their dissatisfaction to the extreme, sending threatening letters containing bogus and defamatory assertions to several of the Plaintiffs, and telephoning them with death threats, in a continuing attempt to extort money from them and to interfere with their business. Even more unfortunately, Plaintiffs are informed and believe that several of the Defendants acted in concert and paid to have the Oshers physically attacked on more than one occasion, during which attacks these Plaintiffs sustained serious injuries.

9.    Plaintiffs now request that the Court enter a judgment for appropriate damages, as set forth in detail below, and make a declaration concerning the rights of the parties with respect to the ownership and administration of the Scores clubs.

A.    **The Parties**

10.    Scores Holding is a publicly traded company.  It currently owns, and exists primarily to hold, (1) all intellectual property rights to the "Scores" name as it relates to the operation of gentlemen's clubs, including but not limited to the name, the brand, and all other trademarks and copyrights (the "Scores Rights"); and (2) all intellectual property rights and other rights relating to the "Diamond Dollars" name as it relates to a system of payment used in the operation of gentlemen's clubs, including but not limited to the name, the brand, and all other trademarks and copyrights (the "Diamond Dollar Rights").

11.    Plaintiff 333 East 60th is a private company. It is currently the lessee of the real property located at 333 East 60th Street, New York, New York, pursuant to a lease between it and its landlord Club at 60th Street, Inc. (which is in turn lessee and sublessee of the property pursuant to other leases not relevant here). Plaintiff 333 East 60th operates the Scores gentlemen's club at that address, and is licensed by Scores Holding to use the Scores Rights to do so.

12.    Go West is a private company. It is currently the lessee of the real property located at 536 West 28 Street, New York, New York. Go West operates the Scores gentlemen's club at that address, and is licensed by Scores Holding to use the Scores Rights to do so.

13.    Elliott Osher and Goldring are, together, majority shareholders of Scores Holding, and the sole shareholders of Plaintiff 333 East 60th and Go West. Elliot Osher and Goldring are officers of all three companies. Harvey and William are operations managers for 333 East 60th and Go West, and are Elliot Osher's brothers (the individual Oshers will be hereinafter referred to by their first names only).

14.    Defendant SEI is a privately held company, the sole shareholder of which is, on information and belief, Bilzinsky. SEI at one time operated the Scores club located at 333 East 60th Street, but as discussed in more detail below, no longer does so.

15.    The Individual Defendants are former employees of, or consultants for, one or the other of the Scores clubs in New York.

**B.    Defendants' Threats, Physical Attacks and Attempted Extortion**

16.    Plaintiffs are informed, and believe, and on that basis allege, that the Individual Defendants, led by the former head of security at the Scores club at 333 East 60th

Street, Nerim "Big John" Gjonbalaj ("Nerim"), and by Bilzinsky are engaged in a program of violence and intimidation aimed at pushing the Oshers and Goldring out of control of the Scores clubs and/or out of the business of operating gentlemen's clubs in New York City. Plaintiffs are informed and believe that the purpose of this scheme is for Defendants to either take control of the Scores clubs in New York City themselves, to extort money, or alternatively to drive the Scores clubs in New York out of business and to set up their own clubs there.

17.     In or about February 2005, while Harvey was in a club in New York, he was physically attacked and beaten by Defendants Denis Kolenovic and Gema Kolenovic (the "Kolenovics"), and two other unidentified individuals. Shortly before this attack, Harvey had terminated Denis Kolenovic as a driver for the Scores clubs, on the basis of poor job performance. During the attack, the Kolenovics stated that they "hated" Harvey, and wanted to kill him for terminating Denis Kolenovic. At the time, Harvey believed this justification. Shortly after the attack, Harvey terminated the employment of Gema Kolenovic, who up to that time had been a worker in the garage for the Scores club at 536 West 28 Street.

18.     Knowing that Nerim was the Kolenovics' cousin, and had some influence over the Kolenovics, Harvey called him to ask him to explain the attack and to help in preventing further attacks. Nerim replied that he would "take care of it."

19.     Shortly after Harvey's telephone call with Nerim, Harvey began receiving a string of anonymous calls on his cellular telephone to the effect that "we're going to get you," or "we are going to kill you."

20.     Nerim once again told Harvey he would "take care of it." Nerim organized a 30 or 40 minute meeting in the Scores club at 333 East 60th Street, with the Kolenovics and others. Harvey was not present. After the meeting, Nerim told Harvey that

5

NEWYORK-MIDTOWNM49266818

everything was "taken care of." Plaintiffs are informed, and believe, and on that basis allege, that the meeting was not for the purpose of convincing the Kolenovics not to attack Harvey, but was instead for the purpose of putting together a plan to extort control of the Scores clubs, or money, from Plaintiffs, or coerce the shutdown of the Scores clubs, by way of intimidation and violence.

21.    The telephonic threats to Harvey continued.

22.    On or about April 3, 2005, Harvey, his wife and children attended a baptism in Brooklyn, and a party afterwards. Upon leaving the party, Harvey found a note on his car stating, in effect, that Harvey was lucky he was with his family, and that "we" would kill Harvey next time. Earlier that day, Harvey's mother-in-law saw the Kolenovics loitering around Harvey's car, and after Harvey received the note she informed him of same.

23.    On or about April 5, 2005, the Oshers visited the home of their mother in Brooklyn, New York. After they left, and were standing outside the building with a friend, the Oshers were approached by approximately 12 men, including the Kolenovics. The men attacked the Oshers with clubs and hammers. Elliot's shoulder was broken. William was beaten to the ground. Gema Kolenovic attacked Harvey with his fists, and Denis Kolenovic broke Harvey's ribs with a hammer or club. During this incident, the attackers stated that "everybody hates" Harvey, that "Big John" (Defendant Nerim Gjonbalaj) hated Harvey, and that the Oshers did not have any friends. The police arrived, and the attackers fled. On information and belief, the police did not catch the attackers.

24.    Preferring, given the circumstances, not to remain in Brooklyn, the Oshers drove to a hospital in Manhattan. During this drive, Harvey called Nerim to ask what was going on. Nerim told Harvey that Harvey would have to "live with it." Nerim then stopped coming

6

into the Scores clubs, without explanation. Shortly thereafter, Harvey terminated Nerim's employment at Scores.

25.    As a result of the attack, Harvey sustained serious personal injuries, including broken ribs, and incurred medical expenses of over $10,000. As a result of the attack, Elliot sustained serious personal injuries, including a shoulder broken in multiple places, and incurred medical expenses of over $40,000. Elliot requires ongoing therapy, and may not recover full use of his left arm.

26.    On or about April 8, 2005, Harvey learned that Nerim had been planning for several months to start his own gentlemen's club. Harvey learned this from customers and employees of the Scores clubs.

27.    Bilzinsky had been working for the 333 East 60th Street Scores club as a consultant, and in or about the several months preceding April 2005 he began to state to Scores' employees and customers that he owned 25% of the clubs (which, as discussed herein, was false) and that he was not being paid enough money by Plaintiffs.

28.    In or about mid-April, Harvey learned from Monte Wiener that Bilzinsky and Nerim were working together to either start a new gentlemen's club, or to attempt to take over control of the Scores clubs. Monte Wiener is a person well-known to all of the parties herein and, from time to time during the time period discussed in this Complaint, has acted as an intermediary between Nerim and Bilzinsky, on the one hand, and the Oshers and Goldring, on the other.

29.    In or about mid-April, Bilzinsky began telling Scores' customers and employees, and Monte Wiener, that Bilzinsky "saved Harvey's life." Bilzinsky refused to tell Harvey what he meant by this. At or about the same time, in trying to understand the meaning of

the threats, attacks, and actions of the Individual Defendants, Harvey learned that shortly after the April 5, 2005, attacks on the Oshers, Bilzinsky paid between $40,000 and $50,000 to the attackers.

30.     In or about mid-April, Harvey stopped paying Bilzinsky as a consultant and prohibited Bilzinsky from entering the Scores clubs.

31.     In mid- or late-April, Harvey and William encountered Nerim at Crobar, a New York nightclub which is unaffiliated with the parties herein. This was the first time Harvey had seen Nerim since the April 5, 2005, attacks on the Oshers. Harvey asked Nerim about what had been going on the past several months. Nerim then grasped Harvey's head with both of his hands, informed Harvey that "it's only business," or "it's all just business," shook Harvey by his head, then told him to "get out of here."

32.     In or about late May 2005, Nerim told Monte Wiener, that "you know what you have to do to make this go away."

33.     Near the end of May 2005, Bilzinsky called Mr. Wiener and asked him to go to a delicatessen, pick up three letters (the "May 2005 Letters"), and deliver them to each of the Oshers. Mr. Wiener informed Harvey of this, then picked up the letters. Mr. Wiener and Harvey delivered the letters to Harvey, and read them with Harvey.

34.     The May 2005 Letters are attached as Exhibit "A" hereto, and assert a laundry list of purported financial improprieties apparently relating to one or more of the Scores clubs.

35.     The assertions concerning the purported financial improprieties are entirely false and bogus, and have no basis in fact.

36.    The May 2005 Letters also repeatedly stated that "Harvey", "Elliot", "Richie" and certain other individuals "extorted" certain monies, participated in "fraudulent" credit card charges, "washed" money that had been "stolen" or "robbed", and "ordered" that money be stolen. Exh. "A".

37.    Plaintiffs are informed and believe, and on that basis allege, that the May 2005 letters' references to "Elliott", "Harvey" and "Richie" were intended to refer to, and did refer to, Elliot Osher, Harvey Osher and Richard Goldring, respectively.

38.    The assertions concerning the actions of "Harvey", "Elliott" and "Richie", to the extent they refer to Elliot Osher, Harvey Osher and Richard Goldring, are entirely false and bogus, and have no basis in fact.

39.    The next day after the letters were delivered, Mr. Wiener spoke to Bilzinsky to ask him why he sent the letters. Bilzinsky told Mr. Wiener that Bilzinsky wanted the two New York City Scores clubs for himself, but that the Oshers could "keep Miami." Mr. Wiener immediately called Harvey to tell him the substance of this conversation.

40.    A few days after the above letters were delivered, Harvey spoke to the proprietor of the delicatessen where the letters were left for pickup. The proprietor told Harvey that "Big John" (Defendant Nerim) had left the letters for pickup.

41.    In or about June 2005, Goldring received a letter addressed to his home, and an identical letter addressed to him care of Scores Holding (the "June 2005 Letters"). The letters stated as follows:

//

//

//

NEWYORK-MIDTOWN\492668\8

"Mr. Goldring,      You might want to read the enclosed pages. You and Harvey and Elliott are all going to prison after all of the information about how the club operated, is released. I'm sure you will enjoy being locked up. You can get pointers from Harvey, I heard he had several close friends while being in jail. I'm sure you'll be liked as well........"
[Ellipses original.]

*See* Exhibit "B" hereto.

42.    The June 2005 Letters enclosed photographs of prisons. Exh. "B".

43.    Shortly after the June 2005 Letters were sent, Goldring received another letter, stating that Goldring would be going to jail.

44.    In mid-June, William received an anonymous voicemail on his home telephone stating that "the Osher brothers" will be killed.

45.    Plaintiffs are informed and believe, and on that basis allege, that throughout the entire period above, the rest of the Defendants, and each of them, conspired with and worked in concert with Nerim and Bilzinsky to physically attack the Oshers, to contact them telephonically with death threats, and to prepare the letters in furtherance of a joint scheme of extortion in an attempt to take control of the Scores clubs in New York City, to push the Oshers and Goldring out of the gentlemen's club business in New York City, and/or to obtain monies from Plaintiffs.

46.    The threats and physical attacks have put the Oshers and Goldring, and their families, in continuing fear for their lives. They respectfully turn to the Court for relief.

**C.    The Contractual Relationships Between The Parties**

47.    At one time, SEI owned the Scores Rights and the Diamond Dollar Rights. In 2001, SEI assigned and transferred the Scores Rights to Scores Holding's predecessor-in-interest, HEIR, Inc. (which was merged into Scores Holding in 2002). *See* Exhibit "C" hereto.

10

In 2002, SEI assigned and transferred the Diamond Dollar Rights to Scores Holding. *See* Exhibit "D" hereto.

48.    On or about April 1, 2003, SEI entered into a Sublicense Agreement with Entertainment Management Services, Inc. (to which Scores Holding had granted a Master License to grant, in turn, sublicenses to use the Scores Rights), to allow it to use the Scores name and marks in operating its business at the 333 60th Street club location. *See* Exhibit "E" hereto. Specifically, the "business" referred to is SEI's being "the owner and operator of an adult-entertainment night club/restaurant located at East 61st Street [sic., should be East 60th Street], New York, New York (the 'Location') which will conduct business under the name 'Scores' ('Scores Showroom')," and the license is specifically granted "in connection with the operation of Scores Showroom at the Location, and the sale of certain merchandise." Exh. "E", at p. 3.

49.    The Sublicense Agreement provides *inter alia* that it would automatically terminate "if Licensee [SEI] discontinues its business." Exh. "E", at p. 6, ¶ 9(c).

**D.    SEI's Forfeiture Of Its License To Do Business And Assignment Of Its Lease Rights**

50.    Until September 30, 2003, or thereabouts, SEI was the lessee of the real property located at 333 East 60th Street, New York, New York, pursuant to a lease (hereinafter, the "333 East 60th Lease") wherein Club at 60th Street, Inc. (which itself was a lessee of the property pursuant to a sublease with another entity) was the landlord.

51.    On or about September 30, 2003, SEI was required to turn in its liquor license to the New York State Liquor Authority. As of that date, the State Liquor Authority prevented SEI from conducting business under the Scores name at the 333 East 60th Street location, and precluded Bilzinsky (the sole shareholder of SEI) from being an interested party in

11

any business conducted at the location. As a result of this, SEI was immediately unable to continue in business at the 333 East 60th Street location. On or about August 8, 2003, SEI had assigned its rights to lease the 333 East 60th Street location to Plaintiff 333 East 60th, which allowed Plaintiff 333 East 60th to demise the premises as of October 1, 2003. *See* Exhibit "F" hereto.

52. Because SEI could no longer continue its business as of September 30, 2003, after losing its liquor license, the Sublicense Agreement automatically terminated as of that date, and SEI thereby forfeited any and all rights it previously had as a licensee of the Scores Rights. Further, because SEI assigned its rights as lessee under the 333 East 60th Lease, it could not as of that time continue its business, and the Sublicense Agreement automatically terminated as of the date of the assignment.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
(For Violation of Racketeer Influenced And Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* – Against All Defendants)

53. Plaintiffs repeat each and every allegation contained in Paragraphs 1 through 52 of the Complaint as if set forth fully herein.

54. In doing the above acts, and making the above statements, Defendants together constituted an enterprise, and associated themselves into and participated in an enterprise, which conducted its activities through a pattern of racketeering activity directed at the Plaintiffs.

55. The pattern of racketeering activity at issue includes (a) the transmission of the June 2005 Letters through the United States mail, which letters contained and constituted threats of extortion and which related to interference with commerce, especially as it pertained to

12

the business activities of Scores Holdings, a publicly traded company, and its owners and affiliates; (b) threats of extortion made, and interference with commerce conducted, over the telephone and otherwise, by Nerim and Bilzinsky, on their own behalf and in concert with and on behalf of the other Defendants herein; and (c) the physical attacks on Harvey Osher, William Osher and Elliot Osher, which, on information and belief were arranged and planned using the instrumentalities of interstate commerce such as the telephone and email, and which, above and beyond their purpose of physically injuring said Plaintiffs was, on information and belief, intended by Defendants, and each of them, to "send a message" to all of the Plaintiffs in furtherance of Defendants' scheme of extortion and to interfere with commerce, especially as it pertained to the business activities of Scores Holdings, a publicly traded company, and its owners and affiliates.

56.     By their activities and statements as set out above, Defendants, and each of them are in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO").

57.     The said activities and statements by Defendants have damaged and injured the business, property and/or person of Plaintiffs, or several of them, as set out herein.

58.     Based upon the foregoing violations of RICO, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial, treble damages as provided by statute, their reasonable attorney's fees, and such other and further damages as may be allowed by law.

//

//

//

NEWYORK-MIDTOWN\492668\8

## SECOND CAUSE OF ACTION
### (For Breach of Contract – By Plaintiffs Scores Holdings and 333 East 60th Against Defendant SEI Only)

59.     Plaintiffs repeat each and every allegations contained in Paragraphs 1 through 58 of the Complaint as if set forth fully herein.

60.     From time to time Scores Holding made loans to SEI, of which SEI failed to pay back $44,773.00.

61.     From time to time Plaintiff 333 East 60th made loans to SEI, of which SEI failed to pay back $76,518.00.

62.     SEI, by and through Bilzinsky, orally agreed to repay said loans on a demand basis. That is, SEI had the duty to repay said loans immediately, upon demand by Scores Holding or 333 East 60th, as applicable.

63.     On or about July 25, 2005, Scores Holding demanded repayment of all said loaned monies. On the same date, Plaintiff 333 East 60th demanded repayment of all said loaned monies.

64.     SEI has refused and failed to pay back the above loans, and Plaintiffs are informed and believe that SEI will continue to refuse to pay back the above loans. Said refusals and failures constitute a breach of SEI's contractual obligations to Scores Holding and to Plaintiff 333 East 60th, to repay said loans.

65.     Based upon the foregoing breaches, Scores Holding is entitled to $44,733.00, and such other and further damages as may be determined at trial.

66.     Based upon the foregoing breaches, Plaintiff 333 East 60th is entitled to $76,518.00, and such other and further damages as may be determined at trial.

//

### THIRD CAUSE OF ACTION
**Alternative to Second Cause of Action for Breach of Contract
(For Unjust Enrichment – By Plaintiffs Scores Holdings and 333 East 60th Against
Defendant SEI Only)**

67.    Plaintiffs repeat each and every allegation contained in Paragraphs 1 through 66 of the Complaint as if set forth fully herein.

68.    Defendant SEI has been unjustly enriched by its retention of the aforesaid monies from Scores Holding and Plaintiff 333 East 60th.

69.    It is inequitable for SEI to retain the aforesaid monies, and to continue to fail to return them to Scores Holding and Plaintiff 333 East 60th.

70.    Scores Holding and Plaintiff 333 East 60th have no adequate remedy at law.

71.    Based upon the foregoing, Scores Holding is entitled to restitution of $44,733.00.

72.    Based upon the foregoing, Plaintiff 333 East 60th is entitled to restitution of $76,518.00.

### FOURTH CAUSE OF ACTION
**Alternative to Second Cause of Action for Breach of Contract
(For Money Had and Received – By Plaintiffs Scores Holdings and 333 East 60th
Against Defendant SEI Only)**

73.    Plaintiffs repeat each and every allegation contained in Paragraphs 1 through 72 of the Complaint as if set forth fully herein.

74.    SEI received and benefited from the aforesaid monies belonging to Scores Holding and Plaintiff 333 East 60th.

75.    Under principles of good conscience, SEI should not be allowed to retain the monies it received that belong as a matter of right to Scores Holding and Plaintiff 333 East 60th.

76.    Based upon the foregoing, Scores Holding is entitled to restitution of $44,733.00.

77.    Based upon the foregoing, Plaintiff 333 East 60th is entitled to restitution of $76,518.00.

### FIFTH CAUSE OF ACTION
#### (For Libel – By Plaintiffs Harvey Osher, Elliot Osher and Richard Goldring Against All Defendants)

78.    Plaintiffs repeat each and every allegation contained in Paragraphs 1 through 77 of the Complaint as if set forth fully herein.

79.    Plaintiffs are informed and believe, and on that basis allege, that Bilzinsky and Nerim sent the May 2005 Letters. Plaintiffs are informed and believe, and on that basis allege, that the rest of the Defendants, and each of them, conspired with, and worked in concert with, Bilzinsky and Nerim to prepare and send said letters. Plaintiffs are further informed and believe, and on that basis allege, that the Defendants prepared and sent said letters as part of a scheme to extort monies and/or control of the Scores clubs from Plaintiffs and/or to intimidate Plaintiffs such that they would leave the business of operating gentlemen's clubs in New York City.

80.    As alleged above, and as set forth in Exhibit "A", the May 2005 Letters are replete with defamatory statements about the purported criminal actions of Harvey Osher, Elliot Osher, Richard Goldring and others.

81.    The May 2005 Letters made known the defamatory statements concerning Harvey Osher and Elliot Osher, and Goldring to Mr. Wiener, and made known the defamatory statements concerning Elliot Osher and Goldring to Harvey Osher, and thus constituted publishing of the above defamatory statements.

82.    The defamatory statements in the May 2005 Letters are entirely false and bogus, and have no basis in fact, and Defendants knew or should have known this.

83.    As a result of the libel of Defendants as set forth above, Harvey Osher, Elliot Osher and Richard Goldring are entitled to compensatory damages in an amount to be determined at trial, together with punitive damages in an amount not less than $10 million per Defendant and other damages as allowable by law.

## SIXTH CAUSE OF ACTION
### (For Intentional Infliction of Emotional Distress – By Plaintiffs Harvey Osher, William Osher, Elliot Osher and Richard Goldring Against All Defendants)

84.    Plaintiffs repeat each and every allegation contained in Paragraphs 1 through 83 of the Complaint as if set forth fully herein.

85.    The May 2005 Letters, the June 2005 Letters, the threats of imprisonment, the death threats, and the physical attacks on the Oshers, were, separately and taken together intended by Defendants, and each of them, to cause severe emotional distress to the Oshers and Goldring.

86.    The said actions, including premeditated physical attacks on the Oshers (which, on information and belief, was intended to "send a message" to all of the Plaintiffs), and numerous death threats, were extreme and outrageous, and put the Oshers and Goldring in fear for their lives and the lives of their families. The said false and baseless defamatory statements were also extreme and outrageous, being of an inflammatory nature, in the furtherance of a

17

scheme of extortion, and explicitly designed to cause Harvey, Elliot and Goldring extreme emotional distress arising from their understandable fear of prosecution, loss of reputation, and prison.

87.    The said actions and statements did in fact cause the Oshers and Goldring severe and continuing emotional distress.

88.    As a result of the above intentional infliction of emotional distress by Defendants, the Oshers and Goldring are entitled to compensatory damages in an amount to be determined at trial, together with punitive damages in an amount not less than $10 million per Defendant, and other damages as allowable by law.

### SEVENTH CAUSE OF ACTION
**(Assault – By Plaintiffs Harvey Osher, William Osher and Elliot Osher Against All Defendants)**

89.    Plaintiffs repeat each and every allegation contained in Paragraphs 1 through 88 of the Complaint as if set forth fully herein.

90.    Plaintiffs are informed and believe, and on that basis allege, that Defendants, and each of them, conspired to, and worked in concert to, effect the attacks on the Oshers.  Plaintiffs are further informed and believe, and on that basis allege, that several of the Defendants paid several of the other Defendants, or third parties, to physically attack the Oshers.

91.    The physical attacks on the Oshers by one or more of the Defendants, or by persons paid by Defendants to do so, were intentional.

92.    The persons physically attacking the Oshers had the ability to carry out the attacks.

93.    The attacks were intended to, and did, cause apprehension in the Oshers of imminent, harmful and offensive bodily contact.

18

94.    Further, Defendant Nerim's grasping Harvey by the head and shaking him was intentional, Nerim had the ability to cause, and did cause, imminent, harmful and offensive bodily contact, and same was intended to, and did, cause apprehension in Harvey of imminent, harmful and offensive bodily contact.

95.    As a result of the assault by Defendants, or by persons paid by Defendants to do so, the Oshers are entitled to compensatory damages in an amount to be determined at trial, together with punitive damages in an amount not less than $10 million per Defendant, and other damages as allowable by law.

### EIGHTH CAUSE OF ACTION
**(Battery – By Plaintiffs Harvey Osher, William Osher and Elliot Osher
Against All Defendants)**

96.    Plaintiffs repeat each and every allegation contained in Paragraphs 1 through 95 of the Complaint as if set forth fully herein.

97.    Plaintiffs are informed and believe, and on that basis allege, that Defendants, and each of them, conspired to, and worked in concert to, effect the attacks on the Oshers. Plaintiffs are further informed and believe, and on that basis allege, that several of the Defendants paid several of the other Defendants, or third parties, to physically attack the Oshers.

98.    The attacks on the Oshers by one or more of the Defendants, or by persons paid by Defendants to do so, were intentional.

99.    The attacks were intended to, and did, cause harmful and offensive bodily contact to the Oshers.

100.    As a result of the attack, Harvey Osher sustained serious personal injuries, including broken ribs, and incurred medical expenses in excess of $10,000.

NEWYORK-MIDTOWN\492668\8

101.    As a result of the attack, Elliot Osher sustained serious personal injuries, including a shoulder broken in multiple places, and incurred medical expenses in excess of $40,000. Elliot requires ongoing therapy, and may not recover full use of his left arm.

102.    Further, Defendant Nerim's grasping Harvey by the head and shaking him was intended to cause, and did cause, imminent, harmful and offensive bodily contact to Harvey.

103.    As a result of the battery by Defendants, or by persons paid by Defendants to do so, Harvey and Elliot are entitled to compensatory damages for their medical expenses in the amount of at least $10,000 for Harvey and at least $40,000 for Elliot, and they and William are entitled to other and further compensatory damages in an amount to be determined at trial, punitive damages in the amount not less than $10 million per Defendant, and other damages as allowable by law.

## NINTH CAUSE OF ACTION
### (Declaratory Relief – Against All Defendants)

104.    Plaintiffs repeat each and every allegation contained in Paragraphs 1 through 103 of the Complaint as if set forth fully herein.

105.    Based upon the foregoing, Plaintiffs contend as follows:

a.    Defendants, and each of them, have no right, title, or interest in the Scores Rights;

b.    Right, title, and interest in the Scores Rights resides solely in Scores Holding (or its validly authorized licensees, to the extent of the license);

c.    Defendants, and each of them, have no right, title, or interest in the Diamond Dollars Rights;

d.   Right, title, and interest to the Diamond Dollars Rights resides solely in Scores Holding;

e.   On September 30, 2003, SEI assigned all of its right, title, and interest as lessee of the property located at 333 East 60th Street, New York, New York, to Plaintiff 333 East 60th;

f.   Defendants, and each of them, have no right, title or interest in Plaintiff 333 East 60th.

g.   Defendants, and each of them, have no right, title or interest in the 333 East 60th Lease;

h.   Defendants, and each of them, have no right, title or interest, as a lessee, in any lease of real property located at 333 East 60th Street, New York, New York;

i.   SEI's loss of its liquor license automatically terminated any and all rights it had as a Licensee under the Sublicense Agreement as of September 30, 2003;

j.   SEI's assignment of its right, title, and interest as lessee of the property located at 333 East 60th Street, New York, New York, automatically terminated any and all rights it had as a Licensee under the Sublicense Agreement as of the date of assignment;

k.   SEI's loss of its liquor license automatically terminated any and all rights it had to conduct business as, or hold itself out to the public as, a gentlemen's club bearing any "Scores" name.

l.   SEI's assignment of its right, title, and interest as lessee of the property located at 333 East 60th Street, New York, New York, automatically terminated any and all rights it had to conduct business as, or hold itself out to the public as, a gentlemen's club bearing any "Scores" name.

m.   SEI has no right to any payments, revenues, royalties, licensing fees, dividends, rights to receive any common stock or warrants, or other monies or securities, relating to the operation or ownership of any Scores gentlemen's club.

n.   Defendants, and each of them, have no right, title or interest in Plaintiff Go West;

o.   Defendants, and each of them, have no right, title or interest as owner, lessee, or otherwise, of the property located at 536 West 28 Street.

106.   Plaintiffs are informed and believe, and on that basis allege, that Defendants dispute the above contentions, and that there is an actual, present and existing dispute between the parties concerning the above contentions.

107.   Wherefore, Plaintiffs request that the Court resolve and adjudicate the dispute between the parties by issuing a declaratory judgment conforming to each of Plaintiffs' contentions specified above at Paragraph 105, subsections a. through o.

//

//

//

## **PRAYER**

**WHEREFORE,** Plaintiffs demand that judgment be granted as follows:

1.      On their First Cause of Action, compensatory damages in an amount to be determined at trial, treble damages and attorney's fees as provided by statute, and such other and further damages as may be allowed by law;

3.      On their Second Cause of Action, compensatory damages in the amount of $44,773.00, awarded to Scores Holding and $76,518.00, awarded to Plaintiff 333 East 60th and such other and further damages as may determined at trial.

4.      If relief cannot for some reason be afforded on the Second Cause of Action, on their Third Cause of Action, restitution to Scores Holding in the amount of $44,773.00 and restitution to Plaintiff 333 East 60th in the amount of $76,518.00.

5.      If relief cannot for some reason be afforded on the Second Cause of Action, on their Fourth Cause of Action, restitution to Scores Holding in the amount of $44,773.00 and restitution to Plaintiff 333 East 60th in the amount of $76,518.00.

6.      On their Fifth Cause of Action, compensatory damages in an amount to be determined at trial and punitive damages of not less than $10,000,000 per Defendant, or as allowable by law.

7.      On their Sixth Cause of Action, compensatory damages in an amount to be determined at trial and punitive damages of not less than $10,000,000 per Defendant, or as allowable by law.

8.      On their Seventh Cause of Action, compensatory damages in an amount to be determined at trial and punitive damages of not less than $10,000,000 per Defendant, or as allowable by law.

9.    On their Eighth Cause of Action, compensatory damages in an amount to be determined at trial and punitive damages of not less than $10,000,000 per Defendant, or as allowable by law.

10.    On their Ninth Cause of Action, a declaration by the Court that:

a.    Defendants, and each of them, have no right, title, or interest in the Scores Rights;

b.    Right, title, and interest in the Scores Rights resides solely in Scores Holding (or its validly authorized licensees, to the extent of the license);

c.    Defendants, and each of them, have no right, title, or interest in the Diamond Dollars Rights;

d.    Right, title, and interest to the Diamond Dollars Rights resides solely in Scores Holding (or its validly authorized licensees, to the extent of the license);

e.    On September 30, 2003, SEI assigned all of its right, title, and interest as lessee of the property located at 333 East 60th Street, New York, New York, to Plaintiff 333 East 60th;

f.    Defendants, and each of them, have no right, title or interest in Plaintiff 333 East 60th.

g.    Defendants, and each of them, have no right, title or interest in the 333 East 60th Lease;

h.    Defendants, and each of them, have no right, title or interest, as a lessee, in any lease of real property located at 333 East 60th Street, New York, New York;

i.    SEI's loss of its liquor license automatically terminated any and all rights it had as a Licensee under the Sublicense Agreement as of September 30, 2003;

j.    SEI's assignment of its right, title, and interest as lessee of the property located at 333 East 60th Street, New York, New York, automatically terminated any and all rights it had as a Licensee under the Sublicense Agreement as of the date of assignment;

k.    SEI's loss of its liquor license automatically terminated any and all rights it had to conduct business as, or hold itself out to the public as, a gentlemen's club bearing any "Scores" name.

l.    SEI's assignment of its right, title, and interest as lessee of the property located at 333 East 60th Street, New York, New York, automatically terminated any and all rights it had to conduct business as, or hold itself out to the public as, a gentlemen's club bearing any "Scores" name.

m.    SEI has no right to any revenues, royalties, licensing fees, dividends, rights to receive any common stock or warrants, or other monies or securities, relating to the operation or ownership of any Scores gentlemen's club.

NEWYORK-MIDTOWNM49266\8

n.    Defendants, and each of them, have no right, title or interest in Plaintiff Go West;

o.    Defendants, and each of them, have no right, title or interest as owner, lessee, or otherwise, of the property located at 536 West 28 Street.

13.    Pre- and post-judgment interest as allowable by law;

14.    Attorney's fees as allowable by law;

15.    Such other and further relief that the Court deems just and proper, together with the costs and disbursements incurred in this action.

Dated: New York, New York
      July 25, 2005

COZEN O'CONNOR
Attorneys for Plaintiffs

By:  _____
Donald N. David
909 Third Avenue
New York, New York 10022
(212) 826-2000