# EXHIBIT GG

Case 1:07-cv-08718-RMB-THK    Document 54-34    Filed 03/28/2008    Page 2 of 15

Page 1
2003 U.S. Dist. LEXIS 27507, *

OLGA GUTESCU, and all others similarly situated, Plaintiff, v. CAREY INTERNATIONAL, INC., CAREY LIMOUSINE FLORIDA, INC., and CLUB LIMOUSINE SERVICE, INC., Defendants.

CASE NO. 01-4026-CIV-MARTINEZ/SIMONTON

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA

2003 U.S. Dist. LEXIS 27507

June 16, 2003, Decided
June 16, 2003, Filed; June 17, 2003, Entered

**SUBSEQUENT HISTORY:** Motion granted by *Gutescu v. Carey Int'l*, 2003 U.S. Dist. LEXIS 27501 (S.D. Fla., June 20, 2003)
Adopted by, Motion denied by, Motion granted by *Gutescu v. Carey Int'l, Inc.*, 2003 U.S. Dist. LEXIS 27499 (S.D. Fla., July 17, 2003)

**COUNSEL:** [*1] For Olga Gutescu, and all others similarly situated, Plaintiff: Chris Kleppin, Harry O. Boreth, Lloyd Scott Glasser, LEAD ATTORNEYS, Glasser Boreth Ceasar & Kleppin, Plantation, FL.

For Robert Michael Morrison, Plaintiff: Pro se, Miramar, FL; Chris Kleppin, LEAD ATTORNEY, Glasser Boreth Ceasar & Kleppin, Plantation, FL.

For Godfrey Easy, Plaintiff: Chris Kleppin, LEAD ATTORNEY, Glasser Boreth Ceasar & Kleppin, Plantation, FL.

For Carey International, Inc., a Florida corporation, Carey Limousine Florida, Inc., a Delaware corporation qualified to do business in the State of Florida, Club Limousine Service, Inc., a Florida corporation, Defendants: Cathleen Grace Bell, John Pope McAdams, LEAD ATTORNEYS, Carlton Fields, Tampa, FL; Kristy Marie Johnson, Michael Adam Shafir, Patricia Halvorson Thompson, LEAD ATTORNEYS, Carlton Fields, Miami, FL.

**JUDGES:** ANDREA M. SIMONTON, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** ANDREA M. SIMONTON

**OPINION**

*REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION TO PERMIT COURT SUPERVISED NOTICE TO EMPLOYEES OF THEIR OPT-IN RIGHTS*

This matter is before the Court upon Plaintiff's Motion to Permit Court Supervised Notice to Employees of Their Opt-In Rights (DE # 25, filed 1/14/02), as supplemented [*2] and amended by Plaintiff's Memorandum in Support of Her Motion to Permit Court Supervised Notice to Employee of Their Opt-In Rights (Motion for Conditional Certification) (DE # 189, filed 9/9/02). This Motion is referred to the undersigned Magistrate Judge (DE # 26). Numerous memoranda and other documents have been filed in support of and in opposition to Plaintiff's request for conditional certification. [1] A hearing was held on August 2, 2002, and at the conclusion of that proceeding, the undersigned determined that it was appropriate to permit Plaintiff to file a Supplement which addressed certain of the deficiencies argued by Defendants. Thereafter, numerous supplemental materials were filed, as set forth in footnote one to this Report. For the reasons stated below, the undersigned Magistrate Judge recommends that the Motion be granted with respect to all persons who worked as house chauffeurs for any of the Defendants in the Miami Office within the three years preceding the date of the opt-in notice, without prejudice to Defendants to file a motion for decertification following the completion of discovery.

1    The following documents have been filed by the parties with respect to the [*3] issues presented in this motion. They are listed chronologically by docket entry number, with the identity of the party filing the document set forth prior to the title of the document: **DE # 25,** filed 1/14/02: Pltff. Motion to Permit Court Supervised Notice to Employees; **DE # 35,** filed 2/26/02: Deft. Response to Motion to Permit Court Supervised Notice; **DE # 38,** filed 3/11/02: Deft. Declaration ("Decl.") of Robert Hamman; **DE # 39,** filed 3/11/02: Deft. Decl. of Robert Sobol; **DE # 46,** filed 3/20/02: Deft. Supplemental Decl. of Robert Sobol; **DE # 50,** filed 3/22/02: Pltff. Reply; **DE # 51,** filed 3/22/02: Pltff. Aff. of Olga Gutescu; DE

**# 144,** filed 7/25/02 Pltff. Deposition ("Depo.") of Larry Procaccini (9:30-6:00pm) & **DE # 181,** cont. Depo. of Larry Procaccini (6-6:30 pm); **DE # 146,** filed 7/25/02: Pltff. Depo. of Robert Hamman; **DE # 148,** filed 7/25/02: Pltff. Depo. of Olga Gutescu; **DE # 151,** filed 7/26/02: Deft. Sur-Reply; **DE # 162,** filed 8/1/02: Pltff. Memo Concerning Depo. Testimony; **DE # 163,** filed 8/1/02: Pltff. Depo. of Alireza Tehrany-Poor; **DE # 166,** filed 8/1/02: Deft. Decl. of Claudia Pereira; **DE # 184,** filed 8/21/02: Pltff. Depo. of Robert Sobol; **DE # 187,** filed 9/5/02: Pltff. Motion [*4] to Add the Limousine Drivers From Carey International, Inc.'s Jacksonville and Dallas Offices to the Collective Action; **DE # 188,** filed 9/9/02: Pltff. Notice of Filing Unsworn Declarations and Report to the Court Concerning Efforts to Contact Putative Class Members; **DE # 189,** filed 9/9/02: Pltff. Memo. In Support of Her Motion to Permit Court Supervised Notice to Employees of Their Opt-In Rights (Motion for Conditional Certification); **DE # 191,** filed 9/16/02: Deft. Response to Pltff. Motion to Add Limo. Drivers; **DE # 192,** filed 9/19/02: Pltff. Decl. of William Havens; **DE # 195,** filed 9/23/02: Defendants' Response to Plaintiff's September 9, 2002 Memorandum in Support of Plaintiff's Motion to Permit Court Supervised Notice; **DE # 197,** filed 9/26/02: Pltff. Reply Memo. in Support of Her Motion to Add the Limousine Drivers From Carey International, Inc.'s Jacksonville and Dallas Offices to the Collective Action; **DE # 199,** filed 9/26/02: Pltff. Notice of Dispositive Case Authority Concerning the Statute of Limitations Applied to Gutescu's Motion for Conditional Class Certification; **DE # 200,** filed 9/27/02: Pltff. Decl. of Anan Rejouis; **DE # 201,** filed 9/27/02: Pltff. Decl. of Javier Amato; [*5] **DE # 202,** filed 9/27/02: Pltff. Decl. of Edward Kranski; **DE # 206,** filed 10/3/02: Deft. Decl. of Ramiro Campins; **DE # 210,** filed 10/15/02: Pltff. Decl. of Richard Wendt; **DE # 212,** filed 10/15/02: Deft. Reply to Notice of Dispositive Case Authority re: Statute of Limitations; **DE # 216,** filed 10/18/02: Pltff. Reply in Support of Notice of Dispositive Case Authority re: Statute of Limitations; **DE # 217,** filed 10/18/02: Pltff. Notice of Filing Defendants' Modification of Their List of Independent Owner Operators Who Worked Out of Their West Palm Beach Office; **DE # 219,** filed 10/18/02: Pltff. Depo. of Velma Wiley; **DE # 223,** filed 11/15/02: Pltff. Notice of Filing Website New Release from Carey International, Inc. in Support of Her Motion to Permit Court Supervised Notice to Employees of Their Opt-In Rights; **DE # 224,** filed 11/22/02: Pltff. Notice of Filing Attached Workers' Compensation Policy; **DE # 225,** filed 11/22/02: Pltff. Depo. of Gary Kessler; **DE # 229,** filed 12/10/02: Deft. Reply to Plaintiff's Workers Compensation Filing; **DE # 231,** filed 12/13/02: Pltff. Reply in Support of Filing Workers Compensation Policy; **DE # 233,** filed 12/13/02: Pltff. Depo. of Mitchell Lahr; **DE # 240,** filed [*6] 2/26/03: Pltff. Notice of Filing Carey International, Inc.'s Standards Manual; **DE # 241,** filed 3/4/03: Deft. Response to Plaintiff's Notice of Filing Carey Intl Standards Manual.

I. *BACKGROUND*

Plaintiff, a limousine driver/chauffeur, has filed a seven-count Complaint against Defendants, alleging that she was their employee, and seeking relief based upon allegations that Defendants failed to pay her and similarly situated employees overtime wages for work performed in excess of 40 hours per week, in violation of the Fair Labor Standards Act ("FLSA") (*29 U.S.C. §§ 201-19*) (Count 1); that Defendants unlawfully discriminated against her in the terms and conditions of her employment on account of her gender, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") (*42 U.S.C. §§ 2000e, et seq.*) (Count 2) and the Florida Civil Rights Act ("FCRA") (*Fla. Stat. §§ 760.01, et seq.*) (Count 3); that Defendants unlawfully terminated her on account of her gender, in violation of Title VII (Count 4) and the FCRA (Count 5); and that Defendants unlawfully retaliated against her based upon her complaints of gender discrimination, in violation of Title VII (Count 6) and the FCRA (Count 7) [*7] (DE # 1). Plaintiff alleges that she was employed jointly and/or severally by all three Defendants, Carey International Inc., Carey Limousine Florida, Inc., and Club Limousine Service, Inc.

Defendants have answered, denying that they violated the FLSA or engaged in gender discrimination (DE # 12), and also contending, *inter alia,* that Plaintiff was not an employee within the meaning of the FLSA, Title VII or the FCRA (DE # 12, P 75).

II. *THE MOTION FOR CONDITIONAL CERTIFICATION*

Plaintiff Olga Gutescu, who performed limousine driver services for Defendant Club Limousine Services, Inc., contends that she has sufficiently shown that similarly situated employees have been adversely affected by Defendants' overtime practices, and that this Court should facilitate notice to all potential plaintiffs (DE # 35). Specifically, Plaintiff alleges that Defendants employed many other similarly situated employees, who were limousine drivers/chauffeurs employed from Sep-

tember 28, 1998 to the present, each of whom is due unpaid compensation under the FLSA because they were not paid time and one-half for each hour and parts of hours worked over forty hours in a given workweek. Plaintiff seeks preliminary [*8] certification and notice to a nationwide class consisting of all limousine drivers/chauffeurs who performed work for any Defendant, or their subsidiaries, regardless of whether they were classified by Defendants as house chauffeurs/independent contractors, employees, or independent owner operators (DE # 25 and # 189 at 2). As the initial motion and the transcript of the hearing held on August 2, 2002 reflects, Plaintiff Initially limited her request for opt-in notice to those persons who worked as drivers in the Miami and West Palm Beach offices. Subsequently, Plaintiff expanded this potential class to request that notice be sent to the additional locations of Jacksonville and Dallas (DE # 187). [2] In the Supplemental Memorandum permitted by the Court, Plaintiff expanded her request once more to include nationwide notice to all persons who worked as drivers for any Defendant or their subsidiaries or affiliates (DE # 189). Plaintiff predicates her claim for a nationwide class on the ground that Carey International, Inc. operates a limousine business through the use of multiple subsidiaries throughout the United States, all of whom are subject to the same standards of operation promulgated [*9] by Carey International, Inc., and that none of the limousine drivers/chauffeurs who perform work for the subsidiaries of Carey International, Inc. are paid overtime. Plaintiff contends that the differences in the job responsibilities and control exercised over the limousine drivers/chauffeurs who perform work for the various subsidiaries are not sufficiently significant to preclude a finding that they are all similarly situated. Plaintiff contends that "the Court should not enable Carey International, Inc. to violate the FLSA's overtime provisions by limiting this suit to two subsidiaries, thereby allowing the other subsidiaries to violate the FLSA with impunity." (DE # 189 at 3).

> [2] Plaintiff requested this expansion in a Motion to Add the Limousine Drivers from Carey International, Inc.'s Jacksonville and Dallas Offices to the Collective Action (DE # 187). In this Motion, Plaintiff claims that the South Florida region of Carey International, Inc. includes Miami, West Palm Beach, Jacksonville and Dallas, Texas, and, therefore, the collective action should include all limousine drivers/chauffeurs who worked out of those offices (DE ## 187, 197).

Defendants contend that Plaintiff was an [*10] independent contractor rather than an employee, and, thus, outside the coverage of the FLSA and not entitled to have notice sent out under *Section 216(b)* (DE # 35).

Defendants further argue that Plaintiff has not met her burden to justify issuance of the requested notice because she has not established that other "employees" want to opt-in, nor Is she similarly situated to the limousine drivers/chauffeurs to whom she requests notice be sent. Moreover, Defendants argue that should notice be given, it should be limited as to position, geographic and temporal scope, and modified for neutrality and clarity. Defendants argue that Plaintiff has failed to prove that the proposed opt-in plaintiffs are similarly situated because she did not set forth specific factual allegations, nor attach affidavits to show similarities between herself and the putative class members. Defendants point to differences in the working conditions of persons who provide limousine driver/chauffeur services at the Miami, West Palm Beach, Jacksonville and Dallas offices, and to the differences between those persons classified as house chauffeurs in Miami, versus independent contractors in West Palm Beach, versus independent [*11] owner operators, versus employee chauffeurs in Jacksonville and Dallas. [3] Those differences are discussed in more detail in the body of this Report.

> [3] At oral argument on August 2, 2002, Plaintiff abandoned her claim that the employee limousine drivers in the Miami office, who were responsible for driving shuttle buses at the University of Miami campus, were similarly situated.

Defendants further argue that if any notice is given, it should be limited to those persons who worked for the Club Limousine Service, Inc. subsidiary for which Plaintiff performed work, and to the period of time which preceded June 30, 2000, when the compensation system changed (DE # 195 at 18).

III. *LEGAL FRAMEWORK FOR ANALYSIS*

It is well-settled that in connection with a lawsuit filed as a collective action [4] under the provisions of the FLSA, *29 U.S.C. § 216(b)*, the District Court has the authority to permit a Notice of Pendency of Action to be sent to similarly situated potential opt-in class members. *Hoffmann-La Roche, Inc. v. Sperling, 493 U.S. 165, 110 S. Ct. 482, 107 L. Ed. 2d 480 (1989)*; *Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208 (11th Cir. 2001)*; *Grayson v. K Mart Corp., 79 F.3d 1086 (11th Cir. 1996)*. Before a court conditionally [*12] certifies the action as a collective action and permits notice to be sent, it must satisfy itself that there are other similarly situated employees of the employer who desire to opt-in. *Dybach v. Florida. Dep't of Corrections, 942 F.2d 1562, 1567-68 (11th Cir. 1991)*; *Tucker v. Labor Leasing, 872 F. Supp. 941, 948-49 (M.D. Fla. 1994)*; *Garner v. G.D. Searle Pharmaceuticals & Co., 802 F. Supp. 418, 422 (M.D. Ala. 1991)*. The parties do not dispute these general prin-

ciples. The issue presented in the case at bar is whether Plaintiff has presented sufficient evidence for this Court to find, even as a preliminary matter, that other employees of Defendants were sufficiently similarly situated to warrant this Court to authorize such notice, and if so, the scope of employees who should be provided such notice.

> 4   The courts use the terms "class action" and "collective action" interchangeably in the context of *29 U.S.C. § 216(b)*.

In *Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d at 1216-19*, the Eleventh Circuit endorsed a two-stage procedure which may be utilized to determine whether it is appropriate to maintain an action under *section 216(b)* as a collective action. In the first stage, [*13] the court should evaluate the case under a fairly lenient standard, based upon the pleadings and affidavits. Once the action is conditionally certified, notice is provided to putative class members, and discovery proceeds. Once discovery is completed, at the second stage of proceedings, the defendant may file a motion to decertify the class, if appropriate to do so based upon the individualized nature of plaintiff's claims.

At both stages, plaintiffs are required to demonstrate some reasonable basis for their claim of class-wide discrimination, and that there are similarly situated class members who desire to join the lawsuit. The difference lies primarily in the scrutiny which will be given to these claims. At the second stage, the court will have much more information on which to base a determination of whether the claimants are similarly situated, and plaintiffs will be required to submit "detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary." *Hipp, 252 F.3d at 1219*.

The requirement that members of the collective action under *29 U.S.C. § 216(b)* who are entitled to notice be "similarly situated" is a flexible one, and is different [*14] from that required under *Fed. R. Civ. P. 23* (governing class actions), *Fed. R. Civ. P. 20* (governing joinder) and *Fed. R. Civ. P. 42* (governing severance). As summarized by the Eleventh Circuit in *Grayson v. K Mart Corp., 79 F.3d 1086, 1096 (11th Cir.), cert. denied, 519 U.S. 987, 117 S. Ct. 447, 136 L. Ed. 2d 342 (1996)*:

> For an opt-in class to be created under *section 216(b)*, an employee need only show that he is suing his employer for himself and on behalf of other employees "similarly situated." "[P]laintiffs need only show 'that their positions are similar, not identical,' to the positions held by the putative class members."
>
> . . . .
>
> We hold that *section 216(b)*'s "similarly situated requirement is less stringent than that for joinder under *Rule 20(a)* or for separate trials under *Rule 42(b)*. See *Flavel v. Svedala Indus., 875 F. Supp. 550, 553 (E.D. Dis. 1994)* ("The 'similarly situated' requirement, in turn, 'is considerably less stringent than the requirement of [*Rule 23(b)(3)*] that common questions 'predominate,' or presumably, the *Rule 20(a)* requirement that claims 'arise out of the same action or occurrence.'").

(some citations omitted). The Court also noted that, "it is clear that the requirements for pursuing [*15] a *§ 216(b)* class action are independent of, and unrelated to, the requirements of a class action under *Rule 23 of the Federal Rules of Civil Procedure*. See e.g. *La Chapelle v. Owens-Illinois, Inc., 513 F.2d 286, 289 (5th Cir. 1975)* (*Rule 23* and *§ 216(b)* actions are 'mutually exclusive and irreconcilable')." *79 F.3d at 1096 n. 12*.

The factors to be considered in determining whether the putative opt-in Plaintiffs are similarly situated include (1) whether the plaintiffs all held the same job title; (2) whether they worked in the same geographical location; (3) whether the alleged violations occurred during the same time period; (4) whether the plaintiffs were subjected to the same policies and practices, and whether these policies and practices were established in the same manner and by the same decision-maker; (5) the extent to which the actions which constitute the violations claimed by Plaintiffs are similar. *See Stone v. First Union Corp., 203 F.R.D. 532, 541-43 (S.D. Fla. 2001)* (collecting cases which discuss the various factors used to determine "similarly situated" requirement). Ultimately, the court must determine whether, based upon the particular facts of the case, the similarities [*16] among the putative class members are sufficient so that it is more practical, efficient and fair, considering the extent to which members of the proposed class will rely on common evidence to prove their claims and the individual defenses that an employer may assert against each plaintiff, to proceed as a collective action rather than requiring separate actions to be maintained.

In addition to determining that other similarly situated employees exist, the court must also determine whether plaintiff has put forth sufficient evidence that such persons desire to become a part of this lawsuit. *Dybach v. Florida Dep't of Corrections, 942 F.2d at 1567-68* ("Before determining to exercise such power [to authorize notice] . . . the district court should satisfy Itself that there are other employees of the []employer who desire to 'opt-in and who are 'similarly situated' with re-

Case 1:07-cv-08718-RMB-THK   Document 54-34   Filed 03/28/2008   Page 6 of 15

Page 5
2003 U.S. Dist. LEXIS 27507, *

spect to their job requirements and with regard to their pay provisions.").

IV. *THE PRELIMINARY FACTS*

Based upon a review of the depositions and affidavits filed in this case, the undersigned has determined that Plaintiff has made a substantial threshold showing of the following facts. These facts are only preliminary findings [*17] based upon the requirement in *Hipp* that Plaintiff make only a preliminary showing sufficient to warrant notification, and are not intended to be dispositive findings, either for purposes of the final determination of whether the collective action should proceed as to some or all of the putative members, summary judgment or trial.

1. On September 20, 1999, Plaintiff Olga Gutescu applied for a position as a limousine driver with Carey-Club Limousine in Miami, Florida, and completed a form entitled, "Driver's Application for Employment." (DE # 51 Gutescu Aff. Ex. A). She was given various forms which referred to her as an employee (DE # 51 Gutescu Aff. Ex. B - H). She also received a manual which outlined various policies and procedures promulgated by Defendant Carey International, Inc. (DE # 51 Gutescu Aff. Ex. J). On October 13, 1999, she signed an Agreement with Defendant Club Limousine, and began work out of the Miami office. The Agreement stated she was an independent contractor, that she would be paid commissions or earnings on completed deals, that she was responsible for paying her income taxes, that she could set her own hours as long as she worked at some time during the Miami [*18] office's posted work hours, and that she was free to work for any company other than Carey South Florida or Club Limousine (DE # 39 Sobol Aff. P 14; DE # 225 Kessler Depo. at 148; DE # 184, Ex. 2 (copy of Agreement)). Plaintiff worked for Carey South Florida until she was terminated in approximately January 2000. There is a dispute over whether Plaintiff's actual working conditions were as outlined in the agreement. For example, Gutescu avers that she was "absolutely barred by the Defendants from working for any other limousine company" (DE # 51 Gutescu Aff. at P 22), and various witnesses have testified that the provision permitting other employment was intended to apply to non-competing businesses.

Plaintiff Gutescu summarized her working conditions In an Affidavit filed in support of her motion (DE # 51). She averred that she was required to take a pre-employment drug test, received numerous forms which identified her as an employee, and was required to clock in and clock out at the beginning and end of her shift (P 3). She further stated, contrary to affidavits submitted by Defendants, that she could not refuse jobs she was assigned (P 11). She was required to use the gas pumps [*19] at the main Miami office, or obtain permission as a condition of reimbursement if fuel was required at a distant location (P 16). In addition, Gutescu claims that she was required to wear certain clothing, drive certain vehicles, and keep the dispatchers advised of her location. She was required to use routes specified by the defendants, and was required to pick up and drop off customers at designated locations. The defendants also controlled what items would be provided to customers while they were in the limousine (PP 12-15). Gutescu specifically disputes the Defendants' contention that she could take alternate routes to destinations without permission (P 15). She also avers that, contrary to the language in the contract she signed, she was not permitted to perform work for other limousine companies (P 22). [5] Gutescu admits that business cards were provided, but states that they had only the name of the company, not her name, and that they were for the benefit of the Defendants rather than for her own benefit (P 25).

   5   Other witnesses also stated that this language was intended to apply to non-competitors.

2. Defendant Carey International, Inc. is an international company which provides [*20] chauffeured vehicle services through a network of subsidiaries, licensees, and affiliates in approximately 480 cities in 75 nations (DE # 223; DE # 233, Lahr Depo. at 30-32). There are approximately 18 subsidiary entities which employ approximately 1,045 employees in 11 states across the country, and each subsidiary makes its own hiring, firing and independent contractor decisions (DE # 98, Kessler Aff. at P 7). [6] Carey International Inc. provides and markets a worldwide reservations system, and receives a portion of the income earned by its various subsidiaries, licensees and affiliates (DE # 233, Lahr Depo. at 30-31). Carey International, Inc. issues policies and procedures concerning the appearance and conduct for all entities that provide chauffeur services under the Carey name (DE # 225, Kessler Depo. at 25-26). Carey Services, Inc. is a subsidiary of Carey International, Inc. (DE # 225, Kessler Depo. at 16-17; DE # 98 Kessler Aff. at P 2). Defendant Carey Limousine Florida, Inc. d/b/a Carey South Florida, is a subsidiary of Carey Services, Inc. (DE # 225, Kessler Depo. at 19). Defendant Club Limousine, Inc., Campanile Motor Services, Inc., [7] East Coast Transportation, Inc., and [*21] a Dallas corporation that was acquired in 2002, and whose name is not reflected in the record, are subsidiaries of Carey Limousine Florida, Inc. (*Id.* at 19). Club Limousine, Inc. and Campanile Motor Services, Inc. operate out of the Miami office (*Id.* at 22-23). East Coast Transportation, Inc. operates out of Jacksonville, Florida (*Id.* at 23). The Dallas subsidiary conducts business at the Dallas location. Carey Limousine Florida, Inc. conducts business from a West Palm Beach office directly and not through a subsidiary (*Id.* at

Case 1:07-cv-08718-RMB-THK   Document 54-34   Filed 03/28/2008   Page 7 of 15

Page 6
2003 U.S. Dist. LEXIS 27507, *

31-32). Carey Services, Inc., Carey Limousine Florida, Inc., Club Limousine, Inc., Campanile Motor Services, Inc. and East Coast Transportation, Inc. all have had the same directors--Vince Wolfington, Devin Murphy and Jeff Larsen (*Id.* at 29-30). One regional vice-president, presently Robert Michael Sobol, oversees all operations of Carey Limousine Florida, Inc. A general manager [8] makes the day-to-day decisions for the operation of each of the locations -- Miami, West Palm Beach, Jacksonville, and Dallas (*Id.* at 44-45). Each subsidiary makes its own hiring, firing and contract decisions (*Id.* at 99-101, 112, 150).

> 6   It is unclear from the Affidavit whether this [*22] number includes chauffeurs who are classified as independent contractors and independent owner/operators, as well as persons who are formally classified as employees: When questioned about this number in his deposition, Gary Kessler testified that this number would not include persons that each subsidiary classified as independent contractors, and that each subsidiary was responsible for providing the information regarding the number of its employees for inclusion in this Affidavit, and for determining whether a person was classified as an independent contractor or employee (DE # 225, Kessler Depo. at 58-59).
>
> 7   It is unclear from Kessler's deposition whether Club Limousine is a separate corporate entity, or a fictitious name under which Campanile Motor Services is doing business (DE # 225, Kessler Depo. at 73, 165, 203). Larry Procaccini also could not describe the difference between the operations of Club Limousine and Campanile Motor Services prior to or after their acquisition by Carey, despite the fact that he was the general manager of the Miami operation both before and after the acquisition (DE # 144 Procaccini Depo. at 13-14). The difference is not material for purposes of this [*23] Report.
>
> 8   This person was called a "managing director" at the time Carey acquired its Miami office, but subsequently the position was renamed to "general manager."

The corporate structure is somewhat confusing, but apparently between mid-2001 and 2002, Defendant Carey Limousine Florida, Inc. directly took over all the operations of Miami, and Sobol became the interim general manager of Miami, as well as the Regional Vice-President. In 2002, the financial operations of Miami and West Palm Beach were consolidated, although they continued to operate to some degree as separate offices. Carey Jacksonville (aka East Coast Transportation) and Carey Dallas are separate subsidiaries that operate In the Southeast region, though also under the supervision of Sobol (DE # 184, Sobol Depo. at 12, 17-18, 36-37).

3. There are three broad categories of persons who provide driver or chauffeur services at the various Carey subsidiaries. The evidence shows that not all subsidiaries use all categories of persons. Some subsidiaries employ drivers or chauffeurs at an hourly rate, pay them overtime and classify them as employees. [9] Some subsidiaries hire chauffeurs called "independent contractors" or "house [*24] chauffeurs" who are provided vehicles by the subsidiary and perform services on a contractual basis, and do not consider these chauffeurs to be employees, and do not pay them overtime. Some subsidiaries hire chauffeurs called "independent owner/operators" who own their own vehicles and perform services on a contractual basis, and do not pay them overtime. Subsidiaries have their own contracts, and decide which types of chauffeurs to hire (DE # 225, Kessler Depo. at 126-36).

> 9   The Miami office, for example, employs persons to serve as shuttle bus drivers for the University of Miami, and classifies them as hourly employees who are paid overtime. As previously stated, Plaintiff has dropped this group of persons from the proposed class.

4. Defendant Carey Limousine acquired Defendant Club Limousine from Michael Campanile in approximately January 1999 (DE # 144, Procaccini Depo. at 7-8). Larry Procaccini was employed by Club Limousine at the time of the acquisition, and had been so employed since 1986. Club Limousine had approximately 40 drivers at the time of the acquisition. Procaccini was the general manager of Club Limousine prior to the acquisition, and he was retained after the acquisition, [*25] in essentially the same capacity, but was given the title of managing director (DE # 144, Procaccini Depo. at 8). Procaccini reported to Guy Thomas, who was a Vice-President with Carey International in Washington, D.C. (DE # 144, Procaccini Depo. at 36). There were monthly regional meetings at the Jacksonville office, attended by the regional director and three managing directors-- Procaccini, the managing director of West Palm Beach and the managing director of Jacksonville (DE # 144, Procaccini Depo. at 24). The purpose of these meetings was to discuss marketing strategies, promote business and to try to attain a certain uniformity of operations (DE # 144, Procaccini Depo. at 25-26). Procaccini left Carey in June 2001, and was replaced on an interim basis by Robert Michael Sobol, who was also the Regional Director. Sobol has remained as the interim general manager of the Miami office since that date. As of mid-2002, there were approximately 50 chauffeurs working out of the Miami office (DE # 184, Sobol Depo. at 70).

Prior to June 2000, the Miami office had two categories of drivers -- it hired employee chauffeurs who drove shuttle buses and it hired persons it called house chauffeurs [*26] [10] under contracts like the one signed by Gutescu to provide other chauffeur services. In June 2000, the Miami office added the third category of independent owner/operators to the persons it hired to provide chauffeur services. At the same time, the compensation structure changed so that persons who were hired as chauffeurs were paid on a percentage basis. Prior to that, and during the entire time that Gutescu worked as a chauffeur, the house chauffeurs were paid based on a flat rate for certain trips, or at an hourly rate for other trips. The flat rate was based on a pre-determined number of hours that were allowed for trips between designated points, and the chauffeur was paid at his/her hourly rate for that designated number of hours, regardless of the actual amount of time it took for those trips (DE # 35, Sobol Aff. Ex. A). The company paid for gas and insurance at the Miami location (DE # 144, Procaccini Depo. at 109-11). Independent contractors were not paid overtime if they worked more than 40 hours per week (DE # 144, Procaccini Depo. at 126-27).

> 10  Drivers who used vehicles owned by the company at other locations, such as West Palm Beach, were referred to an independent contractor [*27] chauffeurs.

5. The operations of Carey in West Palm Beach began prior to the Miami operation, with the acquisition by Carey Limousine of Florida in 1995 of a company called Atlantic Action. Robert Hamman, who had owned Atlantic Action, became the managing director of the West Palm Beach office at that time (DE # 35, Ex. B Hamman Aff.; DE # 146, Hamman Dep. at 9-11; DE # 144, Procaccini Depo. at 41-43). Unlike Defendant Club Limousine Service, Inc., Atlantic Action ceased to exist when it was acquired (DE # 146, Hamman Depo. at 11). Hamman reports to Robert Michael Sobol, the Regional Vice-President for the South Florida region. Independent contractors hired in West Palm Beach sign an Affidavit of Independent Contractor, which is different from the form signed by house chauffeurs in the Miami office (DE # 35, Ex. B Hamman Aff.). In his Affidavit, Hamman outlined other differences in job responsibilities between persons hired in his West Palm Beach office as independent contractors, and those who worked as house chauffeurs for Club Limousine in Miami: chauffeurs In West Palm Beach, unlike Miami, were not required to provide their location to dispatchers on a routine basis; they were not [*28] required to complete trip sheets as in Miami, but could call the dispatcher with that information; they were always paid a specified percentage of the bill collected from a customer for a particular trip, rather than on an hourly or flat rate basis as was Plaintiff, and they were required to pay for their own gas and certain other expenses, such as car washes, radios, cellular phones, and customer discounts, whereas the Miami office paid those expenses (DE # 35, Ex. B Hamman Aff.; DE # 146, Hamman Depo. at 90-92).

Independent operators pay a fee to Carey Limousine Florida to be an independent operator. They lease or own their own vehicles, pay for their own gas and expenses, pay for their own liability insurance, can hire drivers to fill in for them, and can assign their contracts (DE # 35, Ex. A Sobol Aff. PP 50-64; Ex. B. Hamman Aff. PP 19-29).

As of mid-2002, there were approximately 20 chauffeurs working out of the West Palm Beach office, including both independent contractor/house chauffeurs and independent owner operators (DE # 184, Sobol Depo. at 71).

6. In addition to her own Affidavit, Plaintiff has submitted cookie-cutter Affidavits from the following persons who aver that they [*29] worked as house chauffeurs for "Carey in Miami," they worked in excess of 40 hours per week, they were not paid overtime, and they have an interest in joining this lawsuit to recover the overtime owed to them: Rick Holder, Alonzo Badie, John Valley, Nelson Formenta, Alicia Chapman, and Dennis Chapman (all at DE # 189 Exhs. 8, 9), and Anan Rejouis (DE # 200). Nelson Formenta and Alonzo Badie also aver that they worked as independent owner operators for Carey. None of the Affidavits state the dates that they worked for Carey, or describe their job duties. In addition, Plaintiff's counsel has provided the names of seven individuals who stated in telephone conversations that they were interested in joining this lawsuit and were "believed" to have worked as house drivers in Miami [11], but who were unable to be reached for the purpose of signing Affidavits (DE # 188).

> 11  One person also worked as an independent owner operator in Miami.

Given the fact that there is ample testimony that the duties of house chauffeurs in the Miami office had the same duties as Olga Gutescu, and given the timing of the acquisition of Defendant Club Limousine by Carey in 1999, and the fact that the independent owner [*30] operator position did not become available in Miami until mid-2000, it is a reasonable inference that at least some of the above persons worked as house chauffeurs during the applicable time period. [12] Of course, it certainly would have been the better practice to have included such information directly in the affidavits.

> 12  With respect to the Affidavit of Dennis Chapman, Defendants have provided the Affida-

vit of Ramiro Campins who states that, according to the pay records of Club Limousine Service, Inc., Chapman was a Miami house chauffeur who received his first compensation check in March 1998 and his last check on August 7, 1999 (DE # 206). Since, as discussed in more detail *infra*, there is a maximum three-year statute of limitations within which any opt-in notice must be filed, he is outside the relevant time period.

7. With respect to West Palm operations of Carey Limousine Florida, Inc., the Plaintiff initially submitted the Affidavit of Mihail Ispir (DE # 50, Ex. 2). Ispir averred that he worked for "the Defendants in West Palm Beach, Florida" from January 2000 to June 2000, when he resigned. He averred that he was a house chauffeur and that he was required to take the jobs assigned [*31] by the dispatcher, and that he was paid approximately 18% of the amount charged to the customer, plus a gratuity. He typically worked more than 40 hours a week, and was not paid overtime. Defendants provided him with a vehicle, and paid for maintenance of the vehicle, and for any parking tickets he received while driving for them. He also stated that he "would consider exercising . . . opt-in rights to join this lawsuit." (DE # 50, Ex. 2 Ispir Affidavit). Defendants moved to strike this Affidavit on the grounds that it contained inaccurate and conclusory information. The undersigned has previously denied the Motion to Strike, but has not considered the conclusory information which is refuted by persons with specific actual knowledge, and that information Is not recited here.

Subsequently, Plaintiff filed cookie-cutter Affidavits from the following persons who aver that they worked as house drivers for Carey in the West Palm Beach, Florida office, worked in excess of 40 hours per week, were not paid overtime, and have an interest in joining this lawsuit to recover the overtime owed to them: Elie Goldshor, Juan Urrutia, Robert J. Bannon, Stephen Ackerman, George Albanese, William Riley [*32] (all at DE # 189, Ex. 10); and William Havens, who also worked as an independent owner operator (DE # 192), Javier Amato, who also worked as an independent owner operator (DE # 201), and Edward Kranski (DE # 202). In addition, Plaintiff has filed Affidavits of Michael Shendell and John Olsen, who aver that they worked as independent owner operators for Carey in the West Palm Beach, Florida office, worked in excess of 40 hours per week, were not paid overtime, and have an interest in joining the lawsuit (DE # 189, Ex. 11). Finally, Plaintiff filed the similar Affidavit of Richard Wendt, who averred that he worked as a limousine driver, but did not specify whether it was as an independent owner operator or house driver (DE # 210). None of these affidavits, with the exception of Ispir, describe any pay structure or job duties, or dates of employment.

8. No Affidavits have been filed by any chauffeurs who work out of the Dallas or Jacksonville offices of Carey Limousine Florida. East Coast Transportation, Inc. is the subsidiary that operates the Jacksonville office of Carey Limousine Florida, and it was acquired in January 1999 at approximately the same time as Club Limousine (DE # 184, [*33] Sobol Depo. at 24-25). The Dallas office was acquired in January 2002 (DE # 184, Sobol Depo. at 69-70). According to the deposition testimony of Sobol, the Regional Vice President of Operations, limousine drivers in Jacksonville and Dallas are classified as employees, and not as independent contractors. They are paid a percentage of the money collected for each job, and are not paid overtime (DE # 184, Sobol Depo. at 4, 5, 73-76, 85-87). The Jacksonville and Dallas drivers are participants in employee benefit plans, unlike the Miami and West Palm Beach drivers (*Id.* at 74-75, 188). The Jacksonville and Dallas employee chauffeurs are not permitted to refuse work assignments, whereas there is disputed testimony that the Miami independent contractors can (*Id.* at 134). As of mid-2002, there were approximately fifty drivers working out of the Jacksonville office, and approximately fifty to sixty chauffeurs working out of the Dallas office (*Id.* at 71). There was no testimony that the chauffeurs who worked for the Dallas or Jacksonville subsidiaries actually worked over forty hours in one week.

V. *DETERMINATION OF THE SIMILARLY SITUATED PERSONS*

The determination of whether members of a proposed [*34] class are similarly situated must be viewed in light of the nature of the claims and defenses applicable to a particular action. In the case at bar, the primary dispute centers on whether Plaintiff is an employee within the meaning of the Fair Labor Standards Act, or whether she is an independent contractor who falls outside the provisions of that Act. Therefore, although the ultimate issue of whether Plaintiff in the case at bar is an employee or an independent contractor is not presently before this Court, the nature of the evidence that will be adduced to establish that fact is critical to the determination of whether others are similarly situated.

In determining whether a worker is an employee or an independent contractor for the purpose of application of the Fair Labor Standards Act, courts employ the "economic realities test" which considers: (1) the nature and degree of control of the workers by the alleged employer; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (4) whether

the service rendered requires a special [*35] skill; (5) the degree of permanence of the working relationship; and (6) whether the service rendered is an integral part of the alleged employer's business. *Santelices v. Cable Wiring, 147 F.Supp.2d 1313 (S.D. Fla.2001)*. No one factor is dispositive and the test is based on the totality of the circumstances. *United States v. Silk, 331 U.S. 704, 716, 67 S. Ct. 1463, 91 L. Ed. 1757, 1947-2 C.B. 167 (1947)*. The determinative factor of the "economic realities test" in analyzing a possible employee/employer relationship for purposes of the FLSA is whether the worker is dependent upon the business to which he/she renders service. *See Weisel v. Singapore Joint Venture, Inc., 602 F.2d 1185, 1189 (5th Cir. 1979)*; *Usery v. Pilgrim Equipment Company, Inc., 527 F.2d 1308, 1311 (5th Cir. 1976), cert. denied, 429 U.S. 826, 97 S. Ct. 82, 50 L. Ed. 2d 89 (1976)*; *Mednick v. Albert Enterprises, Inc., 508 F.2d 297, 299 (5th Cir. 1975)*.

Thus, even though Plaintiff may have signed a contract with Defendant Club Limousine Service, Inc. that expressly provided that Plaintiff was an independent contractor, she may still be an "employee" within the meaning of the FLSA. *See Herman v. Mid-Atlantic Installation Services, Inc. 164 F.Supp.2d 667 (D. Md. 2000)*. The fact that a business "may [*36] not have had the intention to create an employment relationship is irrelevant." *Donovan v. New Floridian Hotel, Inc., 676 F.2d 468, 471 (11th Cir. 1982)*. It is well-settled that an employer cannot saddle a worker with the status of independent contractor, thereby relieving itself of its duties under Fair Labor Standards Act, by granting him some legal powers where the economic reality is that the worker is not and never has been independently in the business which the employer would have him operate. *Mednick v. Albert Enterprises, Inc., 508 F.2d 297 (5th Cir. 1975)*; *see also Robicheaux v. Radcliff Material, Inc., 697 F.2d 662 (5th Cir. 1983)* (welders were "employees" even though they signed contract stating they were independent contractors, furnished their own equipment and insurance coverage, were self-employed on their tax returns and had their own business cards). Persons are often found to be "employees" although they possess attributes common to independent contractors. *See e.g., Donovan v. Tehco, Inc. 642 F.2d 141 (5th Cir. 1981)*; *Mednick v. Albert Enterprises, Inc., 508 F.2d 297 (5th Cir. 1975)* (man who operated cardrooms for apartment house-hotel deemed to be employee [*37] rather than independent contractor, considering the evidence showing the realities of his situation, including fact that he had no business of his own, though he appeared to have certain legal rights and powers such as power to hire and fire and right to "bill" patrons). Courts do not require that one factor weigh more heavily than any other, just that looking at the totality of the circumstances, as a matter of economic reality, the person is dependent on the employer.

In addition, if there is a finding that the overtime provisions of the FLSA were violated, there will also need to be a determination of whether that violation was "willful," and thus subject to a three-year statute of limitations rather than a two-year statute of limitations. The knowledge of those responsible for setting salaries and working conditions thus will be an issue.

Finally, there is an issue concerning the liability of all three named defendants for overtime compensation; that is, whether the relationship among these three defendants and Plaintiff is such that they can be considered "joint employers." In this regard, the specific facts concerning the operation and control over the various offices by each defendant [*38] is critical.

The above substantive legal principals must now be applied to the test used for determining whether potential opt-in plaintiffs are similarly situated. Although the test is flexible, with no one factor controlling, it is useful to examine the five factors identified in *Stone, supra*.

1. *Whether the plaintiffs all held the same job title.*

In this case there are four job titles at issue: employee chauffeur, house chauffeur, independent contractor chauffeur, and independent owner operator. The job title is only relevant insofar as it reflects the differing duties of the putative class members. In this case, the evidence establishes that each subsidiary controlled the work environment and contracts of the persons it hired to serve as drivers. Independent owner operators are distinguished from house chauffeurs and independent contractor chauffeurs in numerous ways-they own their own cars, they have longer-term contracts which are assignable, they can hire others to work for them, they are responsible for their own insurance. There is even a greater distinction between independent owner operators and employee chauffeurs since employee chauffeurs receive certain benefits that the [*39] others do not, and have taxes withheld from their paychecks. It is clear to the undersigned that these differences will be central to the determination of the employee status of putative class members, and that independent owner operators are not similarly situated to persons with the other three job titles, even within the same office.

With respect to employee chauffeurs who are not paid overtime, the only evidence of this classification is that it is used in the Dallas and Jacksonville offices. [13] These persons drive vehicles which are provided by the subsidiary and are provided with insurance by the subsidiary. It is undisputed that they are cannot refuse job assignments. There is no other specific evidence regarding the day-to-day operations of the Dallas and Jackson-

Case 1:07-cv-08718-RMB-THK   Document 54-34   Filed 03/28/2008   Page 11 of 15

Page 10
2003 U.S. Dist. LEXIS 27507, *

ville offices in terms of job assignments, employment contracts, or control over the daily or weekly activities of chauffeurs. The chauffeurs who work out of these offices are employed by separate subsidiaries and are classified as employees, and are participants in various employee benefit plans that are not provided to the chauffeurs who work out of Miami and West Palm Beach. Moreover, there is no evidence that chauffeurs [*40] in those offices work more than forty hours in a work week, although there was testimony that if they did they would not be paid overtime. There are no affidavits from any persons who work as chauffeurs in those offices that they may desire to join this lawsuit. Plaintiff has failed to establish that employee chauffeurs have sufficiently similar job duties as independent contractors chauffeurs or house chauffeurs to be considered part of the same class.

> 13 As previously stated, Plaintiff has recognized that the Miami employee chauffeurs, who operate the University of Miami shuttle buses and who are paid overtime, are not similarly situated.

With respect to the duties of the house chauffeurs or independent contractor chauffeurs who perform for work for Carey subsidiaries the issue is closer. The job title itself is not determinative, and it appears that persons with both job titles share certain similarities with respect to their job duties. Persons in both positions drive vehicles which are provided by the subsidiary for whom they work, car insurance is provided by the subsidiary, they receive assignments from a dispatcher, and they must adhere to the same standards of conduct. However, [*41] there are other variables that lead the undersigned to conclude that Plaintiff has failed to set forth a reasonable basis for finding that they are sufficiently similar. The most specific evidence relates to the operations which fall under Defendant Carey Limousine Florida, which operates, and/or owns the subsidiaries which operate the Miami and West Palm Beach offices.

Independent contractors in the West Palm Beach office have always been paid a percentage of the amount charged to a customer, plus any gratuity. They are not required to provide their location to dispatchers on a routine basis, they are not required to complete trip sheets, they pay for their own gas and certain other expenses, such as car washes, radios, cellular phones and customer discounts. They were apparently not permitted to refuse work assignments.

House chauffeurs in Miami were paid on a flat rate or hourly basis prior to June or July 2000, when the method of computing was changed to a percentage basis. House chauffeurs did not pay for their own gas or insurance, were required to keep the dispatcher advised of their location, and were required to complete trip sheets.

The job duties of house chauffeurs and independent [*42] contractor chauffeurs share similarities, but also have differences. In view of the fact intensive inquiry needed to determine employee status, however, the balance tips slightly in favor of not permitting plaintiffs in West Palm Beach to participate in this lawsuit.

2. *Whether they worked in the same geographic location.*

Plaintiff seeks to expand this class nationwide. The persons who worked out of the Miami Office all worked in the same geographic location, whereas the persons who worked in other offices did not perform duties in overlapping geographic locations.

3. *Whether the alleged violations occurred during the same time period.*

The violations alleged by Plaintiffs were continuing throughout the relevant time period.

4. *Whether the Plaintiffs were subjected to the same policies and practices, and whether these policies and practices were established in the same manner and by the same decision-maker.*

5. *The extent to which the actions which constitute the violations claimed by Plaintiffs are similar.*

Factors four and five may be considered together. Plaintiff argues that she has established a reasonable basis that there is a policy and practice implemented nationwide through Carey International, [*43] Inc., that is responsible for the determination that overtime will not be paid to chauffeurs, and which regulates the work of chauffeurs to such a degree that all chauffeurs employed by any Carey subsidiary should be deemed similarly situated to Plaintiff.

The evidence establishes, however, that the policies and practices regarding hiring chauffeurs, their specific job duties, the control exercised over the performance of their work, and their benefits, were established by the separate subsidiaries which hired them. Although Carey International set general standards and established certain parameters for matters such as dress and behavior, it did not control the specific work environment which is central to the determination of employee status under the FLSA. The differences in the job duties between the offices specifically discussed, in particular Miami and West Palm Beach, as well as Dallas and Jacksonville, highlights this fact. The West Palm Beach office was managed by Robert Hamman, who entered into agreements with independent contractors which were different than the agreements used by the Carey subsidiaries Club Limousine and Campanile Motor Services in Miami. Hamman also had [*44] different policies regarding

Case 1:07-cv-08718-RMB-THK   Document 54-34   Filed 03/28/2008   Page 12 of 15

Page 11
2003 U.S. Dist. LEXIS 27507, *

work assignments and the provision of tools of the job. Defendant Club Limousine, which employed Plaintiff, had no control over the policies set in West Palm Beach. Moreover, even though Club Limousine is a subsidiary of co-defendant Carey Limousine Florida, which directly operated the West Palm Beach office, the managing director/general manager of Club Limousine did not report directly to the regional director in charge of Carey Limousine Florida, but reported directly to Washington, D.C.

Defendants also emphasize the differing compensation policies. At the time Plaintiff worked at the Miami office, house chauffeurs were compensated on either an hourly basis or a predetermined flat rate. On approximately June 30, 2001, this changed to a system based on a percentage of the money collected from the customer, plus a gratuity. The West Palm Beach office always used a percentage rate to compensate its chauffeurs. Although this highlights the independence of the managers at various locations, the undersigned credits the contention that this is not such a significant difference, in and of itself, that Miami house chauffeurs employed after this change in compensation [*45] are not similarly situated to Plaintiff. [14] Under the FLSA, any computation of damages will need to be made individually, based upon the prescribed formula for determining the regular rate of pay. *See 29 C.F.R. § 778.108, et seq.* Thus, if all other duties are the same, and the persons work at the same location for the same subsidiary, they are similarly situated. *See Bradford v. Bed, Bath & Beyond, 184 F.Supp.2d 1342, 1351 (N.D. Ga. 2002)*; *Moss v. Crawford & Co., 201 F.R.D. 398, 410 (W.D. Pa. 2000).*

> [14] In other situations, however, such as where it is necessary to establish an exemption which requires a salary basis, or that work was performed on a commission basis that exceeded one and a half times the minimum wage, this difference might be dispositive. However, the Defendants have not raised any defenses which make this a significant distinction.

Therefore, the existence of policies and procedures varied from location to location, and it would be too confusing and inefficient to permit employees from both the Miami and the West Palm Beach offices to join the same lawsuit.

For essentially the same reasons that the undersigned has determined that the Miami and West Palm Beach offices are [*46] not sufficiently similar to warrant inclusion of West Palm Beach chauffeurs as potential class members, *a fortiori,* a nationwide class is inappropriate. It is undisputed that there is a relationship between and among Defendant Carey International, Inc. and its various subsidiaries, and that Carey International seeks to impose certain quality control standards on the entities that are associated with it. There is also evidence that the profits of the subsidiaries flow upward to Carey International, and that Carey International provides certain services and benefits to its subsidiaries. It is possible that there is such an interconnected relationship that the defendants in this case might be considered joint employers, and it is possible that Plaintiff may seek to pierce the corporate veil. [15] However, as Defendants argue, that is not the test for determining whether persons are similarly situated such that the Court should permit their individual claims for overtime compensation to be considered in one action. In numerous cases, where there is clearly only one corporate entity involved, courts have held that not all employees in all geographic locations should be permitted to opt into [*47] the collective action. *See e.g., Harper v. Lovett's Buffet, Inc., 185 F.R.D. 358 (M.D. Ala. 1999)*; *Tucker v. Labor Leasing, 872 F. Supp. 941 (M.D. Fla. 1994)*. In the case at bar, the differing operations of the various subsidiaries, whose day-to-day activities and management (including assignment of job responsibilities to employees) are decentralized lead the undersigned to conclude that Plaintiff has failed to establish that all chauffeurs working underneath the Carey umbrella are sufficiently similarly situated to warrant inclusion in this lawsuit.

> [15] The issue of liability for the parent corporations of Club Limousine as joint employers has been raised by the Defendants. Since the liability of parent corporations as joint employers would need to be resolved on a subsidiary by subsidiary basis, this is another factor which militates against he inclusion of drivers who performed work for different subsidiaries within the same lawsuit.

Viewing the allegations of the Complaint, coupled with Plaintiff's Affidavit, Plaintiff's deposition testimony and the Affidavits of various persons who worked at Carey's Miami and West Palm Beach offices, the undersigned Magistrate Judge concludes [*48] that Plaintiff has made a sufficient preliminary showing to warrant notification to potential opt-in Plaintiffs. However, viewing the totality of the circumstances, as reflected in the above discussion, the undersigned has concluded that the only similarly situated chauffeurs to whom notice should be sent are those who worked out of Carey's Miami office. Expanding the collective action beyond Miami would unduly complicate this action by requiring consideration of too many dissimilar circumstances, when viewed in the context of the contested issues. Moreover, one of the defendants, Club Limousine Service, Inc. was not involved in any decision-making with respect to any other offices, and the involvement of Defendant Carey Limousine Florida in the decision-making and management policies of the Miami office varied over time, and

was different than its involvement in the West Palm Beach and other offices within its region. Therefore, considering the totality of the circumstances, the notice will be limited to the Miami office. Furthermore, if the evidence developed in discovery reflects that Plaintiffs who elect to opt-in are not similarly situated, Defendants may file a motion for decertification.

Therefore, [*49] based upon the foregoing analysis, as well as the reasons stated on the record at the hearing, the undersigned Magistrate Judge recommends that the Motion to Permit Court Supervised Notice to Employees of Their Opt-In Rights be granted on a preliminary basis to persons who worked as house chauffeurs in the Miami office of Carey/Club Limousine, without prejudice to Defendants' right to file a motion for decertification at the close of discovery.

VI. *THE FORM OF THE NOTICE*

Defendants object to the form of the Notice which Plaintiffs attached to their Motion on the following grounds: 1) notice should be limited to Carey South Florida house chauffeurs who worked at Carey South Florida's Miami office prior to July 2000, and after a date calculated through application of the statute of limitations, 2) notice should be limited geographically because a national class would be overbroad, 3) notice should be limited temporally because the compensation structure has changed since Plaintiff worked for Defendants, and 4) notice should be modified for neutrality and clarity since it fails to specify that Defendants deny Plaintiff's allegations; refers potential members to contact Plaintiff's attorneys; [*50] and is ambiguous with respect to the legal effect of opting in to this case.

In reply, Plaintiff argues that notice should not be limited geographically because Defendants' failure to inform the Court that they did pay overtime at locations other than Miami and West Palm Beach signifies that Defendants maintained an illegal policy at all locations. Additionally, Plaintiff claims that the change in compensation structure since July, 2000 does not mandate limiting the notice temporally.

1. *Geographic Limitation*

As previously stated, the undersigned has determined that notice should be sent only to house chauffeurs in the Miami location.

2. *Temporal Limitation.* As previously discussed, the undersigned has determined that the notice should not be limited to persons who worked prior to the change in compensation that occurred on June 30, 2000. There is also a dispute, however, with respect to the applicable starting date for the notice. In the form submitted by Plaintiff, she seeks to notify all persons who worked more than forty hours per week, but were not paid time and one-half for every hour worked over forty hours in a given workweek, during the three years preceding the date the Complaint [*51] was filed (*See* DE # 25, Ex. 2). Defendants, on the other hand, seek to notify only those persons who worked such hours during the three years preceding the date of the Notice (DE # 195 Ex. C).

This dispute crystallized between the parties in connection with arguments over the Affidavit filed by Dennis Chapman, a house chauffeur in the Miami office. Based upon the analysis set forth below, the undersigned has determined that notice should be limited to those persons who worked unpaid overtime hours during the three years preceding the notice.

Plaintiff contends, in her Notice of Dispositive Case authority Concerning the Statute of Limitations Applied to Gutescu's Motion for Conditional Class Certification (DE # 199), that the continuing violations doctrine applies to violations of the Fair Labor Standards Act, and that therefore the three-year period of time prescribed by statute may be extended if the time-barred failure to pay overtime is part of the same policy that resulted in a failure to pay overtime within the applicable statutory period.

Defendants contend that damages are recoverable only for those violations that occur within the two years preceding the lawsuit for non-wilful [*52] violations, or for three years in the case of a wilful violation, and that the continuing violations doctrine does not apply to permit damages for overtime violations that occurred prior to limitation period (DE # 212).

*Title 29 United States Code Section 255* sets forth the applicable statute of limitations: "Any action commenced . . . to enforce any cause of action for unpaid minimum wages, unpaid overtime compensation or liquidated damages under the Fair Labor Standards Act . . . shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years."

The parties do not dispute that all of overtime violations alleged by Plaintiff Gutescu, which occurred between October 1999 and January 2000, fall within the statute of limitations, since her Complaint was filed on September 28, 2001.

The dispute concerns the applicable limitations period for potential opt-in Plaintiffs. *Title 29 United States Code Section 256* specifies the "Determination of commencement of future actions." It provides, in pertinent part:

In determining when an action is commenced for the purposes [*53] of *section 255* of this title . . . in the case of a collective or class action instituted under the Fair Labor Standards Act . . ., it shall be considered to be commenced in the case of any individual claimant--

> (a) on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or
>
> (b) if such written consent was not so filed or if his name did not so appear--on the subsequent date on which such written consent is filed in the court in which the action was commenced.

Under the plain terms of this statute, if the written consent of an opt-in plaintiff is not filed within three years from their last pay date, their action is barred. The plain meaning was made explicit by the Eleventh Circuit Court of Appeals in *Grayson v. Kmart Corp., 79 F.3d 1086, 1105-07 cert. denied, 519 U.S. 987, 117 S. Ct. 447, 136 L. Ed. 2d 342 (1996)*, when the Court applied this provision to the Age Discrimination in Employment Act, which incorporates certain provisions of the FLSA: "[W]ith the Portal-to-Portal Act, Congress amended *§ 216(b) of the FLSA* to provide that an employee must [*54] file written consents in order to made a party plaintiff to the collective action under *§ 216(b)*. In discussing this amendment, Congress expressed the concern that an opt-in plaintiff should not be able to escape the statute of limitations bearing on his cause of action by claiming that the limitations period was tolled by the filing of the original complaint. 93 Cong. Rec. 2,182 (1947)." Thus the Court held, "ADEA opt-in plaintiffs are deemed to commence their civil action only when they file their written consent to opt into the class action . . . . Accordingly, we conclude that a putative plaintiff must file his written consent to opt into the class action prior to the expiration of the statute of limitations on his ADEA claim." *Accord Lee v. Vance Exec. Protection. Inc., 7 Fed. Appx. 160, 2001 WL 108760 (4th Cir.2001)*; *Viciedo v. New Horizons Computer Learning Center of Columbus. Ltd., 246 F. Supp. 2d 886 (S.D. Ohio 2003)*.

Plaintiff's Notice of Dispositive Case Authority (DE # 216) correctly states that a putative opt-in plaintiff is not barred from joining this action by the mere fact that the putative plaintiff began employment more than three years ago. The cases cited by Plaintiff stand for [*55] the well-established proposition that each failure to pay overtime during a specified pay period is a new violation. *Hodgson v. Behrens Drug Co., 475 F.2d 1041, 1050 (5th Cir. 1973)*; *Hendrix v. Yazoo City, 911 F.2d 1102, 1104 (5th Cir. 1990)*, citing *Hafferty v. Pulse Drug Co., 821 F.2d 261 (5th Cir. 1987)* (employee can recover for overtime hours worked dating back to beginning of the statute of limitations period, even though hired, and terms of employment were set, outside of the statute of limitations). However, as Defendant points out, this does not mean that a putative plaintiff is permitted to join an action if *none* of his pay periods fall within the statute of limitations. With respect to Dennis Chapman, the chauffeur who is addressed specifically in the parties' memoranda on this issue, the evidence presented by Defendants established that he was working as a house chauffeur for Club Limousine at the time it was acquired by Carey, and continued to work there after the acquisition until August 7, 1999 (DE # 195 at 15). Since he did not file an opt-in notice prior to the expiration of three years from the date his employment terminated, Defendants correctly assert that [*56] he is not entitled to join this action.

Therefore, in the case at bar, the opt-in notice should be sent only to those chauffeurs who performed work for Carey in the Miami office within three years from the date of mailing of the notice. All other plaintiffs are barred from joining this lawsuit.

3. *The Language of the Notice*

The undersigned Magistrate Judge finds that most of Defendants' concerns with respect to the neutrality and clarity of the Notice are well-founded, and therefore the Notice should be tailored accordingly. The Recommended Notice shall 1) state that Defendants deny Plaintiff's claims; 2) refer potential class members to contact Plaintiff's attorneys, as opposed to the Clerk of the Court; 3) advise individuals of the consequences of joining or not joining this case; and 4) advise potential class members of their obligations if they do join.

The Notice recommended by the undersigned is attached to this Report and Recommendation.

VII. CONCLUSION

In sum, based upon a review of the record as a whole, and considering the totality of the circumstances, including the extent to which members of the proposed class will rely on common evidence to prove their claims and the individual [*57] defenses that may be asserted, the undersigned Magistrate Judge finds and concludes that Plaintiff has made a sufficient preliminary showing that house chauffeurs employed at the Miami location of Carey/Club Limousine are similarly situated to Plaintiff such that they should be given notice of this action, and that the other chauffeurs who worked at other locations were not so situated. Therefore, the undersigned Magistrate Judge does hereby

**RECOMMEND** that Plaintiff's Motion to Add the Limousine Drivers from Carey International, Inc.'s Jacksonville and Dallas Offices to the Collective Action (DE # 187) be **DENIED.** It is further

**RECOMMENDED** that Plaintiff's Motion to Permit Court Supervised Notice to Employees of Their Opt-In Rights (DE # 25, filed 1/14/02) be **GRANTED,** as set forth above. It is further

**RECOMMENDED** that Defendants be permitted to file a Motion for Decertification, under the procedures announced in *Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208 (11th Cir. 2001)*.

The parties have until June 26, 2003, to file written objections, if any, for consideration by The Honorable Jose E. Martinez, United States District Judge. Failure to file objections timely shall bar the parties [*58] from attacking on appeal any factual findings contained herein. *LoConte v. Dugger, 847 F.2d 745 (11th Cir.), cert. denied, 488 U.S. 958, 109 S. Ct. 397, 102 L. Ed. 2d 386 (1988)*; *RTC v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993)*.

**DONE AND SUBMITTED** at Miami, Florida, this 16<th> day of June, 2003.

ANDREA M. SIMONTON

UNITED STATES MAGISTRATE JUDGE