# EXHIBIT 3

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x
SIRI DIAZ, CAROLYN SIEGEL, TALIA BUMB,
BLERTA VIKKI, DANIELLE OWIMRIN, on
behalf of themselves and all others
similarly situated,

     Plaintiffs,

  - against -

SCORES HOLDING COMPANY, INC., GO WEST
ENTERTAINMENT, INC., a/k/a SCORES WEST
SIDE; and SCORES ENTERTAINMENT, INC.,
a/k/a SCORES EAST SIDE,

     Defendants.
Case No. 07 Civ. 8718 (RMB)
------------------------------------x

    200 Park Avenue
    New York, New York


    January 8, 2008
    10:25 a.m.


   Deposition of CAROLYN J. SIEGEL,

before Marlene Lee, CSR, CRR, a Notary Public

of the State of New York.




  ELLEN GRAUER COURT REPORTING CO. LLC
   126 East 56th Street, Fifth Floor
    New York, New York 10022
     212-750-6434
      REF: 86395

d4eb2829-95d7-4eb9-b7f3-8e068ed87164

Page 2

1    A P P E A R A N C E S:

2

3    OUTTEN & GOLDEN LLP

4    Attorneys for the Witness and Plaintiffs

5         Three Park Avenue
          New York, New York  10016
6
     BY:  TAMMY MARZIGLIANO, ESQ.
7         212-245-1000                 (Telephone)
          tm@outtengolden.net          (E-mail)
8         212-977-4005                 (Fax)

9

10

11   GREENBERG TRAURIG LLP

12   Attorneys for the Defendants

13        200 Park Avenue
          New York, New York  10166
14
     BY:  NEIL A. CAPOBIANCO, ESQ.
15        212-801-9302                 (Telephone)
          capobiancon@gtlaw.com        (E-mail)
16        212-805-5501                 (Fax)

17

18

19

20

21

22

23

24

25

d4eb2829-95d7-4eb9-b7f3-8e068ed87164

1           SIEGEL

2    informed of that?

3           A.    I don't.

4           Q.    Do you remember when your first

5    night of work was?

6           A.    Yes.  It was a Wednesday.  The

7    beginning of May.  I don't know the date.

8           Q.    If you look at Siegel Exhibit 1,

9    does that help you identify what day it was?

10          A.    Yes, it does.

11          Q.    What day was it?

12          A.    Wednesday, May 2nd.

13          Q.    What happened -- who told you what

14   time you were supposed to come to work?

15          A.    I don't remember.

16          Q.    Do you remember seeing a schedule?

17          A.    No.

18          Q.    Do you remember seeing a schedule

19   at any point that you were there?

20          A.    No.

21          Q.    How did you generally know when you

22   were supposed to go to work next?

23          A.    I know I got my schedule from Gus.

24   I don't remember if it was over the phone or in

25   person.

d4eb2829-95d7-4eb9-b7f3-8e068ed87164

1          SIEGEL

2          Q.      So at some point Gus told you

3    verbally when to come in?

4          A.      Yes.

5          Q.      When you were in any of the

6    non-customer areas of the club, did you ever

7    notice any postings on the wall?

8          A.      No.  Actually, to amend that, yes.

9    The dancer dressing room had a poster that I

10   noticed.

11         Q.      Of what?

12         A.      Of the stage fees.

13         Q.      Anything else?

14         A.      Not that I recall.

15         Q.      I'd like to show you --

16         MR. CAPOBIANCO:  I'd like to have

17   this marked as Siegel Exhibit 4.

18         (Siegel Exhibit 4 for

19   identification, document.)

20         Q.      With respect to Siegel Exhibit 4,

21   did you ever notice while you were working at

22   Go West that this document was posted on any

23   wall in any of the non-customer areas of the

24   club?

25         A.      No.

1                       SIEGEL

2          Q.    Did you come to have an

3     understanding that you would be making 4.60 per

4     hour plus tips?

5          A.    Yes.

6          Q.    When did you arrive at that

7     understanding?

8          A.    I don't remember.

9          Q.    Do you remember how you came to

10    understand that?

11         A.    I think it was just an assumption

12    that I made.

13         Q.    An assumption based on what?

14         A.    Based on previous employment.

15         Q.    So your first day of employment was

16    May 2nd.

17         A.    Yes.

18         Q.    What happened on May 2nd when you

19    appeared at the club?  Well, let me ask you

20    this.  Did you come in what you called your

21    uniform?

22         A.    No.

23         Q.    You did not?

24         A.    No.

25         Q.    Did you bring it with you?

1                          SIEGEL

2          A.     Yes.

3          Q.     So you came in street clothes and

4     changed into it in -- where?

5          A.     In the women's bathroom.

6          Q.     In the women's bathroom.   Okay.

7     Did you clock in on that occasion?

8          A.     Yes.

9          Q.     Is that the first time that you

10    clocked in?

11         A.     Yes.

12         Q.     And do you remember what time you

13    were supposed to be at work on your first day?

14         A.     Seven o'clock.

15         Q.     Were you on time?

16         A.     No.  I was not.

17         Q.     You were late?

18         A.     Yes.

19         Q.     Do you remember why?

20         A.     I had the time wrong.  I thought it

21    was 7:30.

22         Q.     Prior to actually starting work,

23    how were you informed what to wear to work?

24         A.     I was given a uniform.

25         Q.     And that was just by one of the

d4eb2829-95d7-4eb9-b7f3-8e068ed87164

                            SIEGEL

1

2    other waitresses on your first training day?

3         A.    No.  It wasn't.

4         Q.    How did you -- who gave you the

5    uniform?

6         A.    It was a host.

7         Q.    The host gave you the uniform.  And

8    that was just for your first session of

9    training?

10        A.    Yes.

11        Q.    And then you said you had to trade

12   skirts with somebody?

13        A.    Yes.

14        Q.    Was somebody else wearing a skirt?

15        A.    Yes.

16        Q.    And you had to go, both, into the

17   bathroom and trade skirts?

18        A.    Yes.

19        Q.    What did the work outfit look like?

20        A.    It was a corset that zipped up the

21   front and laced up the back.  And then a skort

22   (sic).  It's a skirt with kind of built-in

23   underwear, I guess you could call it.

24        Q.    What color?

25        A.    Black.

1           SIEGEL

2      Q.    Any other aspect to this work

3    outfit?

4      A.    Yes.

5      Q.    What?

6      A.    Tights and black boots.

7      Q.    Were you supplied with the tights?

8      A.    No.

9      Q.    Were you informed that you needed

10   to wear tights?

11     A.    Yes.

12     Q.    Could the tights be of any color?

13     A.    As far as I know.

14     Q.    Did you own a pair of tights?

15     A.    Yes.

16     Q.    Who informed you that you needed to

17   wear tights?

18     A.    That, I don't remember.

19     Q.    Who informed you that you needed to

20   wear black boots?

21     A.    I don't recall exactly.

22     Q.    Were you required to wear black

23   boots as opposed to other type of black

24   footwear?

25     A.    Yes.

Page 50

1                              SIEGEL

2       Q.    Did you own a pair of black boots?

3       A.    Yes.

4       Q.    And when you first -- when you

5    showed up for work on your first night of

6    training, did you -- were you wearing tights

7    and black boots?

8       A.    Yes.

9       Q.    Did you --

10       A.    No.  I wasn't wearing them.

11       Q.    Did you have to change into tights

12    and black boots on your first night of

13    training?

14       A.    Yes.

15       Q.    You did.

16       A.    Yes.

17       Q.    Where did you obtain those items?

18       A.    I had brought them with me, so Gus

19    must have told me that I needed to wear them.

20       Q.    Did Gus also tell you there was a

21    black outfit that they would provide you with?

22       A.    I don't remember.

23       Q.    This black outfit that you were

24    required to wear, did you ever wear it outside

25    of work?

d4eb2829-95d7-4eb9-b7f3-8e068ed87164

1                        SIEGEL

2        A.    No.

3        Q.    Did you ever wear it to or from

4    work?

5        A.    No.

6        Q.    Did you pay for it?

7        A.    No.

8        Q.    Do you still have it?

9        A.    No.

10        Q.    What did you do with it?

11        A.    I returned it to the establishment

12    upon leaving.

13        Q.    On the day you left?

14        A.    Yes.

15        Q.    Is the work outfit that you were

16    given something that you felt you could wear

17    outside of the establishment?

18        A.    No.

19        Q.    Why not?

20        A.    It was too revealing.

21        Q.    Too revealing for your personal

22    taste?

23        A.    Yes.

24        Q.    Is it something that you could see

25    other women wearing out in an evening in

1                       SIEGEL

2    Manhattan?

3         A.    No.  Not that I have seen.

4         Q.    Not that you have seen?  You work

5    in other bars in Manhattan; right?

6         A.    Yes.

7         Q.    You've never seen women coming in

8    dressed as the work outfit at Scores?

9         A.    No.

10        Q.    When you arrived for your first day

11   of work, did you need to fill out any

12   paperwork?

13        A.    I don't remember.

14        Q.    Do you remember if you filled out

15   any papers other than the application at any

16   point in time?

17        A.    I don't.

18             MR. CAPOBIANCO:  I'd like to have

19        this marked as Siegel 5.

20             (Siegel Exhibit 5 for

21        identification, document.)

22        Q.    Is this your signature on Siegel

23   Exhibit 5?

24        A.    Yes, it is.

25        Q.    Do you know what this document is?

Page 53

SIEGEL

1
2    A.    I don't understand the question.
3    Q.    Do you know what this is that you
4    signed?
5    A.    Can you rephrase?
6    Q.    Did you receive an employee
7    handbook --
8    A.    Yes.
9    Q.    -- on or about May 2nd of 2007?
10   A.    Yes.
11   Q.    Do you remember when you received
12   it?
13   A.    I received it prior to May 2nd, on
14   the second day of my training.
15   Q.    You received it on the second day
16   of your training?
17   A.    Yes.
18   Q.    Did you review the employee
19   handbook?
20   A.    A bit.
21   Q.    When was that?
22   A.    During the night.
23   Q.    Did you take it home with you?
24   A.    I did.
25   Q.    Do you still have it?

d4eb2829-95d7-4eb9-b7f3-8e068ed87164

1                          SIEGEL

2      you objected to the tip-sharing?

3          A.    That's not exactly fair to say.

4          Q.    What would you -- explain to me

5      what -- how your pay, your compensation from Go

6      West differed from what you would consider full

7      compensation for your work.

8          A.    Well, the number of hours that I

9      worked that I wasn't paid for, including

10     training days, as well as their failure to

11     allow me to exchange diamond dollars.

12         Q.    Anything else?

13         A.    Can you repeat the main question?

14         Q.    Sure.  How is it that you feel that

15     the compensation you received from Go West

16     differed from what you would consider full

17     compensation for your work?

18         A.    Oh.  Also that I had to provide

19     elements of what they required me to wear as a

20     uniform.

21         Q.    That you had to provide elements?

22         A.    Yes.

23         Q.    What elements are those?

24         A.    They required me to wear tights and

25     boots which, had I not owned, I would have had

1                          SIEGEL

2    to purchase.  And there were also theme nights

3    that required additional clothing.

4           Q.    Did you work any of those theme

5    nights?

6           A.    I did.

7           Q.    What theme night did you work?

8           A.    I worked the American Beauties

9    promotion --

10          Q.    Okay.

11          A.    -- which required that we be

12   dressed in red, white, & blue, or some kind of

13   outfit inspired by Americana.  The examples

14   given were a flag dress, some kind of military

15   outfit, or a Betsy Ross costume.

16          Q.    What night was that?

17          A.    It was the week of Memorial Day.

18          Q.    Did you end up purchasing such a --

19          A.    I did not, but I know people who

20   did.

21          Q.    Who is it that described what it

22   was that you would need to wear on that day?

23          A.    There was a memo.

24          Q.    A memo?

25          A.    Yes.

1          SIEGEL

2     Q.     Did you keep the memo?

3     A.     No.  It was not distributed.  It

4  was posted in the waiters' station.

5     Q.     Any other way in which the

6  compensation you received from Go West differed

7  from what you would define as full compensation

8  for your work?

9     A.     Not that I recall.

10    Q.     What are you hoping to accomplish

11 by this lawsuit?

12    A.     Getting compensation for those

13 employees in the class whose damages have built

14 up over time, and preventing illegal wage

15 practices in the future.

16    Q.     When did you first consider

17 bringing a lawsuit?

18    A.     I didn't -- it wasn't my idea to

19 bring it.  I don't know if that's what you're

20 asking.

21    Q.     Whose idea was it to bring the

22 lawsuit?

23    A.     I'm not sure.  I joined after it

24 was in progress.

25    Q.     Let me ask you this: Did somebody

d4eb2829-95d7-4eb9-b7f3-8e068ed87164

Page 95

1                          SIEGEL

2      believe that it's not accurate?

3           A.    No.

4           Q.    At the time you got this check, did

5      you compare the hours' listing with what you

6      recall about the shifts you worked?

7           A.    No.

8           Q.    So with respect to the hours that

9      were recorded for your work and what you say

10     you worked, are the only differences what you

11     referred to as training and then the delay in

12     getting your card on your first day of work on

13     May 2nd?

14          A.    As far as I can tell.

15          Q.    By the way, what is the card that

16     you were referring to?

17          A.    A server card.

18          Q.    A what --

19          A.    Server card.

20          Q.    What function did it perform?

21          A.    It allowed me to access the menu

22     screens on the computer.

23          Q.    So could you place orders?

24          A.    Yes.

25          Q.    And did it also serve a

d4eb2829-95d7-4eb9-b7f3-8e068ed87164

1              SIEGEL

2    time-keeping function?

3         A.    Yes.

4         Q.    So you were supposed to punch in

5    and punch out using it?

6         A.    Yes.

7         Q.    After you received the card, was it

8    your practice to come in and punch in

9    immediately?

10        A.    No.

11        Q.    What was your practice?

12        A.    I came in.  I changed into my

13   uniform, put my bag and coat in the coat check

14   area, and then punched in.

15        Q.    And what about punching out?  What

16   was your punch-out process?

17        A.    I don't remember exactly, but I

18   remember punching out and then changing out of

19   my uniform and into my street clothes.

20        Q.    What about picking up your coat and

21   bag?

22        A.    That happened after I was changed

23   out of my uniform, unless I had to get my

24   clothes from my bag.

25        Q.    Did you keep your clothes in a

d4eb2829-95d7-4eb9-b7f3-8e068ed87164

1                          SIEGEL

2      locker?

3           A.    No.

4           Q.    Did you have a locker?

5           A.    No.

6           Q.    Let's talk about the end-of-night

7      process.  You talked about the sharing of tips

8      at the end of the night.  Did you physically

9      hand the tips that you were sharing with the

10     other workers, yourself?

11          A.    No.

12          Q.    How did that happen?

13          A.    The other waitress that I was

14     working with either handed it directly to the

15     busers or the bartender or to the host who then

16     distributed it.

17          Q.    Were you sharing tips with anyone

18     other than the busers and the bartenders?

19          A.    And the other waitress?

20          Q.    And the other waitress.

21          A.    No.

22          Q.    So the tips that you received

23     personally were shared only with the -- your

24     partner waitress, the busers, and the

25     bartenders?

1    SIEGEL

2    Q.    We can look back at this page P 262

3    or any of the other documents in Exhibit 9 for

4    this question.  Were there any other deductions

5    from your wages, other than the ones that are

6    recorded here on this document?

7    A.    I don't understand your question.

8    Q.    Did you suffer any deductions from

9    your wages, somebody taking parts of your wage,

10    other than what's recorded as a deduction and

11    reimbursement here on this document?

12    A.    Not that I know of, but it could

13    have happened without my knowledge.

14    Q.    Well, what could have happened

15    without your knowledge?

16    A.    I didn't know the total credit card

17    tip number.  I only know what came in my

18    paycheck.  So anything is possible.

19    Q.    Any other aspect of what you don't

20    know that could have resulted in a deduction

21    from your wage?

22    A.    I don't understand your question.

23    Q.    You gave me an example of something

24    that you don't know but could have resulted in

25    a deduction from your wage.

1                             SIEGEL

2          A.    Yes.

3          Q.    I'm asking if there's any other

4   theoretical possibility you have that something

5   was improperly deducted from your wages.

6          A.    Well, had I cashed in diamond

7   dollars, there would have been deductions.

8          Q.    How do you know that?

9          A.    It was what two different people

10  said.

11         Q.    And who were they?

12         A.    One was a waitress and one was a

13  bus boy.

14         Q.    And what did they tell you?

15         A.    They said that 10 percent was taken

16  off the top by the club.  And then taxes were

17  also taken out.

18         Q.    So did you understand that when you

19  cashed in diamond dollars, you would be

20  receiving cash right then and there?

21         A.    That was my understanding.

22         Q.    Did you ever work at any other

23  clubs that have the Scores name?

24         A.    No.

25         Q.    Do you have any knowledge of the

                        SIEGEL

1

2    practices at the other clubs that used the

3    Scores name?

4        A.    No.

5        Q.    Who would you consider to be your

6    supervisors when you worked at Go West?

7        A.    Gus and Spiro.

8        Q.    Gus and Spiro.  Anyone else?

9        A.    Not that I can recall.

10        Q.    Did you take instructions or

11    receive instructions on how to do your job from

12    anyone else?

13        A.    What kind of instructions?

14        Q.    Any type of instruction.

15    Work-related instruction.

16        A.    Sometimes waitresses or bartenders.

17        Q.    What about the host?

18        A.    The host -- I don't remember.

19        Q.    We haven't talked too much about

20    Spiro.  What was the nature of your

21    interactions with Spiro?

22        A.    He was one of the managers.

23        Q.    Right.

24        A.    I --

25        Q.    Did you specifically have any

d4eb2829-95d7-4eb9-b7f3-8e068ed87164