# Exhibit DDD

1 A P P E A R A N C E S:

2

3 OUTTEN & GOLDEN LLP

4 Attorneys for the Witness and Plaintiffs

5      Three Park Avenue
       New York, New York   10016
6
  BY:  TAMMY MARZIGLIANO, ESQ.
7      212-245-1000         (Telephone)
       tm@outtengolden.net   (E-mail)
8      212-977-4005        (Fax)

9

10

11 GREENBERG TRAURIG LLP

12 Attorneys for the Defendants

13     200 Park Avenue
       New York, New York   10166
14
  BY:  NEIL A. CAPOBIANCO, ESQ.
15      212-801-9302        (Telephone)
       capobiancon@gtlaw.com  (E-mail)
16      212-805-5501        (Fax)

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x
SIRI DIAZ, CAROLYN SIEGEL, TALIA BUMB,
BLERTA VIKKI, DANIELLE OWIMRIN, on
behalf of themselves and all others
similarly situated,

                              Plaintiffs,

          - against -

SCORES HOLDING COMPANY, INC., GO WEST
ENTERTAINMENT, INC., a/k/a SCORES WEST
SIDE; and SCORES ENTERTAINMENT, INC.,
a/k/a SCORES EAST SIDE,

                              Defendants.
Case No. 07 Civ. 8718 (RMB)
------------------------------------x

                    200 Park Avenue
                    New York, New York


                    January 8, 2008
                    10:25 a.m.



          Deposition of CAROLYN J. SIEGEL,

before Marlene Lee, CSR, CRR, a Notary Public

of the State of New York.




          ELLEN GRAUER COURT REPORTING CO. LLC
             126 East 56th Street, Fifth Floor
                New York, New York 10022
                      212-750-6434
                      REF: 86395

Page 44

```
 1                    SIEGEL
 2 informed of that?
 3      A.    I don't.
 4      Q.    Do you remember when your first
 5 night of work was?
 6      A.    Yes.  It was a Wednesday.  The
 7 beginning of May.  I don't know the date.
 8      Q.    If you look at Siegel Exhibit 1,
 9 does that help you identify what day it was?
10      A.    Yes, it does.
11      Q.    What day was it?
12      A.    Wednesday, May 2nd.
13      Q.    What happened -- who told you what
14 time you were supposed to come to work?
15      A.    I don't remember.
16      Q.    Do you remember seeing a schedule?
17      A.    No.
18      Q.    Do you remember seeing a schedule
19 at any point that you were there?
20      A.    No.
21      Q.    How did you generally know when you
22 were supposed to go to work next?
23      A.    I know I got my schedule from Gus.
24 I don't remember if it was over the phone or in
25 person.
```

1                          SIEGEL

2        Q.     So at some point Gus told you

3 verbally when to come in?

4        A.     Yes.

5        Q.     When you were in any of the

6 non-customer areas of the club, did you ever

7 notice any postings on the wall?

8        A.     No.  Actually, to amend that, yes.

9 The dancer dressing room had a poster that I

10 noticed.

11       Q.     Of what?

12       A.     Of the stage fees.

13       Q.     Anything else?

14       A.     Not that I recall.

15       Q.     I'd like to show you --

16              MR. CAPOBIANCO:  I'd like to have

17       this marked as Siegel Exhibit 4.

18              (Siegel Exhibit 4 for

19       identification, document.)

20       Q.     With respect to Siegel Exhibit 4,

21 did you ever notice while you were working at

22 Go West that this document was posted on any

23 wall in any of the non-customer areas of the

24 club?

25       A.     No.

```
 1                    SIEGEL
 2        Q.     Did you come to have an
 3 understanding that you would be making 4.60 per
 4 hour plus tips?
 5        A.     Yes.
 6        Q.     When did you arrive at that
 7 understanding?
 8        A.     I don't remember.
 9        Q.     Do you remember how you came to
10 understand that?
11        A.     I think it was just an assumption
12 that I made.
13        Q.     An assumption based on what?
14        A.     Based on previous employment.
15        Q.     So your first day of employment was
16 May 2nd.
17        A.     Yes.
18        Q.     What happened on May 2nd when you
19 appeared at the club?  Well, let me ask you
20 this.  Did you come in what you called your
21 uniform?
22        A.     No.
23        Q.     You did not?
24        A.     No.
25        Q.     Did you bring it with you?
```

1                    SIEGEL

2 misconduct.

3        Q.    And when did you fill this out?

4        A.    The 2nd.

5        Q.    Did you have any occasion to report

6 any improper solicitation under this policy?

7        A.    No, I did not.

8              MR. CAPOBIANCO:  I'd like to take a

9        10-minute break.

10             (A brief recess was taken.)

11       Q.    Ms. Siegel, do you understand that

12 you're still under oath?

13       A.    Yes.

14       Q.    What were your job duties at Go

15 West?

16       A.    I was responsible for setting up

17 the room when I came in.

18       Q.    What room is this?

19       A.    The main lounge area.

20       Q.    Not the dining room?

21       A.    Not the dining room.

22       Q.    What else?

23       A.    Taking drink orders from customers

24 at tables.  Bringing them into the computer.

25 Picking up drinks from the bartender and

1                        SIEGEL

2 delivering them to the customer.  And then

3 closing out their checks, either with cash or

4 credit cards.

5        Q.    Did you ever mix drinks?

6        A.    No.

7        Q.    You never served as a bartender

8 when you were at Go West?

9        A.    No.

10        Q.    When you say you set up the room,

11 were you referring to the cocktail lounge?

12        A.    Yes.

13        Q.    Was there any other room from which

14 you took orders and delivered drinks?

15        A.    No.

16        Q.    Was your work outfit identical to

17 the work outfit worn by the bartenders?  Or did

18 it differ?

19        A.    There was some slight variation.

20        Q.    What were the slight variations?

21        A.    As I recall, my skirt was an old

22 model.

23        Q.    You mean your skort?

24        A.    Yes.

25        Q.    Any other differences?

```
 1                    SIEGEL

 2      A.     The corset may have been different

 3 as well.

 4      Q.     Was that the sum and substance of

 5 the job duties, what you've testified to, when

 6 you worked at Go West?

 7      A.     What do you mean by "sum and

 8 substance"?

 9      Q.     Was there anything else that you

10 did besides what you described?

11      A.     Not that I recall.

12      Q.     Did you ever work more than 10

13 hours in a single day?

14      A.     Not more than 10.  No.

15      Q.     At Go West did anyone ever share

16 any tips that they had received with you?

17      A.     Yes.

18      Q.     And who did that?

19      A.     The waitress that was my waitress

20 partner for the night.

21      Q.     So on any given evening, you'd be

22 working with another waitress?

23      A.     Sometimes, but not always.

24      Q.     And then when you were at Go West,

25 did you ever share any of your tips that you
```

Page 58

1                    SIEGEL

2 received with anyone else?

3        A.     Yes.

4        Q.     Who?

5        A.     The waitress that I was working

6 with, and also the bartenders and the busers.

7        Q.     And the busers?  Like the bus boy?

8        A.     Yes.

9        Q.     Were there any women working as bus

10 boys?

11        A.     No.

12        Q.     Have you ever worked anywhere else

13 where tips received by one person were shared

14 with another person?

15        A.     Yes.

16        Q.     Where was that?

17        A.     A place called Varietal.

18        Q.     Where is that located?

19        A.     It's not located anymore.  It

20 closed.

21        Q.     Where was it?

22        A.     It was on West 25th Street.

23        Q.     In Manhattan?

24        A.     Yes.

25        Q.     How many days did you actually work

1                          SIEGEL

2 for"?

3        Q.      Well, let's just take it from --

4 let's say -- what time did Scores close?

5        A.      4:00 in the morning.

6        Q.      4:00 in the morning.  What were

7 your duties and responsibilities after -- at

8 the time of business closing?

9        A.      Cleaning up and wiping down the

10 tables.  Replacing the chairs and the tables in

11 the correct formation.  And -- yeah, that was

12 about it until we counted the money.

13       Q.      When you say "we counted the

14 money," who are you including in the "we"?

15       A.      Waitresses.  And there was a host

16 present as well.  And the bartenders.

17       Q.      Host, plus the waitresses and the

18 bartenders.

19       A.      Yes.

20       Q.      When you say "counted the money,"

21 are you referring just to tips?  Or are you

22 referring to some other form of money?

23       A.      I don't know what the bartenders

24 did, but the waitresses just counted tips.

25       Q.      Were you just counting with the

Page 64

1                          SIEGEL

2 other waitresses?  Or were you with the

3 bartenders at the time the money was counted?

4        A.      We were physically in the same

5 space, but the money was not together.

6        Q.      So did you and the other waitress

7 pool the tips that you had received?

8        A.      There were a few different

9 waitresses.  We didn't all pool together.

10 Usually it worked in pairs.  So I would pool

11 with the person who was my partner for the

12 night.  Or if there were two girls, the three

13 of us would pool, and then there would be other

14 girls who were separate.

15        Q.      And tell me what the practice of

16 pooling involved.  How did this work?

17        A.      All of the tips during the night

18 went into slots in a locked box that was

19 divided into five different sections.  So we

20 each had our designated section for the night.

21 So at the end of the night the host would

22 unlock the box and we would take our cash tips

23 from our section and count it.  And then the

24 host would tell us how much out of our tips to

25 give to the busers and the bartenders.

Page 65

1                          SIEGEL

2        Q.     Did you at any time record how much

3 you received in cash tips?

4        A.     No.

5        Q.     You never recorded that.

6        A.     No.

7        Q.     So did you ever receive any credit

8 card tips?

9        A.     Yes.

10       Q.     And how were those paid to you?

11       A.     Those came in a paycheck.

12       Q.     Do you remember the name of any of

13 the hosts with whom you worked?

14       A.     One host was named Alex.  I don't

15 remember any other names.

16       Q.     So if I understand this correctly,

17 the lockbox was opened by the host.  Every

18 waitress took out the tips that were designated

19 for them.  You counted the cash tips.  Was

20 there anything in there besides cash?

21       A.     Yes.

22       Q.     What?

23       A.     Diamond dollars.

24       Q.     So would you count the cash and the

25 diamond dollars together?  Or separately?  Or

1                    SIEGEL

2 how was that counted?

3        A.     I don't remember.

4        Q.     But you counted -- you counted your

5 tips.  You reported to the host how much you

6 had, as did the other waitresses, presumably,

7 and the bartenders?

8        A.     Yes.

9        Q.     Did you notice if the host was

10 writing these numbers down?

11       A.     He was.

12       Q.     And then you said the host told you

13 how much to give the busers and the bartenders.

14       A.     Yes.

15       Q.     And how much was it?  Was it a

16 fixed percent of what you took in?  Or was it a

17 variable amount?  Or did you --

18       A.     I think it was a fixed percent.

19       Q.     Do you know what that was?

20       A.     Twenty percent to the bartenders,

21 and 10 percent to the busers.

22       Q.     You said 20 percent to the

23 bartenders and -- how much to the busers?

24       A.     Ten percent.

25       Q.     Did you ever attempt to exchange a

Page 67

1                    SIEGEL

2 diamond dollar?

3      A.    Yes.

4      Q.    Tell me about that.

5      A.    I started my shift, and I asked, if

6 I remember -- I think it was a waitress -- how

7 we exchange them.  And she said listen for the

8 announcement from the DJ.  And at the end of

9 the night I hadn't heard it.  And so I asked a

10 host -- I don't know if it was that same night

11 or the next time I went in.  And he said, "Oh,

12 it can only be done at that specific time of

13 the night.  You have to listen for the

14 announcement," which, again, I never heard.

15             And on a third occasion, I asked --

16 I believe it was another host.  And he said,

17 "You have to wait for the announcement."  And

18 again, I was unable to exchange them.

19      Q.    In the tip-counting process, did

20 you ever see anyone give in diamond dollars at

21 that point?

22      A.    No.

23      Q.    So do I understand correctly you

24 asked three different people, two hosts and one

25 waitress, how you exchange diamond dollars, and

Page 68

1                     SIEGEL

2 they all said you have to wait for an

3 announcement by the DJ?

4        A.     Yes.

5        Q.     And you never heard an

6 announcement?

7        A.     No.

8        Q.     Did you ever ask anyone else?

9        A.     Yes.  After I had left and went

10 back to pick up a paycheck, I asked if I could

11 cash them in.  And I was told I could not

12 because I was no longer employed there.

13       Q.     Who did you ask?

14       A.     The person at the door.

15       Q.     Who was that?

16       A.     I don't remember.

17              MR. CAPOBIANCO:  I'd like to have

18       this marked as Siegel Exhibit 8.

19              (Siegel Exhibit 8 for

20       identification, diamond dollar.)

21       Q.     Ms. Siegel, do you recognize this

22 document that has been marked as Siegel Exhibit

23 8?

24       A.     Yes.

25       Q.     Is this a document or is this a

Page 69

1                    SIEGEL

2 copy of something you turned over to your

3 attorney?

4        A.     It appears to be.

5        Q.     Is this what the diamond dollar

6 that you received looked like?

7        A.     Yes.

8        Q.     Did all three of the ones you

9 received look the same?

10       A.     Yes.

11       Q.     Do you still possess those three

12 diamond dollars?

13       A.     No.

14       Q.     Where are they?

15       A.     Two I gave to my attorney.  One was

16 misplaced.

17       Q.     But they all look the same?

18       A.     Yes.

19       Q.     Did you review your paycheck when

20 you received it?

21       A.     Yes.

22       Q.     How many paychecks did you receive

23 while you worked for Scores?

24       A.     While I worked there?  Or after I

25 no longer worked there?

1                    SIEGEL

2        Q.    We can look back at this page P 262

3 or any of the other documents in Exhibit 9 for

4 this question.   Were there any other deductions

5 from your wages, other than the ones that are

6 recorded here on this document?

7        A.    I don't understand your question.

8        Q.    Did you suffer any deductions from

9 your wages, somebody taking parts of your wage,

10 other than what's recorded as a deduction and

11 reimbursement here on this document?

12        A.    Not that I know of, but it could

13 have happened without my knowledge.

14        Q.    Well, what could have happened

15 without your knowledge?

16        A.    I didn't know the total credit card

17 tip number.   I only know what came in my

18 paycheck.   So anything is possible.

19        Q.    Any other aspect of what you don't

20 know that could have resulted in a deduction

21 from your wage?

22        A.    I don't understand your question.

23        Q.    You gave me an example of something

24 that you don't know but could have resulted in

25 a deduction from your wage.

Page 100

```
 1                    SIEGEL

 2      A.    Yes.

 3      Q.    I'm asking if there's any other

 4 theoretical possibility you have that something

 5 was improperly deducted from your wages.

 6      A.    Well, had I cashed in diamond

 7 dollars, there would have been deductions.

 8      Q.    How do you know that?

 9      A.    It was what two different people

10 said.

11      Q.    And who were they?

12      A.    One was a waitress and one was a

13 bus boy.

14      Q.    And what did they tell you?

15      A.    They said that 10 percent was taken

16 off the top by the club.  And then taxes were

17 also taken out.

18      Q.    So did you understand that when you

19 cashed in diamond dollars, you would be

20 receiving cash right then and there?

21      A.    That was my understanding.

22      Q.    Did you ever work at any other

23 clubs that have the Scores name?

24      A.    No.

25      Q.    Do you have any knowledge of the
```

```
 1                    SIEGEL
 2 practices at the other clubs that used the
 3 Scores name?
 4      A.    No.
 5      Q.    Who would you consider to be your
 6 supervisors when you worked at Go West?
 7      A.    Gus and Spiro.
 8      Q.    Gus and Spiro.  Anyone else?
 9      A.    Not that I can recall.
10      Q.    Did you take instructions or
11 receive instructions on how to do your job from
12 anyone else?
13      A.    What kind of instructions?
14      Q.    Any type of instruction.
15 Work-related instruction.
16      A.    Sometimes waitresses or bartenders.
17      Q.    What about the host?
18      A.    The host -- I don't remember.
19      Q.    We haven't talked too much about
20 Spiro.  What was the nature of your
21 interactions with Spiro?
22      A.    He was one of the managers.
23      Q.    Right.
24      A.    I --
25      Q.    Did you specifically have any
```